[If you need additional space for ANY section, please attach an additional sheet and reference that section.]



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

RECEIVED

JAN 16 2019 *JJ*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Edward Jones Junior
1607 "N" Berwick Blvd apt #1-E
Waukegon, Illinois 60085

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

**1:19-cv-00317**
**Judge Gary Feinerman**

vs.

Ca **Magistrate Judge Maria Valdez**

1) Federal Personal (OIG) 950 pensyraini
2) Visid of or Department
Waukegon County Personal (OIG) Lake County Health department
VAC, Personal
3) State Personal (OIG) military vateron Rights Beaura
4) Hud-VAsh personal 42 USC 200a
5) First midwest Bonk
6) Chase Bonh

(Enter above the full name of ALL
defendants in this action. <u>Do not</u>
use "et al.")

**CHECK ONE ONLY:**

_____     **COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
U.S. Code** (state, county, or municipal defendants)

___X___     **COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
28 SECTION 1331 U.S. Code** (federal defendants)

_____     **OTHER** (cite statute, if known)

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR
FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

I.    **Plaintiff(s):**

A.    Name: _Edward Jones Junior_

B.    List all aliases: _NOT a prisoner_

C.    Prisoner identification number: _NOT a prisoner_

D.    Place of present confinement: _Not a prisoner_

E.    Address: _____

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II.   **Defendant(s):**
      (In **A** below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in **B** and **C**.)

A.    Defendant: _____

      Title: _____

      Place of Employment: _____

B.    Defendant: _____

      Title: _____

      Place of Employment: _____

C.    Defendant: _____

      Title: _____

      Place of Employment: _____

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

2                                                          Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**III.** **List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

A. Name of case and docket number: _Civil Docket # Case# 15CV4219_

B. Approximate date of filing lawsuit: _5 years ago Chase Bank_

C. List all plaintiffs (if you had co-plaintiffs), including any aliases: _____

D. List all defendants: _____

E. Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): _____

F. Name of judge to whom case was assigned: _____

G. Basic claim made: _____

H. Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): _____

I. Approximate date of disposition: _____

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Case: 1:19-cv-00317 Document #: 1 Filed: 01/16/19 Page 4 of 149 PageID #:4

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## IV.   Statement of Claim:

State here as briefly as possible the facts of your case. Describe how each defendant is involved, including names, dates, and places. **Do not give any legal arguments or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets if necessary.)

This Matter is Beeing petition pro-see civil Docket in violation plaintiff Civil Right AND Constitutional Right pursuant To Title 42 USC 2000 (E)(b) (I) Action 1983 Hud-houseing,

Theif of Property 1997 Ford VAN Taken From Property at Plaintiff Address The next day After it was purchose AND his 1997 Jeep Criminal Charges were File, springfield Illinois

The Ford Mortor Company Refuse To fix The Break offer it was Towed Again And Again. Libertiville, Illinois

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

evidents docoment are attacked, Lisa midigan
have MRI CD she refuse to return, plaintoff
have reasion to belkive State Employee are
holding issure one compamy checks 4,000.
Pbm enriident on File 01/07/2017.

Complonts were file vkure The automotive Repair
Plavd begoin ond reported They cut The mileage
goge, That way They Con use it, steel The property
use stand bring it Boah keys were made
egnition, AND Door key, they got My Address
AND start to Release Break pluid, Threw The
vale on The Caliber, right side.

These people have Been hanceing Edword Jones
Debt Card, Greate Lake Credit Account, file
with Erica Black Hitchenton 450 GoldenGate
SAN FRANCISCO, CaliForria DIAnn
Fiestiene MAyor Then Doughtor my
Teacher at 536 mission street elegall
retailiate because I File Pro-see Complonts
350.millsion dollar Bi As A dutude Toward
men. General Assistonce 4 2vscHouseing
Food stamps, Federal ASSisted funded Projects
C-I officon cydate Hireing Practices
discrimintory Veterons VA alse.

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**V.** **Relief:**

State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.

42 USC 2000 Action 1983 -1b
42 USC consitional Houseing
42 USC
29 CFR 3.1 AND 3.2 Advancement of Religion Copyrights 21% of each
9 Pont, 39 USC 502(a) - 1132
General.

**VI.** The plaintiff demands that the case be tried by a jury. ☐ YES ☐ NO

no sure

## CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief. I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this ___Tuesday___ day of ___January___ 20_19_

Edward Jones Junior

(Signature of plaintiff or plaintiffs)

Edward Jones Junior

(Print name)

_____

(I.D. Number)

_____

_____

1607 "N" Berwick Blvd #1-E Waukegon, Illinois

(Address)

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Clerk Complaint Packet

① Complaint (2 +1 each Def. (8)

② Summons (2 each Def.

③ USm-285's (2 for each Def.

④ Motion for IFP - (2)

⑤ Motion For Attorney Rep. (2)

⑥ Civil Cover Sheet

⑦ Appearance

 # COPY/CERTIFICATE SERVICES REQUEST FORM

**Terminal No.** _____      **Date** _____

| | |
|---|---|
| Name | |
| Firm Name | |
| Address | |
| Telephone # | |
| Case # | |
| Case Title | |

| Request Type | Price Per Item | Quantity | Total |
|---|---|---|---|
| Copies printed from terminal | $0.10 | | |
| Copies printed by Intake Desk clerk | $0.50 | | |
| Photocopies (per page) | $0.50 | | |
| Certification of Documents | $11.00 | | |
| Exemplification of Documents | $22.00 | | |
| Apostille | $33.00 | | |
| Certificate of Good Standing | $19.00 | | |
| Certificate of Admission | $19.00 | | |
| Certificate of Search | $31.00 | | |
| Certification of Judgment | $11.00 | | |
| Retrieval of Case File/Docket Sheet – 1st box | $64.00 | | |
| Retrieval of Case File/Docket Sheet – additional boxes | $39.00 | | |
| *Federal Record Center* SmartScan – non-certified copies, only. Per page fee $0.65 | $19.90 $0.65 | | |

**Total Due**

_____
*Signature of Deputy Clerk*

Rev. 09182017



**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF ILLINOIS
219 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60604

**THOMAS G. BRUTON**
CLERK

CASE NUMBER_____N/A_____

The enclosed document was submitted to this court. However, it is being returned to you. The document does not appear to be in compliance with federal or local rule, as indicated below.

☐　The document(s) being returned are discovery materials. Pursuant to Local Rule 26.3 of this court, discovery materials are not to be filed except by order of court.

☐　The document(s) being returned were inadvertently delivered to this court instead of the court noted in the heading on the pleading.

☐　Subpoenas are not filed with the Clerk's Office

☐　Rockford filings are to be filed in the Western Division at 327 S. Church Street, Rockford, Illinois 61101

☐　The document(s) being returned were inadvertently lost or damaged in the mail and delivered to this court.

☒　The document(s) being returned requires further information. Please provide the case number, judge's name and case title.

☐　Please review the enclosed Guide for Pro Se Litigant for filing a civil case.

☐　The enclosed documents were delivered to the Court's overnight drop box on _____.
We have attempted to contact you at the phone number listed on the documents with no results. It is unclear as to what the request may be, therefore, we are returning these documents to you. Please contact our office should you need further assistance.

Please include a case
number or let us know
what these documents are
for. Additionally please
bind your documents
per the local rule.

**THOMAS G. BRUTON, Clerk**

By:_____
Deputy Clerk



**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF ILLINOIS
219 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60604

**THOMAS G. BRUTON**
CLERK

CASE NUMBER _____N/A_____

The enclosed document was submitted to this court. However, it is being returned to you. The document does not appear to be in compliance with federal or local rule, as indicated below.

☐   The document(s) being returned are discovery materials. Pursuant to Local Rule 26.3 of this court, discovery materials are not to be filed except by order of court.

☐   The document(s) being returned were inadvertently delivered to this court instead of the court noted in the heading on the pleading.

☐   Subpoenas are not filed with the Clerk's Office

☐   Rockford filings are to be filed in the Western Division at 327 S. Church Street, Rockford, Illinois 61101

☐   The document(s) being returned were inadvertently lost or damaged in the mail and delivered to this court.

☒   The document(s) being returned requires further information. Please provide the case number, judge's name and case title.

☐   Please review the enclosed Guide for Pro Se Litigant for filing a civil case.

☐   The enclosed documents were delivered to the Court's overnight drop box on _____.
We have attempted to contact you at the phone number listed on the documents with no results. It is unclear as to what the request may be, therefore, we are returning these documents to you. Please contact our office should you need further assistance.

Please include a case
number or let us know
what these documents are
for. Additionally please
bind your documents
per the local rule.

**THOMAS G. BRUTON, Clerk**

By: _____
Deputy Clerk

**(A)** has not adopted a funding improvement or rehabilitation plan under that section by the deadline established in such section, or

**(B)** fails to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section,

by an employer that has an obligation to contribute with respect to the multiemployer plan or an employee organization that represents active participants in the multiemployer plan, for an order compelling the plan sponsor to adopt a funding improvement or rehabilitation plan or to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section and the funding improvement or rehabilitation plan; or

**(11)** in the case of a multiemployer plan, by an employee representative, or any employer that has an obligation to contribute to the plan, (A) to enjoin any act or practice which violates subsection (k) of section 1021 of this title (or, in the case of an employer, subsection (*l*) of such section), or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection.

**(b) PLANS QUALIFIED UNDER INTERNAL REVENUE CODE; MAINTENANCE OF ACTIONS INVOLVING DELINQUENT CONTRIBUTIONS**

**(1)** In the case of a plan which is qualified under section 401(a), 403(a), or 405(a) [2] of title 26 (or with respect to which an application to so qualify has been filed and has not been finally determined) the Secretary may exercise his authority under subsection (a)(5) with respect to a violation of, or the enforcement of, parts 2 and 3 of this subtitle (relating to participation, vesting, and funding), only if—

**(A)** requested by the Secretary of the Treasury, or

**(B)** one or more participants, beneficiaries, or fiduciaries, of such plan request in writing (in such manner as the Secretary shall prescribe by regulation) that he exercise such authority on their behalf. In the case of such a request under this paragraph he may exercise such authority only if he determines that such violation affects, or such enforcement is necessary to protect, claims of participants or beneficiaries to benefits under the plan.

**(2)** The Secretary shall not initiate an action to enforce section 1145 of this title.

**(3)** Except as provided in subsections (c)(9) and (a)(6) (with respect to collecting civil penalties under subsection (c)(9)), the Secretary is not authorized to enforce under this part any requirement of part 7 against a health insurance issuer offering health insurance coverage in connection with a group health plan (as defined in section 1191b(a)(1) of this title). Nothing in this paragraph shall affect the authority of the Secretary to issue regulations to carry out such part.

**(c) ADMINISTRATOR'S REFUSAL TO SUPPLY REQUESTED INFORMATION; PENALTY FOR FAILURE TO PROVIDE ANNUAL REPORT IN COMPLETE FORM**

**(1)** Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 [2] of this title, section 1021(e)(1) of this title, section 1021(f) of this title, or section 1025(a) of this title with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal,

and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

**(2)** The Secretary may assess a civil penalty against any plan administrator of up to $1,000 a day from the date of such plan administrator's failure or refusal to file the annual report required to be filed with the Secretary under section 1021(b)(1) of this title. For purposes of this paragraph, an annual report that has been rejected under section 1024(a)(4) of this title for failure to provide material information shall not be treated as having been filed with the Secretary.

**(3)** Any employer maintaining a plan who fails to meet the notice requirement of section 1021(d) of this title with respect to any participant or beneficiary or who fails to meet the requirements of section 1021(e)(2) of this title with respect to any person or who fails to meet the requirements of section 1082(d)(12)(E) of this title with respect to any person may in the court's discretion be liable to such participant or beneficiary or to such person in the amount of up to $100 a day from the date of such failure, and the court may in its discretion order such other relief as it deems proper.

**(4)** The Secretary may assess a civil penalty of not more than $1,000 a day for each violation by any person of subsection (j), (k), or (*l*) of section 1021 of this title or section 1144(e)(3) of this title.

**(5)** The Secretary may assess a civil penalty against any person of up to $1,000 a day from the date of the person's failure or refusal to file the information required to be filed by such person with the Secretary under regulations prescribed pursuant to section 1021(g) of this title.

**(6)** If, within 30 days of a request by the Secretary to a plan administrator for documents under section 1024(a)(6) of this title, the plan administrator fails to furnish the material requested to the Secretary, the Secretary may assess a civil penalty against the plan administrator of up to $100 a day from the date of such failure (but in no event in excess of $1,000 per request). No penalty shall be imposed under this paragraph for any failure resulting from matters reasonably beyond the control of the plan administrator.

**(7)** The Secretary may assess a civil penalty against a plan administrator of up to $100 a day from the date of the plan administrator's failure or refusal to provide notice to participants and beneficiaries in accordance with subsection (i) or (m) of section 1021 of this title. For purposes of this paragraph, each violation with respect to any single participant or beneficiary shall be treated as a separate violation.

**(8)** The Secretary may assess against any plan sponsor of a multiemployer plan a civil penalty of not more than $1,100 per day—

**(A)** for each violation by such sponsor of the requirement under section 1085 of this title to adopt by the deadline established in that section a funding improvement plan or rehabilitation plan with respect to a multiemployer plan which is in endangered or critical status, or

**(B)** in the case of a plan in endangered status which is not in seriously endangered status, for failure by the plan to meet the applicable benchmarks under section 1085 of this title by the end of the funding improvement period with respect to the plan.

**(9)**

**(A)** The Secretary may assess a civil penalty against any employer of up to $100 a day from the date of the employer's failure to meet the notice requirement of section 1181(f)(3)(B)(i)(I) of this

title. For purposes of this subparagraph, each violation with respect to any single employee shall be treated as a separate violation.

· **(B)** The Secretary may assess a civil penalty against any plan administrator of up to $100 a day from the date of the plan administrator's failure to timely provide to any State the information required to be disclosed under section 1181(f)(3)(B)(ii) of this title. For purposes of this subparagraph, each violation with respect to any single participant or beneficiary shall be treated as a separate violation.

**(10) SECRETARIAL ENFORCEMENT AUTHORITY RELATING TO USE OF GENETIC INFORMATION.—**

**(A) General rule.—**
The Secretary may impose a penalty against any plan sponsor of a group health plan, or any health insurance issuer offering health insurance coverage in connection with the plan, for any failure by such sponsor or issuer to meet the requirements of subsection (a)(1)(F), (b)(3), (c), or (d) of section 1182 of this title or section 1181 or 1182(b)(1) of this title with respect to genetic information, in connection with the plan.

**(B) Amount.—**

**(i) In general.—**
The amount of the penalty imposed by subparagraph (A) shall be $100 for each day in the noncompliance period with respect to each participant or beneficiary to whom such failure relates.

**(ii) Noncompliance period.—**For purposes of this paragraph, the term "noncompliance period" means, with respect to any failure, the period—

**(I)** beginning on the date such failure first occurs; and

**(II)** ending on the date the failure is corrected.

**(C) Minimum penalties where failure discovered.—**Notwithstanding clauses (i) and (ii) of subparagraph (D):

**(i) In general.—**In the case of 1 or more failures with respect to a participant or beneficiary—

**(I)** which are not corrected before the date on which the plan receives a notice from the Secretary of such violation; and

**(II)** which occurred or continued during the period involved;

the amount of penalty imposed by subparagraph (A) by reason of such failures with respect to such participant or beneficiary shall not be less than $2,500.

**(ii) Higher minimum penalty where violations are more than de minimis.—**
To the extent violations for which any person is liable under this paragraph for any year are more than de minimis, clause (i) shall be applied by substituting "$15,000" for "$2,500" with respect to such person.

**(D) Limitations.—**

**(i) Penalty not to apply where failure not discovered exercising reasonable diligence.—**

No penalty shall be imposed by subparagraph (A) on any failure during any period for which it is established to the satisfaction of the Secretary that the person otherwise liable for such penalty did not know, and exercising reasonable diligence would not have known, that such failure existed.

**(ii) Penalty not to apply to failures corrected within certain periods.**—No penalty shall be imposed by subparagraph (A) on any failure if—

**(I)** such failure was due to reasonable cause and not to willful neglect; and

**(II)** such failure is corrected during the 30-day period beginning on the first date the person otherwise liable for such penalty knew, or exercising reasonable diligence would have known, that such failure existed.

**(iii) Overall limitation for unintentional failures.**—In the case of failures which are due to reasonable cause and not to willful neglect, the penalty imposed by subparagraph (A) for failures shall not exceed the amount equal to the lesser of—

**(I)** 10 percent of the aggregate amount paid or incurred by the plan sponsor (or predecessor plan sponsor) during the preceding taxable year for group health plans; or

**(II)** $500,000.

**(E) Waiver by secretary.**—
In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the penalty imposed by subparagraph (A) to the extent that the payment of such penalty would be excessive relative to the failure involved.

**(F) Definitions.**—
Terms used in this paragraph which are defined in section 1191b of this title shall have the meanings provided such terms in such section.

**(11)** The Secretary and the Secretary of Health and Human Services shall maintain such ongoing consultation as may be necessary and appropriate to coordinate enforcement under this subsection with enforcement under section 1320b–14(c)(8) [2] of title 42.

**(12)** The Secretary may assess a civil penalty against any sponsor of a CSEC plan of up to $100 a day from the date of the plan sponsor's failure to comply with the requirements of section 1085a(j)(3) of this title to establish or update a funding restoration plan.

**(d) STATUS OF EMPLOYEE BENEFIT PLAN AS ENTITY**

**(1)** An employee benefit plan may sue or be sued under this subchapter as an entity. Service of summons, subpena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan. In a case where a plan has not designated in the summary plan description of the plan an individual as agent for the service of legal process, service upon the Secretary shall constitute such service. The Secretary, not later than 15 days after receipt of service under the preceding sentence, shall notify the administrator or any trustee of the plan of receipt of such service.

**(2)** Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.

**(e)** JURISDICTION

**(1)** Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section.

**(2)** Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

**(f)** AMOUNT IN CONTROVERSY; CITIZENSHIP OF PARTIES

The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.

**(g)** ATTORNEY'S FEES AND COSTS; AWARDS IN ACTIONS INVOLVING DELINQUENT CONTRIBUTIONS

**(1)** In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

**(2)** In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

   **(A)** the unpaid contributions,

   **(B)** interest on the unpaid contributions,

   **(C)** an amount equal to the greater of—

      **(i)** interest on the unpaid contributions, or

      **(ii)** liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

   **(D)** reasonable attorney's fees and costs of the action, to be paid by the defendant, and

   **(E)** such other legal or equitable relief as the court deems appropriate.

   For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26.

**(h)** SERVICE UPON SECRETARY OF LABOR AND SECRETARY OF THE TREASURY

A copy of the complaint in any action under this subchapter by a participant, beneficiary, or fiduciary (other than an action brought by one or more participants or beneficiaries under subsection (a)(1)(B) which is solely for the purpose of recovering benefits due such participants under the terms of the plan) shall be served upon the Secretary and the Secretary of the Treasury by certified mail. Either Secretary shall have the right in his discretion to intervene in any action, except that the Secretary of the Treasury may not intervene in any action under part 4 of this subtitle. If the Secretary brings an action under subsection (a) on behalf of a participant or beneficiary, he shall notify the Secretary of the Treasury.

#### (i) ADMINISTRATIVE ASSESSMENT OF CIVIL PENALTY

In the case of a transaction prohibited by section 1106 of this title by a party in interest with respect to a plan to which this part applies, the Secretary may assess a civil penalty against such party in interest. The amount of such penalty may not exceed 5 percent of the amount involved in each such transaction (as defined in section 4975(f)(4) of title 26) for each year or part thereof during which the prohibited transaction continues, except that, if the transaction is not corrected (in such manner as the Secretary shall prescribe in regulations which shall be consistent with section 4975(f)(5) of title 26) within 90 days after notice from the Secretary (or such longer period as the Secretary may permit), such penalty may be in an amount not more than 100 percent of the amount involved. This subsection shall not apply to a transaction with respect to a plan described in section 4975(e)(1) of title 26.

#### (j) DIRECTION AND CONTROL OF LITIGATION BY ATTORNEY GENERAL

In all civil actions under this subchapter, attorneys appointed by the Secretary may represent the Secretary (except as provided in section 518(a) of title 28), but all such litigation shall be subject to the direction and control of the Attorney General.

#### (k) JURISDICTION OF ACTIONS AGAINST THE SECRETARY OF LABOR

Suits by an administrator, fiduciary, participant, or beneficiary of an employee benefit plan to review a final order of the Secretary, to restrain the Secretary from taking any action contrary to the provisions of this chapter, or to compel him to take action required under this subchapter, may be brought in the district court of the United States for the district where the plan has its principal office, or in the United States District Court for the District of Columbia.

#### (l) CIVIL PENALTIES ON VIOLATIONS BY FIDUCIARIES

(1) In the case of—

(A) any breach of fiduciary responsibility under (or other violation of) part 4 of this subtitle by a fiduciary, or

(B) any knowing participation in such a breach or violation by any other person,

the Secretary shall assess a civil penalty against such fiduciary or other person in an amount equal to 20 percent of the applicable recovery amount.

(2) For purposes of paragraph (1), the term "applicable recovery amount" means any amount which is recovered from a fiduciary or other person with respect to a breach or violation described in paragraph (1)—

(A) pursuant to any settlement agreement with the Secretary, or

**(B)** ordered by a court to be paid by such fiduciary or other person to a plan or its participants and beneficiaries in a judicial proceeding instituted by the Secretary under subsection (a)(2) or (a)(5).

**(3)** The Secretary may, in the Secretary's sole discretion, waive or reduce the penalty under paragraph (1) if the Secretary determines in writing that—

**(A)** the fiduciary or other person acted reasonably and in good faith, or

**(B)** it is reasonable to expect that the fiduciary or other person will not be able to restore all losses to the plan (or to provide the relief ordered pursuant to subsection (a)(9)) without severe financial hardship unless such waiver or reduction is granted.

**(4)** The penalty imposed on a fiduciary or other person under this subsection with respect to any transaction shall be reduced by the amount of any penalty or tax imposed on such fiduciary or other person with respect to such transaction under subsection (i) of this section and section 4975 of title 26.

**(m) PENALTY FOR IMPROPER DISTRIBUTION**

In the case of a distribution to a pension planparticipant or beneficiary in violation of section 1056(e) of this title by a plan fiduciary, the Secretary shall assess a penalty against such fiduciary in an amount equal to the value of the distribution. Such penalty shall not exceed $10,000 for each such distribution.

(Pub. L. 93–406, title I, § 502, Sept. 2, 1974, 88 Stat. 891; Pub. L. 96–364, title III, § 306(b), Sept. 26, 1980, 94 Stat. 1295; Pub. L. 99–272, title X, § 10002(b), Apr. 7, 1986, 100 Stat. 231; Pub. L. 100–203, title IX, §§ 9342(c), 9344, Dec. 22, 1987, 101 Stat. 1330–372, 1330–373; Pub. L. 101–239, title II, § 2101(a), (b), title VII, §§ 7881(b)(5)(B), (j)(2), (3), 7891(a)(1), 7894(f)(1), Dec. 19, 1989, 103 Stat. 2123, 2438, 2442, 2445, 2450; Pub. L. 101–508, title XII, § 12012(d)(2), Nov. 5, 1990, 104 Stat. 1388–573; Pub. L. 103–66, title IV, § 4301(c)(1)–(3), Aug. 10, 1993, 107 Stat. 376; Pub. L. 103–401, §§ 2, 3, Oct. 22, 1994, 108 Stat. 4172; Pub. L. 103–465, title VII, § 761(a)(9)(B)(ii), Dec. 8, 1994, 108 Stat. 5033; Pub. L. 104–191, title I, § 101(b), (e)(2), Aug. 21, 1996, 110 Stat. 1951, 1952; Pub. L. 104–204, title VI, § 603(b)(3)(E), Sept. 26, 1996, 110 Stat. 2938; Pub. L. 105–34, title XV, § 1503(c)(2)(B), (d)(7), Aug. 5, 1997, 111 Stat. 1062; Pub. L. 107–204, title III, § 306(b)(3), July 30, 2002, 116 Stat. 783; Pub. L. 108–218, title I, §§ 102(d), 103(b), 104(a)(2), Apr. 10, 2004, 118 Stat. 602, 603, 606; Pub. L. 109–280, title I, § 103(b)(2), title II, § 202(b), (c), title V, §§ 502(a)(2), (b)(2), 507(b), 508(a)(2)(C), title IX, § 902(f)(2), Aug. 17, 2006, 120 Stat. 816, 884, 885, 940, 941, 949, 951, 1039; Pub. L. 110–233, title I, § 101(e), May 21, 2008, 122 Stat. 886; Pub. L. 110–458, title I, §§ 101(c)(1)(H), 102(b)(1)(H), (I), Dec. 23, 2008, 122 Stat. 5097, 5101; Pub. L. 111–3, title III, § 311(b)(1)(E), Feb. 4, 2009, 123 Stat. 70; Pub. L. 113–97, title I, § 102(b)(6), Apr. 7, 2014, 128 Stat. 1117; Pub. L. 113–235, div. O, title I, § 111(d), Dec. 16, 2014, 128 Stat. 2793.)

[1] So in original. Probably should be "subtitle".

[2] See References in Text note below.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

About LII

Contact us

Advertise here

Help

Terms of use

Privacy

$\left[ \mathrm{LII} \right]$

# Understanding 42 U.S.C. § 1983 Claims[1]

The statute was enacted in 1871 to check abuses by state officials as part of the "Ku Klux Klan Act," though it didn't have much "teeth" until the Civil Rights Movement in the next century. *Monroe v. Pape*, 365 U.S. 167 (1961) (rev'd on other grounds) held that actions taken by state government officials in carrying out their official responsibilities, even if contrary to state laws, were nevertheless "under color of law." In *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978), the Supreme Court held that municipal entities are subject to liability under § 1983 when an official's unconstitutional action carried out a municipal policy or practice (not under a theory of *respondeat superior*).

## Statute of limitations

The federal statute does not include a statute of limitations, so it defaults to the SOL for personal injury. In Illinois that is 2 years for injury to a person and 5 for injury to property.

## Identifying the defendant(s)

Proper defendants under § 1983 claims are state and municipal officials, municipal entities, and private parties, who act under color of state law.

Municipal officials may be sued in their personal or official capacities. A claim against a municipal official in her official capacity is treated as a claim against the entity itself. An official capacity claim is simply another way of pleading an action against an entity of which the official is an agent. One need only identify either the entity or the official acting in her official capacity as agent for the entity – naming both is superfluous and judges regularly dismiss out one or the other.

### Entities and agents sued in their official capacity

Bringing a claim against a person in his or her "official capacity" is the same as bringing one against the employer entity. In these suits the plaintiff must show that enforcement of the entity's policy or custom caused the violation of the plaintiff's federally-protected right.

---

[1] Taken from Martin A. Schwartz and Kathryn R. Urbonya, *Section 1983 Litigation*, Second Edition (Federal Judicial Center, Washington, D.C., 2008).

1

The 3 most common issues arising under § 1983 are:

1. Whether the plaintiff has established a violation of a federal statutory or constitutional right,
2. Whether qualified immunity protects an official from personal monetary liability, and
3. Whether the plaintiff has established municipal liability through enforcement of a municipal policy, a municipal practice, or a decision of a municipal policymaker.

A municipal policy can be expressed through an ordinance, regulation, or policy statement. A municipal practice need not be authorized expressly, though it must be widespread and so permanent and well settled as to constitute a custom or usage with the force of law. If it's a policymaker decision at issue, the person must have final policymaking authority.

Some examples include deliberately indifferent hiring, training, supervision, or discipline; and deliberate indifferent failure to adopt policies necessary to prevent constitutional violations.

## Affirmative defenses

States and state entities (and their agents sued in their official capacities) are immune under the 11th Amendment to the U.S. Constitution,[2] unless expressly waived (very rare), but municipalities and their entities are not. These local entities may argue that they are immune but bear the burden of proving they are an "arm" of the state. State officials sued in their personal capacity cannot assert 11th Amendment immunity.

Officials sued in their personal capacity may be able to assert the common law defense of absolute or qualified immunity. Whether an official may assert absolute immunity or qualified immunity depends on the nature of the function performed, not the identity of the actor who performed it. Thus, an official may be entitled to absolute immunity for carrying out one function (a judge ruling on a case) but qualified immunity for another function (that same judge hiring a law clerk).

*Absolute immunity*

---

[2] The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state. (In case you're wondering, the Court has interpreted this language to prohibit citizens from bringing suit against their own state as well.)

FindLaw. (https://www.findlaw.com/)

Search FindLaw

Find a Lawyer (https://lawyers.findlaw.com/)   **Learn About the Law (https://public.findlaw.com/)**   FindLaw Answers (https://boa

Civil Rights

Civil Rights                     Location                     **SEARCH**

FINDLAW (HTTPS://WWW.FINDLAW.COM/)  /  LEARN ABOUT THE LAW (HTTPS://PUBLIC.FINDLAW.COM/)  /  CIVIL RIGHTS (HTTPS://CIVILRIGHTS.FINDLAW.COM/)  /
ENFORCING YOUR CIVIL RIGHTS (HTTPS://CIVILRIGHTS.FINDLAW.COM/ENFORCING-YOUR-CIVIL-RIGHTS.HTML)  /  DISCRIMINATION IN PUBLIC ACCOMMODATIONS

# Discrimination in Public Accommodations

## Stay up to date with the latest on the law.


Please enter your email address    Subscribe

By submitting this form, you agree to Findlaw.com's terms (https://company.findlaw.com/findlaw-terms-of-service.html). We respect your privacy. (https://www.thomsonreuters.com/en/privacy-statement.html)

Federal and state laws prohibit discrimination against certain protected groups in businesses and places that are considered "public accommodations." The definition of a "public accommodation" may vary depending upon the law at issue (i.e. federal or state), and the type of discrimination involved (i.e. race discrimination (https://employment.findlaw.com/employment-discrimination/race-discrimination.html) or disability discrimination (https://civilrights.findlaw.com/discrimination/disability-discrimination.html)). Generally speaking, it may help to think of public accommodations as most (but not all) businesses or buildings that are open to (or offer services to) the general public. More specifically, the definition of a "public accommodation" can be broken down into two types of businesses / facilities:

- Government-owned/operated facilities, services, and buildings
- Privately-owned/operated businesses, services, and buildings

### Government-owned/operated facilities and services

Government-owned facilities include courthouses, jails, hospitals, parks, and other places owned and operated by federal, state and local government. Government-operated services, programs, or activities provided by federal, state, or local governments include transportation systems and government benefits programs (such as welfare assistance).

### Privately-owned/operated businesses and buildings

Privately-owned businesses and facilities that offer certain goods or services to the public - including food, lodging, gasoline, and entertainment - are considered public accommodations for purposes of federal and state anti-discrimination laws. For purposes of disability discrimination, the definition of a "public accommodation" is even more broad, encompassing most businesses that are open to the public (regardless of type).

**Laws Prohibiting Discrimination in Public Accommodations: Race, Color, Religion, and National Origin**

Federal law prohibits public accommodations from discriminating (https://civilrights.findlaw.com/civil-rights-overview/public-accommodations-equal-rights.html) on the basis of race, color, religion, or national origin. If you think that you have been discriminated against in using such a facility, you may file a complaint (https://civilrights.findlaw.com/enforcing-your-civil-rights/discrimination-in-public-accommodations-government-enforcement.html) with the Civil Rights Division of the Department of Justice (https://www.justice.gov/crt), or with the United States attorney in your area. You may also file suit in the U.S. district court.

There are also state laws that broadly prohibit discrimination on the bases of race, color, religion, and national origin in places of public accommodation. To determine whether your state has such a law, you should contact your state or local human rights agency, or your state attorney general's office.

**Laws Prohibiting Discrimination in Public Accommodations and Disability Discrimination**

At the federal level, the Americans with Disabilities Act (https://civilrights.findlaw.com/discrimination/the-americans-with-disabilities-act-overview.html) prohibits discrimination on the basis of disability in a wide range of places of public accommodation, including facilities that offer lodging, food, entertainment, sales or rental services, health care and other professional services, or recreation. State and local governments must eliminate any eligibility criteria for participation in programs, activities, and services that screen out or tend to screen out persons with disabilities, unless the government can establish that the requirements are necessary for the provision of the service, program, or activity. In addition, public facilities must ensure that individuals with disabilities are not excluded from services, programs, or activities because buildings are inaccessible. (https://civilrights.findlaw.com/discrimination/ada-access-to-buildings-and-businesses-public-accommodations.html)

There are also state laws that broadly prohibit discrimination on the basis of disability in places of public accommodation. To determine whether your state has such a law, you should contact your state or local human rights agency or your state attorney general's office.

**Talk to an Attorney about Your Discrimination Claim**

Have you been denied services in a commercial facility based on your religion, national origin, or other protected characteristic? Have you been confined to inferior areas in buildings or businesses because of your disability? If you are concerned about your civil rights in a place of public accommodation, then talk to an attorney knowledgeable about discrimination claims (https://lawyers.findlaw.com/lawyer/practice/discrimination). An attorney can help you navigate the complexity of civil rights law.

### Next Steps

Contact a qualified civil rights attorney to help you protect your rights.

| (e.g., Chicago, IL or 60611) | Find Lawyers |

### Help Me Find a Do-It-Yourself Solution

- Complaint for Employment Discrimination (https://www.uslegalforms.com/prodpages/US-000267.htm%7Cfdlaw)
- Complaint For Employment or Workplace Discrimination and Sexual Harassment (https://www.uslegalforms.com/prodpages/US-000296.htm%7Cfdlaw)

**Popular Directory Searches**

- Civil Rights Attorneys (https://lawyers.findlaw.com/lawyer/practice/civil-rights)
- Constitutional Lawyers (https://lawyers.findlaw.com/lawyer/practice/constitutional-law)
- Discrimination Lawyers (https://lawyers.findlaw.com/lawyer/practice/discrimination)

## Enforcing Your Civil Rights

- Civil Rights Laws and Resources (https://civilrights.findlaw.com/enforcing-your-civil-rights/civil-rights-laws-resources.html)
- Filing Civil Rights Claims (https://civilrights.findlaw.com/enforcing-your-civil-rights/filing-civil-rights-claims.html)

BACK TO TOP

**Learn More About**

Legal Topics (https://public.findlaw.com/moretopics.html)
State Laws (https://statelaws.findlaw.com/)
Blogs (https://legalblogs.findlaw.com/)
FindLaw RSS Feeds (https://www.findlaw.com/rss-index.html)
Sitemap (https://www.findlaw.com/toc.html)
Geography Sitemap (https://company.findlaw.com/products-services/findlaw-lawyer-directory-geography-sitemap.html)
Abogado (https://www.abogado.com)
LawInfo (https://www.lawinfo.com/)
Super Lawyers (https://www.superlawyers.com/)

**Find a Lawyer**

Browse by Location (https://lawyers.findlaw.com/lawyer/state.jsp)
Browse by Legal Issue (https://lawyers.findlaw.com/lawyer/practice.jsp)
Browse by Law Firm & Lawyer Profile (https://pview.findlaw.com/)

**Get Legal Forms**

Visit our Legal Forms site (https://forms.findlaw.com/)

**About Us**

Company History (https://company.findlaw.com/company-history/findlaw-corporate-information-press-company-background.html)
Media (https://company.findlaw.com/press-center/findlaw-corporate-information-press-media-relations.html)
Contact Us (https://company.findlaw.com/contact-us/contacts.html)
Privacy (https://www.thomsonreuters.com/en/privacy-statement.html)
Cookies (//info.evidon.com/pub_info/15540?v=1&nt=0&nw=false)
Terms (https://company.findlaw.com/findlaw-terms-of-service.html)
Disclaimer (https://company.findlaw.com/disclaimer.html)
Advertising (https://company.findlaw.com/media-kit.html)
Jobs (https://company.findlaw.com/employment/employment.html)

**Social**

(https://www.facebook.com/FindLawConsumers) Facebook (https://www.facebook.com/FindLawConsumers)
(https://www.youtube.com/findlaw) YouTube (https://www.youtube.com/findlaw)
(https://plus.google.com/114073820765227291949) Google Plus (https://plus.google.com/114073820765227291949)

**Find Answers**

FindLaw Answers (https://boards.answers.findlaw.com/)

Community Guidelines (https://company.findlaw.com/community-guidelines.html)

(https://twitter.com/findlawconsumer)

(https://pinterest.com/findlawconsumer/) Pinterest (https://pinterest.com/findlawconsumer/)

### For Lawyers

Visit our professional site (https://lp.findlaw.com/)

Edit your legal profile (http://pu.findlaw.com/)

Website development (https://www.lawyermarketing.com/services/mobile-friendly-websites/)

Advertise on our site (https://www.lawyermarketing.com/)

### Law Firm Marketing

Attorney Websites (https://www.lawyermarketing.com/services/mobile-friendly-websites/?

ct_primary_campaign_source=701130000027LuU&ct_source=Website&ct_sourc

Online Advertising (https://www.lawyermarketing.com/services/integrated-marketing-solutions/?

ct_primary_campaign_source=701130000027LuU&ct_source=Website&ct_sourc

Buy a Directory Profile (https://store.lawyermarketing.com/)

### Marketing Resources

On-Demand Webcasts (https://www.lawyermarketing.com/webcasts/?

ct_primary_campaign_source=701130000027LuU&ct_source=Website&ct_sourc

White Papers (https://www.lawyermarketing.com/white-papers/?

ct_primary_campaign_source=701130000027LuU&ct_source=Website&ct_sourc

FindLaw.

 THOMSON REUTERS

Copyright © 2019, Thomson Reuters. All rights reserved.

## TEMPORARY INSURANCE CARD

COMPANY
APOLLO 10343
POLICY NUMBER
PENDING

| EFFECTIVE DATE | EXPIRATION DATE | BINDING DATE & TIME |
|---|---|---|
| 08/04/2018 | 02/04/2019 | 08/03/2018 - 10:52:56 |

| YEAR | MAKE | MODEL |
|---|---|---|
| 1997 | FORD | EXPLORER |

VEHICLE ID. NUMBER          COVERAGE
1FMDU34X8VUA16862     Liability \ Comp\Collision

AGENCY / COMPANY ISSUING
FLEX INSURANCE SERVICES, LLC
P.O. BOX 475
NORTHBROOK, IL60065-          877/323-3539

INSURED
EDWARD JONES JR
1607 N BERWICK BLVD #1E
WAUKEGAN, IL 60085

Valid for 60 days

THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND
PRESENTED UPON DEMAND

IN CASE OF ACCIDENT:     Report all accidents to your
Agency / Company as soon as possible. Obtain the following
information :

1. Name and address of each driver, passenger and
2. Name of Insurance Company and policy number for
   vehicle involved.

Valid for 60 days

---

## TEMPORARY INSURANCE CARD

COMPANY
APOLLO 10343
POLICY NUMBER
PENDING

| EFFECTIVE DATE | EXPIRATION DATE | BINDING DATE & TIME |
|---|---|---|
| 08/04/2018 | 02/04/2019 | 08/03/2018 - 10:52:56 |

| YEAR | MAKE | MODEL |
|---|---|---|
| 1997 | FORD | EXPLORER |

VEHICLE ID. NUMBER          COVERAGE
1FMDU34X8VUA16862     Liability \ Comp\Collision

AGENCY / COMPANY ISSUING
FLEX INSURANCE SERVICES, LLC
P.O. BOX 475
NORTHBROOK, IL60065-          877/323-3539

INSURED
EDWARD JONES JR
1607 N BERWICK BLVD #1E
WAUKEGAN, IL 60085

Valid for 60 days

THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND
PRESENTED UPON DEMAND

IN CASE OF ACCIDENT:     Report all accidents to your
Agency / Company as soon as possible. Obtain the following
information :

1. Name and address of each driver, passenger and
2. Name of Insurance Company and policy number for
   vehicle involved.

Valid for 60 days

IDCARD.FRX 06/22/17

870 3629116

| | | | | |
|---|---|---|---|---|
| **FLEX PREMIUM FINANCE**<br>P.O. BOX 475<br>NORTHBROOK, IL 60065<br><br>877/323-3539 | ACCT. NO.<br>15285-8 | DO NOT SEND CASH IN THE MAIL | | |
| | | ACCT. NO. | 15285-8 | |
| | PAYMENT DUE<br>11/25/2018 | PAYMENT DUE | 11/25/2018 | |
| Amount due when paid on or before due date. $ | 75.25 | PAYMENT NO. | 4 | |
| Amount due if paid more than [5] days after due date. $ | 79.01 | AMOUNT PAID | $ | |
| **EDWARD JONES JR**<br>1607 N BERWICK BLVD #1E<br>WAUKEGAN, IL 60085 | AMOUNT PAID<br><br>$ | YOUR AGENT IS:<br>**FLEX INSURANCE SERVICES,**<br>P.O. BOX 475<br>NORTHBROOK, IL 60065 | | |

Printed on 08/03/2018

MAKE CHECK PAYABLE TO FLEX PREMIUM FINANCE

RETURN WITH YOUR PAYMENT

RETAIN FOR YOUR RECORDS

PFCOUPON.FRX 04/06/2010

| | | | | |
|---|---|---|---|---|
| **FLEX PREMIUM FINANCE**<br>P.O. BOX 475<br>NORTHBROOK, IL 60065<br><br>877/323-3539 | ACCT. NO.<br>15285-8 | DO NOT SEND CASH IN THE MAIL | | |
| | | ACCT. NO. | 15285-8 | |
| | PAYMENT DUE<br>12/25/2018 | PAYMENT DUE | 12/25/2018 | |
| Amount due when paid on or before due date. $ | 75.25 | PAYMENT NO. | 5 | |
| Amount due if paid more than [5] days after due date. $ | 79.01 | AMOUNT PAID | $ | |
| **EDWARD JONES JR**<br>1607 N BERWICK BLVD #1E<br>WAUKEGAN, IL 60085 | AMOUNT PAID<br><br>$ | YOUR AGENT IS.<br>**FLEX INSURANCE SERVICES,**<br>P.O. BOX 475<br>NORTHBROOK, IL 60065 | | |

Printed on 08/03/2018

MAKE CHECK PAYABLE TO FLEX PREMIUM FINANCE

RETURN WITH YOUR PAYMENT

RETAIN FOR YOUR RECORDS

PFCOUPON.FRX 04/06/2010

ERISA      29 USC. ch. 18 §1001
                            et seg.

                                    29 CFR 3.1
                Pension Claim              3.2

                1RA Claim


           United States - circumstances —
                          statutes
                          —
           — deprived you federal

           Sueing federal Tort Claim acts
           when
           Consitution Violation.

Suet State for
       DIVORCE Case              1942 Section
   you have The federal Tort Claims Acts    1983
   and Bivens
   Mis-conduct in public office

Towing Company —

STAte Court —

—

Towing Co.     — broke
a federal regulation

retaliation —

Title II  CR 1964

42 USC 1981
                    contractual
                    relationship

29 USC 502(a) - 1132

Beneficial Fiduciary

Right To Sue for damages

2. General Assistant
3. Unemployment Benifits
4. 42-U.S.C. 1400 ... Fits
(b), (d) Comprehensive 665
and Training Act.
The Issues Concerning ISA Federal Jurisdiction

#1 I did file petition opter petition

To The United States District Court To a U.S. Magestrate
Thomas Ray, Little Rock, Arkansas Filed Oint To Title
42 U.S.C. 2000 (c) (b) (d) copyright 29 U.S.C. Section 3.1 Esection
3.2 Advincement of Redesion.

These Issues have been on The Books for years, I
Recently file a Criminal Complont To The United
States Justice Department 950 Pennsylvania Ave NW
Room 5406 Washington D.C. 20530, afout my pension,
731.00 Since 1999 Advdicated I made Plons To put
409.00 dollars in my I.R.A. Account.

Federal Jursidiction

VA Higher Education Title 38 USC. a Three Judge
Apn al Aludicate all Vietnam Veteron 15 000, Settlem
- ent Pursvont to interlectural Internet Accossioflity,
We were only afle to receive less Thon Comcast,
Internet. I was not afle To Receive a Medical,
Discharge. Pursvont To my military I.Q. Interance.

Zain Smith, Costalg, Lisa Medigon, Attorney
Omitted Criminal complont file to There office

State
Issue
- Insure Proud Since, Automotive Repair Shop
Proud, They Cut my milage wire so the steel my
VAN when ever They wonted it.

State
Issue
The TNT stolen my VAN 6/8/2018 I purchases
it 6/07/2018. Tags, Insured flex insurance, I have
Insure one located at 701 Lewis Avenue street
Workegon, Illnois,

Federal business loan,
The Judge Henry Woods Was murder by me
Dennis Federal case 2002, Copyright 21¢ OF each
Grant Iorn project Aware INC,

FBI contact for help Garthatta Groon 2112 RooserValt Rd
Chicago, Illinois Did not do Anything To help.

The chase Bonk cael themself've haues ng Hud-
houseing, They oue The Citizens 800 hunder Million do
That Federal case # 115CV4219 Summer Judge Rule 55

I ask The small claim be Consoldate with
This case because They are in Valation real Estate
Law (red inning) when I Lived at 709 Grand
Avenue.

The appeal federal court pull me. asking for
500 hunder dellar Pro. see pettition,

Pension
IRA      1. 76000 IRA Accaunt money due me
Federal      at 409.00 dallas A Month,

Federal  2. 13,500 dallay due me From The settlement
ADA Title 3 Internet Accebility Eric Black
Hitchison spring 1982 elegally suspended me
From
Federal   DiAnne Ristine es senitor's daughter
Complat   in Retailation because she was suid by
File.     me for Riling Meth a Chiminal Complant C-2
5.        officer Rastran Met SAN Proncisco, California
          Police Department, I also worked with Triple AAH
          shipyard, she closed The intires shipyard down,
Federal   SAn Proncisco, state university Also denied me
          Work-study- paymentnd My Pell grant Money And
          1500 Hunder dallar Regestration Fee V.A.
          12 credits VA Benifts.

Account: IL-1125625

Insured:

Edward  Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

## Monthly Billing of Agency Products

At the time you purchased your insurance policy, you may have also purchased optional memberships and other products from your agency ("Agency Products") and elected to pay these thorough monthly installments.  The Agency Products you purchased are listed below:

| Member No. | Product Description | Total Price | Monthly Billing |
|---|---|---|---|
| 1467496 | 134/B Towbuster 6mo | $60.00 | $10.00 |

As a convenience to you, the Agency Products will be included on your monthly payment coupon.  A summary of the amounts you owe under your premium finance loan, as well as any amounts you will be billed on your monthly payment coupon for Agency Products, is presented below:

| | |
|---|---|
| Monthly Payment Due on Premium Loan | $33.99 |
| Agency Products billed monthly by your Agent (not part of your loan) | |
| 134/B Towbuster 6mo | $10.00 |

***Total Monthly Payment, Including Agency Products***                 $43.99

Any amounts payable related to Agency Products are not included in your Insurance Premium Finance and Security Agreement and are not part of your premium finance loan.  <u>As such, no finance charges, interest or late fees will be charged to you on amounts related to these Agency Products.</u>

<u>You may, at any time, choose to terminate any of the Agency Products by not remitting that portion of the monthly installment for the Agency Product you wish to terminate.</u>  Your decision to discontinue any Agency Product will have no effect on your premium finance loan and will not adversely impact your underlying auto insurance coverage as long as your premium finance loan remains current under the term s of your Insurance Premium Finance and Security Agreement.

Should you have any questions, please contact your insurance agent during normal business hours or call Confie Premium Finance Customer Service at 1-877-926-4600 between the hours of 8:00am and 6:00pm CST Monday thru Friday or between the hours of 7:00am and 4:00pm Saturday.



# American Alliance Casualty Company

Policy Number: ILAA-0247178-01
Policy Effective Date: 12/17/2016

| *SCHEDULE OF COVERAGES* | | | | Premium | | | |
|---|---|---|---|---|---|---|---|
| Coverage | Limits | | Deductible | Veh. 1 | Veh. 2 | Veh. 3 | Veh. 4 |
| Bodily Injury | $25,000/ | each person | | $60.00 | | | |
| | $50,000 | each accident | | | | | |
| Property Damage | $20,000 | each accident | | $35.00 | | | |
| Medical Payments | $1,000 | each person | | $10.00 | | | |
| Uninsured Motorist - | $25,000/ | each person | | $65.00 | | | |
| Bodily Injury | $50,000 | each accident | | | | | |
| **Vehicle 1  Limits** | | | | | | | |
| Uninsured Motorist  Property Damage | | | $15,000 - $250 | $25.00 | | | |
| Towing & Labor | | | | N/A | | | |
| Rental Reimbursement | | | | N/A | | | |
| Comprehensive | | | | N/A | | | |
| Collision | | | | N/A | | | |
| | | | **Total Premium** | $195.00 | | | |

The following discounts and surcharges have been applied to your policy:

- Renewal (10%)
- AntiTheft (5%)

Your automobile policy consists of this Policy Declaration and the documents listed below.  Please keep them together.

Policy Declaration Page - ILDEC 01/15
ID Card
Illinois Policy - ILPOL 07/16 - Available online at www.myamericanalliance.com or request a copy by calling (847) 916-3200.





# AMERICAN ALLIANCE

## CASUALTY COMPANY

## PERSONAL AUTOMOBILE
## INSURANCE POLICY
### ILLINOIS

This is your policy of insurance.

Your policy has been issued based upon your statements contained and the information as provided in your application which is incorporated into this policy. Please take the time to review your entire policy, including any enclosures or attachments. If you find any errors, please immediately contact the Company.

**In the event of an Accident**, immediately contact our
Claims Department at **(847) 916-3200**
or
at our website at **www.myamericanalliance.com**.

# AMERICAN ALLIANCE CASUALTY COMPANY

Rosemont, Illinois (the "Company")

agrees with the insured, named in the Declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Application made a part hereof, and subject to the Declarations and all the terms of this policy:

## PART I - LIABILITY

**A - Bodily Injury Liability; B - Property Damage Liability.** To pay on behalf of the insured, but only to the extent of the applicable policy limits, all sums which the insured shall become legally obligated to pay as damages because of:

A. bodily injury, or

B. property damage

arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile, and the Company shall defend any lawsuit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the lawsuit are groundless, false or fraudulent; but the Company may make such investigation and settlement of any claim or lawsuit as it deems expedient. It is understood and agreed that the Company has no obligation to any insured after the applicable limits of the policy have been exhausted by payment; it is further understood and agreed that the Company is not obligated to pay, and shall not pay, attorney fees for any legal or investigative work unless such attorneys are specifically selected by the Company; it is further understood and agreed that the Company is not obligated to pay, and shall not pay, any sum which the insured may be legally obligated to pay as a result of a lawsuit unless the Company received actual notice of said lawsuit before any judgment had been entered in said lawsuit. It is understood and agreed that the Company has the sole right to settle or defend any lawsuit including, but not limited to, the right to accept or reject arbitration awards entered in such suit.

**Supplementary Payments.** To pay, in addition to the applicable limits of liability:

(a) all expenses incurred by the Company, all costs taxed against the insured in any such lawsuit and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

(b) premiums on appeal bonds required in any such lawsuit, premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of an automobile insured hereunder, not to exceed $100 per bail bond, but without any obligation to apply for or furnish any such bonds;

(c) all reasonable expenses, other than loss of earnings, incurred by the insured at the Company's request.

**Persons Insured.** The following are insureds under Part I:

(a) with respect to the owned automobile,

(1) the named insured,

(2) any other person using such automobile to whom the named insured has given permission, provided the use is within the scope of such permission;

(b) with respect to a non-owned automobile;

(1) the named insured, provided the named insured received the permission of its owner, and the use is within the scope of such permission,

(2) a relative, but only with respect to a private passenger automobile, provided the person using such automobile has received the permission of its owner and the use is within the scope of such permission;

(c) any other person or organization legally responsible for the use of:

(1) an owned automobile, or

(2) a non-owned automobile, if such automobile is not owned or hired by such person or organization, provided the actual use thereof is by a person who is an insured under (a) or (b) above with respect to such owned automobile or non-owned automobile; and

(d) any other person who is not insured for liability coverage by any other insurance policy, a self-insurance program, or a liability bond while using either the owned or non-owned autos. The use of such owned or non-owned auto must be within the scope of consent of insured or your spouse.

The insurance afforded under Part I applies separately to each insured against whom claim is made or suit is brought, but neither the inclusion herein of more than one insured nor the application of the policy to more than one automobile shall operate to increase the limits of liability stated in the Declarations for the liability coverages.

**Definitions.** Under Part I:

**"named insured"** means the individual named as Named Insured of the Declarations and also includes his or her spouse, if a resident of the same household;

**"spouse"** means a lawfully wedded spouse and also means a person joined in a civil union according to statute;

**"insured"** means a person or organization described under "Persons Insured";

**"relative"** means a person related to the named insured or his spouse by blood, marriage or adoption and who is a resident of the same household as the insured or spouse and is either a non-driver or is listed on the Application for this insurance as a driver, provided neither such relative nor his spouse owns a private passenger automobile;

**"owned automobile"** means:

(a) a private passenger, farm or utility automobile described in this policy;

(b) a private passenger, farm or utility automobile, ownership of which is acquired by the named insured during the policy period provided:

(1) that the acquired automobile replaces an automobile described in this policy; that neither the named insured nor any resident of his household retains ownership of the described replaced automobile, and that the named insured notified the Company in writing within 30 days after the acquisition of his intention to make this policy applicable to such acquired replacement automobile;

(2) that the Company insures all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the Company in writing within 30 days after the date of such acquisition of his election to make this and no other policy issued by the Company applicable to such automobile; or,

(c) a temporary substitute automobile;

**"temporary substitute automobile"** means any automobile not owned by the named insured, or by any resident of the same household, while temporarily used as a substitute for the owned automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;

**"non-owned automobile"** means an automobile not owned by, furnished or available for the regular use of either the named insured or any resident of the same household, while said automobile is in the possession or custody of the named insured or any resident of the same household, or is being operated by him or her, other than a temporary substitute automobile;

**"private passenger automobile"** means a four wheel private passenger, station wagon or jeep type automobile;

**"farm automobile"** means an automobile of the truck type with a load capacity of fifteen hundred pounds or less not used for business or commercial purposes other than farming;

**"utility automobile"** means an automobile, other than a farm automobile, with a load capacity of fifteen hundred pounds or less of the pick-up body, sedan delivery or panel truck type not used for business or commercial purposes;

**"trailer"** means a trailer designed for use with a private passenger automobile, if not being used for business or commercial purposes with other than a private passenger, farm or utility automobile, or a farm wagon or farm implement while used with a farm automobile, and if not a home, office, store, display or passenger trailer;

**"automobile business"** means the business or occupation of selling, repairing, servicing, storing or parking automobiles;

**"Property damage"** mean physical injury to, destruction of, or loss of use to tangible property which is caused by an accident covered under this policy and occurring while the policy is in force

**"use"** of an automobile includes the loading and unloading thereof;

**"war"** means war, whether or not declared, civil war, insurrection, rebellion or revolution, or any act or condition incident to any of the foregoing.

**Exclusions.** This policy *does not* apply under Part I:

(a) to bodily injury, or property damage to the named insured and any relative of the insured related by blood, marriage or adoption residing in the same household as the insured. The term "insured" as used in this exclusion means the person against whom the claim is made or lawsuit is brought. This exclusion shall not apply when a third party acquires the right of contribution against a member of the injured person's family. Nor shall this exclusion apply when any person not residing in the household of the named insured was driving the vehicle insured under this policy at the time of the accident that is the subject of the claim or lawsuit;

(b) to any automobile while used as a public or livery conveyance, but this exclusion does not apply to the named insured with respect to bodily injury or property damage which results from the named insured's occupancy of a non-owned automobile other than as the operator thereof;

(c) to bodily injury or property damage caused intentionally by or at the direction of the insured;

(d) to bodily injury or property damage arising out of the operation of farm machinery;

(e) to bodily injury of any employee of the insured arising out of and in the course of employment by the insured if such injury arises out of the ownership, maintenance or use of an owned automobile or of a non-owned automobile;

(f) to bodily injury to any fellow employee of the insured injured in the course and scope of his/her employment if such injury arises out of the ownership, maintenance or use of an automobile in the business of the insured's employer;

(g) to an owned automobile while used in the automobile business, but this exclusion does not apply to the named insured, a relative, a partnership in which the named insured or such relative is a partner, or any partner, agent or employee of the named insured, such relative or partnership;

(h) to a non-owned automobile while used (1) in the automobile business by the insured or (2) in any other business or occupation of the insured except a private passenger automobile operated or occupied by the named insured or by his private chauffeur or domestic servant, or a trailer used therewith or with an owned automobile;

(i) to injury to or destruction of (1) property owned or transported by the insured or (2) property rented to or in charge of the insured other than a residence or private garage or (3) property as to which the insured is for any purpose exercising physical control. An automobile used, operated or maintained by an insured is considered property in charge of that insured;

(j) to any automobile, farm automobile or utility automobile, or any other type of motor vehicle, rented or leased by the insured where other valid and collectible insurance has been purchased by or furnished to the insured in connection with such rental or lease;

(k) to bodily injury or property damage with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability;

(l) to any automobile designed for racing while being tested, repaired or serviced, or to any automobile or motor vehicle while used, operated, manipulated or maintained in any prearranged or organized race or speed test, including "hot rod" or "stock car" racing;

(m) to bodily injury or property damage due to war, whether or not declared, civil war, riot, insurrection, rebellion or revolution or to any act or condition incidental to any of the foregoing;

(n) to any automobile while being operated or used in the commission of a crime, other than a traffic violation;

(o) to the payment of punitive or exemplary damages;

(p) to any person who operated or used an owned automobile or a non-owned automobile without a reasonable belief that he or she is entitled to do so, however, this exclusion does not apply to the named insured;

(q) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(r) to the payment of civil fines, attorney fees and any other charges levied or claimed by a municipality or other division of government with respect to property damage or bodily injury;

(s) to liability assumed by an insured under any contract or other agreement;

(t) to bodily injury or property damage resulting from the pushing or pulling of a vehicle (other than a trailer) by an insured automobile, or the pushing and pulling of an insured automobile by another vehicle (other than a tow truck).

**Financial Responsibility Laws**. When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by the policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The insured agrees to reimburse the Company

for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**Limits of Liability**. The limit of Bodily Injury Liability stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Bodily Injury Liability stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same occurrence. The limits of liability are not increased because more than one person is insured at the time of the accident. The limit of property damage liability stated in the Declarations is the total limit of the Company's liability for all damage to property of one or more persons arising out of the same occurrence. Any amounts payable under Part I of this policy will be reduced by any amounts paid or payable for the same elements of loss under Parts II, III or IV of this policy.

**Other Insurance**. If the insured is covered by other insurance or self-insurance against a loss covered by Part I of this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance and self-insurance against such loss; provided, however, the insurance under this policy with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any valid collectible insurance or self-insurance applicable to such temporary substitute automobile or non-owned automobile.

## PART II – UNINSURED MOTORIST COVERAGE

**Uninsured Motorist Coverage**. To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of property damage to a vehicle described in the policy and bodily injury, including death resulting therefrom, hereinafter called "bodily injury", sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured motor vehicle, provided, for the purposes of this coverage, determination of whether the insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured or such representative and the Company or, if they fail to agree, by arbitration. Recovery under this Part for "property damage" is subject to the payment of a specific separate premium for uninsured motorist property damage liability. No judgment against any person or organization alleged to be legally responsible for the bodily injury or property damage shall be conclusive, as between the insured and the Company, of the issues of liability of such person or organization or of the amount of damages to which the insured is legally entitled unless such judgment is entered

pursuant to an action prosecuted by the insured with the written consent of the Company.

**Definitions.** The definitions under Part I, except the definition of "insured" and where limited or altered under the Limits of Liability of this coverage, apply to Part II and under Part II:

"insured" means:

(a) the named insured and any relative of the named insured;

(b) any other person while lawfully occupying an insured automobile;

(c) any person, with respect to damages he is entitled to recover because of bodily injury to which this Part applies sustained by an insured under (a) or (b) above; and

(d) any other person who is not insured for uninsured motor vehicle coverage under another vehicle policy while occupying your auto, a temporary substitute auto, a newly acquired auto or a trailer attached to such auto. Such vehicle has to be used within the scope of the consent of the insured or their spouse. Such other person occupying a vehicle used to carry persons for a charge is not an insured.

The insurance afforded under Part II applies to each insured, but the inclusion herein of more than one insured shall not operate to increase the limits of the Company's liability.

**"insured automobile"** means:

(a) an automobile described in the policy for which a specific premium charge indicated that coverage is afforded;

(b) a private passenger, farm or utility automobile, ownership of which is acquired by the named insured during the policy period, provided:

   (1) it replaces an insured automobile defined in (a) above and the insured notifies the Company in writing within 30 days after the date of said replacement;

   (2) the Company insures under this coverage all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the Company in writing within 30 days after the date of such acquisition of his election to make the Liability and Uninsured Motorist Coverages under this and no other policy issued by the Company applicable to such automobile;

(c) a temporary substitute automobile for an insured automobile as defined in (a) or (b) above;

(d) a non-owned automobile while being operated by the named insured, but shall not include:

   (1) any automobile or trailer owned by a resident of the same household as the named insured;

   (2) any automobile while used as a public or livery conveyance; or

   (3) any automobile while being used without the permission of the owner.

**"uninsured motor vehicle"** includes a trailer of any type and means:

(a) a motor vehicle or trailer with respect to the ownership, maintenance or use of which, there is no bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such automobile, or said bond or insurance policy has limits less than that required by the Illinois Financial Responsibility Law;

(b) a hit-and-run motor vehicle; or

(c) a motor vehicle where on, before, or after the accident date, the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified in the policy, because of the entry by a Court of competent jurisdiction of any order of rehabilitation or liquidation by reason of insolvency on or after the accident date, provided however that the insured notifies the Company of his/her claim under this provision within the later of 6 months from the date of such Court order of rehabilitation or insolvency or two years from the date of accident. To the extent that this provision conflicts with this policy's exclusion for claims submitted to the Company more than two years after the accident, this provision shall control;

*but* the term "uninsured motor vehicle" shall not include:

   (1) an insured motor vehicle or a motor vehicle furnished or available for the regular use of the named insured or of a relative which causes bodily injury or property damage in excess of the limit required under the Illinois Financial Responsibility Law;

   (2) a motor vehicle or trailer owned or operated by a self-insurer within the meaning of any motor vehicle financial responsibility law, motor carrier law or any similar law;

   (3) a motor vehicle or trailer owned by the United States of America, Canada, a state, a political subdivision of any such government or any agency of the foregoing or a municipal government;

   (4) a land motor vehicle or trailer if operated on rails or crawler-treads or while located for use as a residence or premises and not as a vehicle; or

   (5) a farm type tractor or equipment designed for use principally off public roads, except while actually upon public roads.

**"hit-and-run motor vehicle"** means a motor vehicle which causes bodily injury to an insured arising out of physical contact of such motor vehicle with the insured or with an automobile which the insured is occupying at the time of the accident, provided, (a) there cannot be ascertained the identity of either the operator or owner of such "hit-and-run motor vehicle", (b) the insured or someone on his behalf shall have reported the accident within 24 hours to a police, peace or judicial officer to the Commissioner of Motor Vehicles, and shall have filed with the Company within 30 days thereafter a statement under oath that the insured or his legal representative has a cause or causes of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and setting forth the facts in support thereof; and (c) at the Company's request, the insured or his legal representative makes available for inspection the motor vehicle which the insured was occupying at the time of the accident;

**"occupying"** means in or upon or entering into or alighting from;

**"state"** includes the District of Columbia, a territory or possession of the United States, and a province of Canada.

**Exclusions**. This policy does not apply under Part II:

(a) to bodily injury or property damage to an insured with respect to which such insured, his legal representative or any person entitled to payment under this coverage shall, without written consent of the Company, make any settlement with any person or organization who may be legally liable therefor;

(b) so as to inure directly or indirectly to the benefit of any workmen's compensation or disability benefits carrier or any person or organization qualifying as a self-insurer under any workmen's compensation or disability benefits law or any similar law;

(c) to any claim for punitive or exemplary damages;

(d) to property damage when the owned automobile has collision coverage or is described in any other policy of automobile insurance;

(e) to any claim received by the Company more than 2 years after the date of accident;

(f) to bodily injury of an insured while occupying a motor vehicle owned by, or furnished or available for the regular use of the insured, a resident spouse, or a resident relative, if that motor vehicle is not described in this policy or is not newly acquired or replacement motor vehicle covered under the terms of this policy;

(g) to any claim for which the Company does not receive a written demand for arbitration within two years of the date of accident or, if coverage for the claim is based on a Court order of rehabilitation or liquidation by reason of insolvency of an insurer, within the later of the two years of the date of the accident or six months of entry of the Court order of rehabilitation or liquidation by reason of insolvency;

(h) to any claim by a person who operated, occupied or used an automobile without a reasonable belief that he or she was entitled to do so, however, this exclusion does not apply to the named insured;

(i) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(j) to bodily injury or property damage which is either expected or intended by the insured.

(k) to bodily injury or property damage if Liability coverage or Underinsured Motorist coverage applies under this policy to the accident.

(l) while any vehicle is operated by an Excluded driver,

**Limits of Liability**

(a) The limit of Uninsured Motorist Coverage stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages due to bodily injury to one person. Bodily injury to one person includes all injury and damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Uninsured Motorist Coverage as stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same accident. The limits of liability are not increased because more than one person is insured at the time of the accident.

(b) Any amount payable under the terms of Part II because of bodily injury sustained in an accident by a person who is an insured under Part II shall be reduced by:

(1) all sums paid on account of such bodily injury by or on behalf of (i) the owner or operator of the uninsured motor vehicle and (ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury including all sums paid under A of Part I, and

(2) the amount paid and the present value of all amounts payable on account of such bodily injury under any workmen's compensation law, disability benefits law or any similar law.

(c) Any payment made under Part II to or for any insured shall be applied in reduction of the amount of the Limit of Liability under Part I.

(d) The Company shall not be obligated to pay under this coverage that part of the damages which the insured may be entitled to recover from the owner or operator of an uninsured automobile which represents medical payments paid or payable under Part IV.

(e) If more than one policy issued by this Company applies to Part II, the total limit of this Company's liability under all such policies shall not exceed the amount applicable under only one policy.

(f) It is agreed between the insured and the Company that in no event shall the total limit of the Company's liability exceed the limits set forth in the Declarations regardless of the number of vehicles insured under the policy or the separate itemization of premiums therefor; and that coverage under this section shall not be "stacked" with any other similar or identical coverage that may be issued under this policy, including Underinsured Motorist Coverage (Part III).

(g) Uninsured Motorist Coverage does not apply nor is it applicable to any accident or loss where the insured has Underinsured Motorist Coverage which applies to such accident or loss.

(h) Any amount payable under Part II shall be reduced by all sums paid to the insured for property damage on behalf of the owner or operator of the uninsured automobile and any other person or organization jointly or severally liable together with such owner or operator.

(i) Property damage losses recoverable hereunder shall be limited to damages caused by the actual physical contact of an uninsured motor vehicle with the vehicle described in the policy.

(j) There shall be no coverage for loss of use of the insured motor vehicle and no coverage for loss or damage to personal property located in the insured motor vehicle, except with respect to replacement of a child restraint system that was in use by a child during an accident to which coverage is applicable.

(k) There shall be no liability imposed under the Uninsured Motorist Property Damage Coverage if the owner or the operator of the vehicle at fault or the hit-and-run motor vehicle cannot be identified.

(l) There shall be no coverage for the deductible amount of damage, as shown in the Declarations, to the property insured as the result of any one accident.

(m) If coverage is provided to a motor vehicle, defined herein as an uninsured motor vehicle, under a bond or insurance policy having limits less than required by the Illinois Financial Responsibility Law then the Company's maximum limit of liability under this Part for "each person" is the difference between the minimum limit required by the Illinois Financial Responsibility Law for injury to one person and the corresponding limit provided in such bond or insurance policy, and the Company's maximum limit of liability under this Part for "each accident" is the difference between the minimum limit required under the Illinois Financial Responsibility Law for injury to two or more persons and the corresponding limit provided in such bond or insurance policy.

**Other Insurance.** With respect to bodily injury to an insured while occupying a motor vehicle not owned by the named insured, the insurance under Part II shall apply only as excess insurance over any other similar insurance available to such insured and applicable to such motor vehicle as primary insurance and this insurance shall then apply only in the amount by which the limits of liability for this coverage exceeds the applicable limit of liability of such other insurance.

Except as provided in the foregoing paragraph, if the insured has other similar insurance available to him and applicable to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the Company shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

**Arbitration.** Any dispute with respect to the coverage and the amount of damages shall be submitted for arbitration to the American Arbitration Association and shall be subject to its rules governing the conduct of arbitration hearings as to all matters except medical opinions. If the amount of damages being sought is equal to or less than the amount provided for in Section 7-203 (or its successor) of the Illinois Motor Vehicle Code, then the current American Arbitration Association Rules shall apply as to medical opinions. If the amount being sought in an American Arbitration Association case exceeds that amount as set forth in Section 7-203 (or its successor) of the Illinois Motor Vehicle Code, then the Rules of Evidence that apply in the Illinois Court's for placing medical opinions into evidence shall govern. Alternatively, disputes with respect to damages and the coverage shall be determined in the following manner: Upon the insured requesting arbitration, each party to the dispute shall select an arbitrator and the 2 arbitrators so named shall select a third arbitrator. If such arbitrators are not selected within 45 days from such request, either party may request that the arbitration be submitted to the American Arbitration Association. Any decision made by the arbitrators shall be written and shall be binding for the amount of damages not exceeding $75,000 for bodily injury to or death of any one person, $150,000 for bodily injury to or death of 2 or more persons in any one motor vehicle accident, or the corresponding policy limits under this Part, whichever is less. Arbitrations before a three arbitrator panel shall be subject to the rules of evidence in Illinois Courts, except to the extent the use of such rules is modified by the Illinois Insurance Code. Each party shall bear the cost of his/her own arbitrator and shall share equally the cost of the third arbitrator. All arbitration hearings under this policy shall take place in the Illinois County in which the insured resides and in accordance with the usual rules governing procedures and admissions of evidence in Courts of law of that county and not in accordance with any Court mandated arbitration or mediation rules. If the person demanding arbitration does not reside in Illinois, then arbitration shall take place in any Illinois County in which the Company has an office. Any person making claim hereunder shall answer written questions under oath when served by the Company, as well as comply with the Company's request for production of documents supporting that person's claim. No arbitrator shall have authority to entertain or decide class or representative claims.

**Trust Agreement.** In the event of payment to any person under Part II:

(a) the Company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against a person or organization legally responsible for the bodily injury because of which such payment is made;

(b) such person shall hold in trust for the benefit of the Company all rights of recovery which he shall have against such other person or organization because of the damages which are the subject of claim made under Part II;

(c) such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights;

(d) if requested in writing by the Company, such person shall take, through any representative designated by the Company, such actions as may be necessary or appropriate to recover such payment as damages from such other person or organization, such action to be taken in the name of such person; in the event of a recovery, the Company shall be reimbursed out of such recovery to expenses, costs and attorneys' fees incurred by it in connection therewith;

(e) such person shall execute and deliver to the Company such instruments and papers as may be appropriate to secure the rights and obligations of such person and the Company established be these provisions.

## PART III -- UNDERINSURED MOTORIST COVERAGE

**Underinsured Motorist Coverage.** To pay all damages which an insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury sustained by an insured. The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the underinsured motor vehicle provided, for the purposes of this coverage, determination as to whether the insured is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured and the Company or, if they fail to agree, by arbitration. No judgment against any person or organization alleged to be legally responsible for the bodily injury shall be conclusive, as between the insured and the Company, of the issues of liability of such person or organization or of the amount of damages to which the insured is legally entitled unless such judgment is entered pursuant to an action prosecuted by the insured with the written consent of the Company. The Company shall not be obligated to pay under this coverage until after the limits of liability under all applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

**Definitions.** The definitions under Part I apply to Part III, the definitions of "insured" and "insured automobile" from Part II apply to Part III, and the following also apply under this Part III:

**"Underinsured motor vehicle"** means a motor vehicle whose ownership, maintenance or use has resulted in bodily injury or death of the insured, as defined in the policy, and for which the sum of the limits of liability under all bodily injury liability insurance policies or bonds or other security required to be maintained under Illinois law applicable to the

driver or to the person or organization legally responsible for such vehicle and applicable to the vehicle, is less than the limits for Underinsured Motorist Coverage as stated on the Declarations or endorsement to this policy at the time of the accident.

*However,* "underinsured motor vehicle" does not include any vehicle:

(1) owned by or furnished or available for the regular use of the insured or any family member or person residing in the insured's household;

(2) owned by any governmental unit or agency;

(3) operated on rails or crawler treads;

(4) which is a farm type tractor or equipment designed mainly for use off public roads while not upon public roads;

(5) while located for use as a residence or premises;

(6) owned or operated by a person qualifying as a self-insurer under any applicable motor vehicle law;

(7) to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company denies coverage or is or becomes insolvent; or

(8) which is defined as an "uninsured motor vehicle" under Part II.

**Exclusions.** This policy does not apply under Part III:

(a) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(b) to any person using a vehicle without a reasonable belief that the person is entitled to do so;

(c) so as to inure, directly or indirectly, to the benefit of any worker's compensation or disability benefits insurer or any person or organization qualifying as a self insurer under any worker's compensation or disability benefits law or any similar law, provided, however, that there shall be no setoff or exclusion under this policy for amounts paid as disability benefits by the Social Security Administration or by any similar state or federal agency;

(d) to punitive or exemplary damage;

(e) to any claim against the Company submitted after the later of (i) two years after the date of accident, or (ii) six months after the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement; or

(f) to any claim by a person who operated, used or occupied an owned automobile or a non-owned automobile without a reasonable belief that he or she was entitled to do so.

**Limit of Liability.**

(a) The Company's maximum limit of liability for all damages due to bodily injury to one person is the limit of liability as shown in the Declarations for "each person" for Underinsured Motorist Coverage less those amounts actually recovered under the applicable bodily injury insurance

policies, bonds or other security maintained on the underinsured motor vehicle. Bodily injury to one person includes all injury and damages, including loss of service, society or consortium, to others resulting from this bodily injury. The Company's maximum limit of liability for all damages due to bodily injury to two or more persons in the same accident is the limit of liability as shown in the Declarations for "each occurrence" for Underinsured Motorist Coverage, subject to the above provision respecting each person, less those amounts actually recovered under the applicable bodily injury insurance policies, bonds or other security maintained on the underinsured motor vehicle. The limits of liability are not increased because more than one person is insured at the time of the accident. Any payment otherwise due under this coverage shall be reduced by a payment for bodily injury or medical expense under any other part of this policy. If more than one policy issued by this Company provides underinsured motorist coverage for the same bodily injury, the total limit of this Company's liability under all such policies shall not exceed the amount applicable under only one policy. In no event shall the total limit of the Company's liability exceed the limits set forth in the Declarations, regardless of the number of vehicles insured under the policy or the separate itemization of premiums therefor and coverage under this section shall not be "stacked" with any other similar or identical coverage that may be issued under this policy, including Uninsured Motorist Coverage.

(b) The Company shall not be obligated to make payment under this coverage until the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement. A judgment or settlement of the bodily injury claim in an amount less than the limits of the bodily injury coverages applicable to the claim shall not preclude the claimant from making an underinsured motorist claim against the Underinsured Motorist Coverage.

(c) Notwithstanding any of the above, if the Company and the insured or his/her legal representative agree that the insured suffered bodily injury as a result of negligent operation, use or maintenance of an underinsured motor vehicle, and without arbitration, agree also on the amount of damages that the insured is legally entitled to collect, then the maximum amount payable pursuant to such an underinsured motor vehicle insurance settlement agreement shall not exceed the amount by which the limits of the Underinsured Motorist Coverage exceed the limits of bodily injury liability insurance of the owner or operator of the underinsured motor vehicle. Any such agreement shall be final as to the amount due and shall be binding upon the insured and the Company regardless of the amount of any judgments, or any settlement reached between any insured and the person or persons responsible for this accident. No such settlement shall be concluded unless: (i) the insured has complied with all other applicable policy terms and conditions; and (ii) before the conclusion of the settlement agreement, the insured has filed a lawsuit against the underinsured motor vehicle owner or operator and has not abandoned the suit, or settled the lawsuit without preserving the rights of the Company, provided, however, that lawsuit

bodily injury; or

B. incurred for:
   1. the use of thermography or other related procedures of similar nature; or
   2. the use of acupuncture or other related procedures of a similar nature; or
   3. the purchase or rental of equipment not primarily designed to serve a medical purpose.

**Definitions**. The definitions under Part I apply to Part IV, and the following also applies under Part IV:

**"occupying"** means in or upon or entering into or alighting from.

**Exclusions**. This policy does not apply under Part IV to bodily injury, sickness, disease or death:

(a) sustained while occupying (1) an owned automobile while used as a public or livery conveyance, or (2) any vehicle while located for use as a residence or premises;

(b) sustained by the named insured or a relative (1) while occupying an automobile owned by or furnished or available for the regular use of either the named insured or any relative, other than an automobiles defined herein as an "owned automobile", or (2) while occupying or through being struck by (i) a farm type tractor or other equipment designed for use principally off public roads, while not upon public roads, or (ii) a vehicle operated on rails or crawler-treads;

(c) sustained by any person other than the named insured or a relative, resulting from use of (1) a non-owned automobile in the automobile business or as a public or lively conveyance, or (2) a non-owned automobile in any other business or occupation except operation or occupancy of private passenger automobile by the named insured or by his private chauffeur or domestic servant or of a trailer used therewith or with an owned automobile;

(d) sustained by any person who is employed in the automobile business, if the accident arises out of the operation thereof and if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law (<u>This includes a self-insurer, which would otherwise be required to provide coverage pursuant to any federal or state worker's compensation law or other similar law;</u>);

(e) to injury, sickness, disease, death or loss due to war;

(f) to the extent that any medical expense is paid or payable to or on behalf of the injured person under the provisions of any (i) automobile or premises insurance affording benefits for medical expenses, (ii) individual, blanket or group accident, disability or hospitalization insurance, (iii) medical or surgical reimbursement plan, or (iv) workmen's compensation or disability benefits law or any similar law;

(g) resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

(h) arising out of the operation of any automobile insured under this policy which is designed for racing while being tested, repaired or serviced or to any automobile or motor vehicle while used, operated, manipulated or maintained in any prearranged or organized race or speed test, including "hot rod" or "stock car" racing;

(i) to any claim by a person who operated, used or occupied an owned automobile or a non-owned automobile without permission or a reasonable belief that he or she was entitled to do so; or

(j) to any person while engaged in use of or occupying a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services, or (2) for snow removal.

(k) bodily injury caused by or a consequence of a discharge or use of a weapon.

**Limit of Liability**. The limit of liability for medical payments stated in the Declarations as applicable to "each person" is the limit of the Company's liability for all expenses incurred by or on behalf of each person who sustains bodily injury as the result of any one accident. If more than one policy issued by this Company applies to this part, the total limit of this Company's liability under all such policies shall not exceed the amount applicable under only one policy.

**Other Insurance**. If there is other automobile medical payments insurance against a loss covered by Part IV of this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability of all valid and collectible automobile medical payments insurance; provided however, the insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible automobile medical payments insurance.

**Arbitration.** If any person making claim hereunder and the Company do not agree that a medical bill submitted for payment is not usual and customary or necessary and reasonable or do not otherwise agree that it is payable under Part IV, these matters shall be submitted to arbitration. Upon the insured or the Company demanding arbitration, the insured and the Company shall each select an arbitrator and the two arbitrators so named shall select a third arbitrator. The three arbitrators so selected shall hear and determine the questions in dispute. Any decision made by the arbitrators shall be binding for the amount decided by the arbitrators to be payable hereunder not exceeding the limits of liability for Medical Payments as provided in the Declarations of this policy subject to all other terms and conditions of this policy. To the extent that an arbitration decision exceeds the limit of liability, it is void. The authority of the arbitrators is limited to a determination of the amount due for Medical Payments under this policy and does not extend to punitive damages or other damages other than Medical Payments covered by this policy. Each party shall bear the cost of his/her own arbitrator and shall share equally the costs of the third arbitrator The arbitration shall take place in Illinois in the County of residence of the person demanding arbitration. If the person demanding arbitration does not reside in Illinois then the arbitration shall take place in an Illinois

County where the Company maintains a place of business. In any arbitration hereunder the arbitrators shall be governed by the rules of evidence as used in Illinois courts. No arbitrator shall have authority to entertain or decide class or representative claims.

## PART V – PHYSICAL DAMAGE COVERAGE.

**A - Comprehensive (excluding Collision)**. At the Company's option to have repaired or to pay for loss caused other than by collision to the owned automobile or to a non-owned automobile operated by an insured but only for the amount of each such loss in excess of the deductible amount stated in the Declaration as applicable hereto. For the purpose of this coverage, breakage of glass and loss caused by missiles, falling objects, fire, theft or larceny, explosion, earthquake, windstorm, hail, water, flood, malicious mischief or vandalism, riot or civil commotion shall not be deemed to be loss caused by a collision.

**B - Collision**. At the Company's option to have repaired or to pay for loss caused by collision to the owned automobile but only for the amount of each such loss in excess of the deductible amount stated in the Declarations as applicable hereto.

**C - Towing and Labor Costs**. To pay for towing and labor costs necessitated by the disablement of the owned automobile,other than disablement due to running out of gas, provided:
1. the labor is performed at the place of disablement.
2. the disablement does not occur at your residence; and
3. you provide us with proof in the form of verifiable receipts of towing and labor charges incurred.

**D – Rental.** In consideration of the premium charged, to reimburse the insured for the rental fee expenses, but only to the extent of the applicable limits for rental under this Part V, incurred (excluding mileage charge) commencing forty-eight (48) hours after the insured has reported the loss or theft to the Company and the loss is caused by an auto accident.
Our payment will be limited to the lesser of that period of time:
1. Reasonably required to repair or replace your auto, or
2. the repair facility finishes the repairs;
3. we offer to replace the Insured auto;
4. we offer settlement to you
Coverage terminates upon the completion of the repairs, but in no event later than 12:01 AM on the last day of coverage identified in the Declarations. The Company shall not be obligated to pay aggregate expenses in excess of the amounts in the Declarations. In no event shall the Company accept a claim for collision reimbursement unless a verified itemized statement of rental charges is supplied by the insured within thirty (30) days after the date of accident.

**Storage Charges**: In addition, after an auto accident for which this coverage is provided, we will pay reasonable storage charges to the insured or any relative who is legally responsible for storing your covered auto.

If the insured fails to notify the company within 48 hours that the auto is in storage, or if the insured refuses to release the auto for movement to the company's preferred storage lot, we will only pay storage charges to a maximum of $200. This coverage applies only if the Declarations indicate that "Collision" or "Comprehensive" is provided for that auto.

**Supplementary Payments**. In addition to the applicable limit of liability, the Company will pay reasonable general and salvage charges for which the insured becomes legally liable as to the automobile being transported.

**Definitions**. The definitions of "named insured", "relative", "owned automobile", "farm automobile", "utility automobile", "automobile business", "war" in Part I apply to Part V and under Part V:

**"date of accident"**, for purposes of the Collision coverage, means the date of the collision; for purposes of Comprehensive Coverage, "date of accident" means the date of the event out of which the claim arises, such as but not limited to the date of fire, theft, vandalism or other event described in Comprehensive Coverage.

**"insured"** means (a) with respect to the owned automobile (1) the named insured and (2) any person or organization, other than a person or organization engaged in the automobile business or as a carrier or the bailee for hire, maintaining, using or having custody of said automobile with the permission of the named insured; (b) with respect to a non-owned automobile, the named insured and any relative provided the actual use thereof is with the and within the scope of permission of the owner;

**"non-owned automobile"** means an automobile not owned by or furnished or available for the regular use of either the named insured or any relative, other than a temporary substitute automobile, while said automobile is in the possession or custody of the insured or is being operated by him;

**"loss"** means direct and accidental physical damage to the automobile or its parts, including any child restraint system that was in use by a child during an accident to which this coverage applies, but "loss" does not include diminution in value;

**"collision"** means collision of an automobile covered by this policy with another object or with a vehicle to which it is attached or by upset of such automobile;

**"trailer"** means a trailer designed for use with a private passenger automobile, if not being used for business or commercial purposes with other than a private passenger, farm or utility automobile, and if not a home, office, store, display or passenger trailer;

**"forcible entry"** means unauthorized entry to the vehicle and use of actual force or tampering to operate it evidenced by marks or damage to the ignition, ignition locks, steering locks, or other security devices installed to prevent operation by unauthorized persons

11 | ILLINOIS PERSONAL AUTO POLICY ~ FORM ILPOL 10/15

**"aftermarket crash part"** means a replacement for any of the non-mechanical sheet metal or plastic parts that generally constitute the exterior of a motor vehicle, including inner and outer panels;

**"non-original equipment manufacturer (Non-OEM) aftermarket crash part"** means an aftermarket crash part not made for or by the manufacturer of the motor vehicle;

**"like kind and quality part"** includes but is not limited to a replacement part for any vehicle obtained from another vehicle;

**"repair"** means physical repair but does not mean restoration to pre-accident value or condition;

**"diminution in value"** means the actual or perceived decrease of market or resale value of an automobile or part thereof, measured after repair of physical damage.

**Exclusions.** This policy does not apply under Part V:

(a) to any automobile while used as a public or livery conveyance;

(b) to loss of equipment which is not available from the manufacturers of the automobile named in the policy for that make, model, and model year;

(c) to loss of equipment which is available from the manufacturers of the automobile named in the policy for that make, model, and model year, but which is not permanently installed in the dash or console opening specified by the manufacturer of the automobile for the installation of such equipment;

(d) to loss to a non-owned automobile arising out of its use by the insured in the automobile business;

(e) to loss to a private passenger, farm or utility automobile or trailer owned by the named insured and not described in this policy or to any temporary substitute automobile therefor, if the insured has other valid and collectible insurance against such loss;

(f) to damage which is due and confined to wear and tear, freezing, mechanical or electrical breakdown or failure, unless such damage results from a theft covered by this policy;

(g) to tires, unless damaged by fire, malicious mischief, vandalism, stolen or unless loss be coincident with and from same cause as other loss covered by this policy;

(h) to loss due to radioactive contamination;

(i) under B of Part V, to breakage of glass if insurance with respect to such breakage is otherwise afforded;

(j) to loss to any automobile designed for racing while being tested, repaired or serviced or to any automobile or motor vehicle used, operated, manipulated or maintained in any prearranged or organized race or speed test, including "hot rod" or "stock car" racing;

(k) to loss of or damage to any device or instrument designed for the recording, reproduction, receiving, or transmittal of sound, radio waves, microwaves or television signals unless such device or instrument is permanently installed in the dash or console opening specified by the manufacturer of the motor vehicle for the installation of such equipment;

(l) to loss of or damage to any tape, wire, record disc or other medium for use with any device or instrument designed for the recording, reproduction, or recording and reproduction of sound;

(m) to loss with respect to an automobile, ownership of which is acquired by the named insured during the policy period, the named insured has not notified the Company in writing within 30 days of such acquisition, of his election to make Part V of this policy applicable to such automobile;

(n) to any loss due to theft under Coverage (A) of Part V if evidence exists that forcible entry was not required to gain access to the automobile or to operate it, or that evidence exists that keys were left in, on or near the automobile while it was unattended;

(o) to loss to any custom furnishings or equipment in or upon any pick-up, panel truck, or van, including, but not limited to, special carpeting, insulation, furniture, bars, television receivers, facilities for cooking or sleeping, height extending roofs, custom murals, paintings or other decals or graphics;

(p) to damage caused intentionally by or at the direction of the insured, however this exclusion does not apply to the interest in the property of an innocent co-insured who did not cooperate in or contribute to the creation of the loss if the loss arose out of a pattern of criminal domestic violence and the perpetrator of the loss is criminally prosecuted for the act causing the loss, provided that payment to the innocent co-insured is limited to his or her ownership interest in the property as reduced by any payments to a mortgagor or other secured interest;

(q) to any loss arising out of or during its use for the transportation of hazardous substance, flammable liquid, or similarly hazardous material;

(r) to loss due to war, declared or undeclared; or,

(s) to diminution in value to any vehicle.

**Limit of Liability.** The Company's liability for all losses under Part V except for non-owned trailers shall not exceed the smallest of the following:

(a) the actual cash value of stolen or damaged property or part thereof at the time of the loss;

(b) the amount necessary to repair the damaged property using, at the sole direction of the company, new parts from the vehicle's manufacturer, aftermarket crash parts or non-original equipment manufacturer (Non-OEM) aftermarket crash parts or like kind and quality parts. Non original equipment manufacturer (Non-OEM) aftermarket crash parts will be identified on the repair estimate;

(c) the amount necessary to replace the stolen or damaged property at the time of the loss with like kind and quality property less depreciation;

The Company's liability for loss under Part V for non-owned trailers shall not exceed $500.00.

**Other Insurance.** This insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance or self-insurance.

## PART VI – NON OWNER COVERAGE.

**Non-Owner Coverage**. This Part VI applies only if the term "Non-Owner" appears on the Declarations of the policy. The purpose of "Non-Owner" Coverage is to insure the named insured against the liability imposed by the law upon the named insured for bodily injury to or death of any person or damage to property to the amounts and limits stated on the Declaration of this policy and growing out of the use or operation by the named insured within the continental limits of the United States or the Dominion of Canada of a non-owned automobile. If the term "Non-Owner" appears on the Declarations of the policy, then all the terms and conditions of the policy apply except as modified herein, and to the extent that any definition, term or provision of Part VI conflicts with any definition, term or provision of any other Part of this policy, the purpose, definitions, terms and provisions of Part VI shall control the other Part of this policy.

If this Part VI applies then:

1) In Part I - Liability and in all other Parts incorporating said section "Persons Insured" is deleted and the following is substituted:

**"Persons Insured"** The only person insured under this policy is the named insured and his or her spouse, if a resident of the same household, and then only with respect to a non-owned automobile, provided the use and operation thereof is with the permission of its owner and within the scope of such permission.

2) Part VI Definitions to be substituted for definitions in Part I - Liability and as incorporated in other Parts or Conditions from Part I - Liability:

**"Non-owned automobile"** means an automobile not owned by or furnished for the regular use of the named insured or any resident of the household of the named insured.

**"Owned automobile"** means any automobile owned by or furnished for the regular use of the named insured or a resident of the household of the named insured.

3) Part VI definitions to be substituted in specified Parts and related Conditions:

For purpose of Part II - Uninsured Motorist Coverage and of Part III - Underinsured Motorist Coverage:

**"Insured"** means the named insured and any relative of the named insured.

4) The following are added Exclusions:

In Part I - Liability:

(aa) to any automobile owned by or furnished or available for the regular use of the named insured, or owned by or furnished or available for the regular use of a resident of the household of the named insured;

(bb) to any automobile while used in a business or occupation of the named insured.

In Parts II - Uninsured Motorist Coverage and Part III - Underinsured Motorist Coverage:

(aa) to injuries arising out of the operation, use or maintenance of a motor vehicle owned by or furnished or available for the regular use of the named insured, resident spouse or other resident of the named insured's household.

In Part IV - Medical Payments:

(aa) arising out of the use, operation, or maintenance of any automobile owned by or furnished or available for the regular use of the named insured or a resident of the household of the named insured;

5) In all Parts, delete the Other Insurance section and replace it with:

**Other Insurance**. This insurance shall be excess insurance over any other valid and collectible insurance or self-insurance.

## CONDITIONS

**1. Policy Period, Territory**. This policy applies only to accidents, occurrences and losses during the policy period, as stated in the Declarations, while the automobile is within the United States of America, its territories or possessions, or Canada or is being transported between ports thereof. This policy may be renewed for successive policy periods by payment of the required premium to the Company on or before the effective date of each successive policy period. If such premium is not paid when due, the policy shall terminate as of that date and such date shall be the end of the policy period. Such premium shall be computed in accordance with the manuals then in use by the Company. Each policy period shall begin and end at 12:01 A.M. local time at the address of the named insured.

**2. Premium**. During the term of this policy and any renewal thereof, the named insured shall immediately inform the Company of each change in the garaging address of an insured vehicle, of each new resident driver. of the suspension or revocation of the driver license of the named insured or of any resident driver, and of any other change in

the persons or risks for which coverage is provided hereunder so as to allow the Company to determine whether and under what premium and conditions to continue coverage under this policy. If the named insured disposes of or replaces a private passenger, farm or utility automobile, he shall inform the Company in writing within 30 days of such change. If the named insured acquires ownership of an additional private passenger, farm or utility automobile, he shall inform the Company in writing within 30 days following the date of its delivery of his election to make this policy applicable to such owned automobile. Any premium adjustment necessary shall be made as of the date of such change or acquisition in accordance with the manuals in use by the Company. The named insured shall, upon request, furnish reasonable proof of the number of such automobiles or trailers and a description thereof.

**3. Notice**. In the event of an accident, occurrence or loss, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the

names and address of the injured and of available witnesses, shall be given by or for the insured to the Company as soon as practicable. However, in the case of a "hit and run" claim under Part II, notice must be given to the Company in writing within 30 days of the accident. A lawsuit seeking recovery against the Company under Part II must be filed within two years of the accident, however this period limiting time to file suit against the Company is tolled from the date proof of loss is filed, in whatever form is required by the policy, until the date the claim is denied in whole or in part. In the event of theft the insured shall also promptly notify the police. If claim is made or lawsuit is brought against an insured, he shall immediately forward to the Company every demand, notice, summons or other process received by him, his representative or agent. The Company will not be obligated to pay, and shall not pay under Part I, unless the Company received actual notice of a lawsuit before a judgment had been entered in said lawsuit. If, before the Company makes a payment of loss under Part II, the insured or his legal representative shall institute any legal action for bodily injury against any person or organization legally responsible for the use of an automobile involved in the accident. A copy of the summons and complaint or other process served in connection with such legal action shall be forwarded immediately to the Company by the insured or his legal representative. All notices to the Company should be provided to:

American Alliance Casualty Company
9600 Bryn Mawr, Suite 275
Rosemont, Illinois 60018

#### 4. Fraud and Misrepresentation.

**(a)** If there has been a misrepresentation or false warranty, made with actual intent to deceive or which materially affects either the risk or hazard assumed by the Company, made by the insured or in his behalf in the negotiation for this policy, or breach of condition of such policy, and if said misrepresentation or false warranty or breach of condition is stated in the policy or endorsement or rider attached thereto, or in the written application for this policy, then this policy shall be null and void and of no benefit, provided, however that the Company, during the lesser of the first year of the policy or the first term of the policy, rescinds the policy and declares this policy void. If the policy has been in effect more than the lesser of one year or the first policy term , then the Company shall not rescind this policy. Notwithstanding any other provisions of this policy, this policy shall provide no coverage or benefit to any person who makes a fraudulent statement or omission or engages in fraudulent conduct with respect to any accident of loss for which coverage or a benefit is sought under this policy or any renewal of this policy.

(b) If, at any time, the Company becomes aware of misrepresentation that would have made the risk ineligible or resulted in a higher premium charge, the Company reserves the right to retroactively endorse the policy to the correct premium charge. In the event that the Company exercises that right, the named insured will be liable for the total premium amount charged for the applicable coverage, which shall include any additional premium amounts that the named insured would have been charged had such

misrepresentation not been made. In addition, a two-hundred percent (200%) surcharge, based on the total premium amount the named insured would have been charged for the coverage had such misrepresentation not been made, may, at the Company's option, be assessed against the policy. However, the amount charged shall not exceed the claim amount, in the event that such claim is the reason the Company becomes aware of the misrepresentation. The total premium amount charged will be calculated based on the earlier of (1) the inception date of the policy, or (2) the date the misrepresentation occurred during the policy period. Nothing in this Condition shall preclude the Company from exercising or pursing any other right or remedy available under Illinois law.

**5. Two or More Automobiles - Parts I, IV and V**. When two or more automobiles are insured hereunder, the terms of this policy shall apply separately to each, but an automobile and a trailer attached thereto shall be held to be one automobile as respects limits of liability under Part I and IV of this policy, and separate automobiles under Part V of this policy, including any deductible provisions applicable thereto.

**6. Assistance and Cooperation of the Insured**. As a condition precedent to the Company's duty of indemnity with respect to claims and lawsuits brought against an insured, the insured shall cooperate with the Company and upon request by the Company or attorneys hired by the Company to represent the insured, the insured shall assist in completing the Company's investigations including answering questions and providing all reasonably available evidence and in the litigation of any lawsuit including attending hearings, trials and examinations under oath, and assisting in making settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of any legal proceedings in connection with the subject matter of this insurance. During the pendency of any claim or lawsuit against an insured, the insured shall advise the Company in writing of his new residential address or new residential telephone number within 14 days of any change. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident. After the notice of claim under any part of this policy, the Company may require the insured to take such actions as may be necessary or appropriate to preserve his right to recover damage from any person or organization alleged to be legally responsible for the bodily injury; and in any action against the Company, the Company may require the insured to join such person or organization as a party defendant.

**7. Action Against Company - Part I**. No action shall lie against the Company unless, as a condition precedent thereto, the insured shall have fully complied with all terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the Company. Any lawsuit must be filed within one year after the date of loss or damage. However, this one-year period is tolled from the date proof is filed until the day the claim is

denied in whole or in part. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Company as a party to any action against the insured to determine the insured's liability, nor shall the Company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the insured or the insured's estate shall not relieve the Company of any of its obligations hereunder.

**Parts II, III, IV and V.** No action shall lie against the Company unless, as a condition precedent thereof, there shall have been full compliance with all the terms of this policy nor under Part V until 30 days after proof of loss is filed and the amount of loss is determined as provided in this policy. Under this policy the running of all contractual periods limiting time to file suit against the Company is tolled from the date proof of loss is filed, in whatever form is required by the policy, until the date the claim is denied in whole or in part. In no event shall lawsuit, arbitration or appraisal be commenced against the Company more than two years after the date of accident, except only in the following circumstances:

(a) under Part II, if coverage is based on entry of the court order of rehabilitation or liquidation by reason of insolvency of an insurer, lawsuit or arbitration shall not be commenced against the Company after the later of: two years after the date of the accident or six months after the entry of such court order of rehabilitation or liquidation by reason of insolvency; or

(b) under Part III, suit or arbitration shall not be commenced after the later of: two years after the date of accident or six months after the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement.

**8. Medical Report; Proof and Payment of Claim - Part IV.** As soon as practicable the injured person or someone on his behalf shall give to the Company written proof of claim, under oath if required, and shall, after each request from the Company, execute authorization to enable the Company to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the Company when and as often as the Company may reasonably require. The Company may pay the injured person or any person or organization rendering the services and such payment shall reduce the amount payable hereunder for injury. Payment hereunder shall not constitute an admission of liability of any person or, except hereunder, of the Company.

**9. Insured's Duties in Event of Loss - Part V.** In the event of loss the insured shall:

(a) protect the automobile, whether or not the loss is covered by this policy, and any further loss due to the insured's failure to protect shall not be recoverable under this policy; reasonable expenses incurred in affording such protection shall be deemed incurred at the Company's request;

(b) file with the Company, within 91 days after loss, his sworn proof of loss in such form and including such information as the Company may reasonably require and shall, upon the Company's request, exhibit the damaged property and submit to examination under oath.

(c) promptly report any loss to the Company and, in the event of theft, promptly report the theft to the police within 24 hours of the theft;

**10. Proof of Claim; Medical Report - Part II, III and IV.** As soon as practicable, the insured or other person making claim shall give to the Company written proof, under oath, if required, including full particulars of the nature and extent of the injuries, treatment, and other details entering into the determination of the amount payable. The insured and every other person making claim shall submit to examinations under oath by any person named by the Company and subscribe the same, as often as may reasonably be required. Proof of claim shall be made upon forms furnished by the Company unless the Company shall have failed to furnish such forms within 15 days after receiving notice of claim. The injured person shall submit to physical examinations by physicians selected by the Company when and as often as the Company may reasonably require and he, or in the event of his incapacity his legal representative, or in the event of his death his legal representative or the person or persons entitled to sue therefor, shall upon each request from the Company execute authorization to enable the Company to obtain medical reports and copies of records.

**11. Appraisal - Part V.** If the insured and the Company fail to agree as to the amount of loss, then the dispute shall be decided by appraisal as described herein. In such event the insured and the Company shall each select a competent appraiser. The appraisers shall state separately the actual cash value and the cost of repairs and failing to agree shall submit their differences to an umpire whom they select. An award in writing of any two shall determine the actual cash value and the cost of repairs. The insured and the Company shall each pay his chosen appraiser and shall bear equally the other expenses of the appraisal and umpire. The Company shall not be held to have waived any of its rights by any act relating to appraisal. No appraiser or umpire shall have authority to entertain or decide class or representative claims.

**12. Payment of Loss.** Any amount due is payable (a) to the insured, or (b) if the insured is a minor to his parent or guardian, or (c) if the insured is deceased to his surviving spouse, otherwise (d) to a person authorized by law to receive such payment or to a person legally entitled to recover the damages which the payment represents; provided, the Company may at its option pay any amount due in accordance with provision (d) hereof.

**Part V.** The Company may pay for the loss in money; or may repair or replace the damaged or stolen property; or may at any time before the loss is paid or the property is so replaced, at its expense return any stolen property to the named insured, or at its option to the address shown in the declarations, with payment for any resultant damage thereto less deductible; or may take all or such part of the property at the agreed or appraised value but there shall be no abandonment to the Company. If the Company deems the

automobile a total loss, then the Company may pay the insured and the loss payee, if any. The interest of a loss payee is subject to any defenses available against the insured under the terms and conditions of this policy with respect to any loss. If the insured or owner elects to have the automobile repaired at a facility of his/her own choosing and that facility charges more than the Company would pay for the repair at another licensed auto repair facility reasonably available, then the Company may tender the amount payable under its estimate and the insured or owner will be responsible to pay the difference to the repair facility of his/her own choosing. If hidden or additional damage is identified, then the Company shall be given the opportunity to estimate the cost of such additional repair and the Company may tender such additional amount payable pursuant to its additional estimate.

**13. No Benefit to Bailee - Part V.** The insurance afforded by this policy shall not inure directly or indirectly to the benefit of any carrier or other bailee for hire liable for loss to the automobile.

**14. Subrogation.**

(a) In the event of any payment under this policy, the Company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and paper and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

(b) In the event of any payment under Part IV - Medical Payments, the Company shall be subrogated to all the rights of recovery therefor which the insured person or anyone receiving such payment may have against any person or organization and such person shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. Such person shall do nothing after loss to prejudice such rights.

(c) In the event of any payment under the Underinsured Motorists Coverage, the Company shall not exercise any right of subrogation under a policy providing additional uninsured motorist coverage against an underinsured motorist where the Company has been provided with written notice in advance of a settlement between its insured and the underinsured motorist and the Company fails to advance a payment to the insured, in an amount equal to the tentative settlement, within 30 days following receipt of such notice.

**15. Changes.** Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or stop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by a duly authorized representative of the Company.

**16. Assignment.** Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if however, the insured named as Named Insured of the Declarations, or his spouse if a resident of the same household, shall die, this policy shall cover (1) the survivor as named insured, (2) his legal representative as named insured but only while acting within the scope of his duties as such, (3) any person having proper temporary custody of

an owned automobile, as an insured, until the appointment and qualification of such legal representative, and (4) under Division 1 of Part IV any person who was a relative at the time of such death.

**17. Cancellation.** This policy may be cancelled by the named insured named as Named Insured of the Declarations by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the Company by mailing to the named insured and loss payee at their last known addresses written notice stating when not less than 30 days thereafter such cancellation shall be effective, however, where cancellation is for non-payment of premiums at least ten (10) days notice must be given. The Company shall not exercise its right to cancel such policy after it has been in effect for 60 days or any policy that has been renewed except for the reasons set forth in Section 5/143.19 of the Illinois Insurance Code. The mailing of notice as aforesaid on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service shall be sufficient proof of notice, and a copy of such notice shall be sent to the insured's broker or the agent of record at the last mailing address known to the Company. In the event of the cancellation of this policy by the Company or the named insured, earned premium shall be computed pro-rata to the date of cancellation. Any refund of the premium shall be without prejudice to any claim arising prior to the cancellation, and such refund shall be made to the broker or the agent of the named insured by the Company within 30 days from (1) the date of the notice of cancellation by the Company, or (2) the date the Company receives the request for cancellation from the named insured or its representatives, but payment or tender of unearned premium is not a condition of cancellation. If this policy has been cancelled and reinstatement is requested, the Company may at its sole option reinstate the policy and determine the effective date of reinstatement. Coverage under a reinstated policy shall be prospective only as of the date stated in the reinstatement endorsement and is not retroactive to the prior cancellation date. No coverage is provided under a reinstatement of this policy relative to any accident, loss or occurrence between a prior cancellation and the effective date of reinstatement.

**18. Declarations.** By acceptance of this policy, the insured named as Named Insured of the Declarations agrees that the statements contained in the Application, which forms a part of this policy, have been made by him or on his behalf and that said statements and the statements of the Declarations and in any subsequent Application accepted by the Company are offered as an inducement to the Company to issue or continue this policy and that the same are his agreements and representations, and that this policy is issued and continued in reliance upon the truth of such statements and representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

**19. Excluded Drivers.** If any person is identified on the Declarations or an endorsement thereto in effect at the time of an accident as "EXCLUDED", and if the accident involves the use or operation of any motor vehicle by the

16 | Illinois Personal Auto Policy ~ Form ILPOL 10/15

person identified as "EXCLUDED" then, notwithstanding any other provision of this policy or its Declarations or amended Declarations, no coverage of any kind under this policy is owing or payable by the Company to any person with respect to such accident and the Company is not obligated to defend any person in any legal action arising out of the accident.

**20. Choice of Law.** The laws of the State of Illinois govern the interpretation of this policy and the respective rights and the obligations of the parties hereto. Further, this policy does not comply with (a) any Financial Responsibility Law other than Illinois, or (b) any other state's statutory requirements for No-Fault Coverages.

### 21. Loss Payable Clause

Loss or damage shall be paid, subject to all the terms of this policy, as interest may appear, to the named insured, the Loss Payee shown on the Declarations Page of this policy, both jointly, or separately, at our discretion. The loss payee has no greater rights under this policy than the insured. Where coverage is denied to the insured, coverage is also denied to the loss payee.

Where fraud, misrepresentation, material omission, or intentional damage has been committed by or at the direction of you or a family member, the Loss Payee or lien holder's interest will not be protected, except in the case where an innocent co-insured who did not cooperate in or contribute to the creation of the loss if the loss arose out of a pattern of criminal domestic violence and the perpetrator of the loss is criminally prosecuted for the act causing the loss.

However, we reserve the right to cancel or non-renew this policy as permitted by policy terms and the cancellation or non-renewal shall terminate this agreement as to the Loss Payee's interest.

When we pay the Loss Payee, we shall, to the extent of payment, be subrogated to the Loss Payee's rights of recovery.

All other terms and conditions of this policy remain unchanged.

### 22. Automatic Termination

If a person other than You or a Relative becomes the owner of the auto, coverage for that auto will automatically terminate at the time possession is conveyed to the new owner

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its President and Secretary, but this policy shall not be valid unless completed by the attachment hereto of the Declarations page and countersigned on the aforesaid Declarations page by a duly authorized representative of the Company.

President

Secretary

American Alliance Casualty Company
Personal Auto Policy

Illinois Personal Auto Policy Form ILPOL 10/15
Section 143c of the Illinois Insurance Code requires notification of the following addresses:

**American Alliance Casualty Company**
9600 Bryn Mawr Avenue, Suite 275
Rosemont, Illinois 60018
(877) 228-3101
(847) 916-3200

**Illinois Department of Insurance**
Consumer Services Section
320 West Washington Street
Springfield, Illinois 62767

against the underinsured owner and operator may be dismissed where the Company has been given notice in advance of a settlement between the insured and the underinsured motorist and the Company fails to advance a payment to the insured in an amount equal to the tentative settlement within 30 days following receipt of such notice.

**Arbitration**. If any person making claim hereunder and the Company do not agree that such person is legally entitled to recover damages from the owner or operator of an underinsured motor vehicle because of bodily injury to an insured or do not agree as to the amount payable hereunder, then these matters shall be submitted to arbitration. Upon the insured requesting arbitration, each party to the dispute may select an arbitrator and the two arbitrators so named may select a third arbitrator. If such arbitrators are not selected within 45 days from such request, either party may request that such arbitration be submitted to the American Arbitration Association. The arbitrators shall then hear and determine the questions in dispute, and decision in writing of any two arbitrators shall be binding upon the parties. All arbitration hearings under this policy, including both the tripartite panel and the American Arbitration Association, shall be conducted in the County and State in which the insured resides and in accordance with the usual rules governing procedure and admission of evidence in Courts of law of the County and not in accordance with any Court mandated arbitration or mediation rules. Any decision made by the arbitrators shall be binding for the amount of damages not exceeding $50,000.00 for bodily injury to or death to any

one person, $100,000.00 for bodily injury to or death of 2 or more persons in any one motor vehicle accident, or the corresponding policy limits for bodily injury or death under this Part, whichever is less ("UIM arbitration limits"). It is agreed that the arbitrators shall not enter an award in excess of UIM arbitration limits, and, if an award is entered in excess of the UIM arbitration limits then that portion of the award which exceeds the policy limits is void and not binding on either the insured or the company. All expenses of any arbitration hereunder shall be shared equally by the parties. No arbitrator shall have authority to entertain or decide class or representative claims.

**Other Insurance**. With respect to bodily injury to an insured while occupying a motor vehicle not owned by the named insured, the insurance under Part III shall apply only as excess insurance over any other similar insurance available to such insured and applicable to such motor vehicle as primary insurance, that this insurance shall then apply only in the amount by which the limit of liability for Part III exceeds the applicable limit of liability of such other insurance. Except as provided in the foregoing paragraph, if the insured has other similar insurance available to him and applicable to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the Company shall not be liable for a greater proportion of any loss to which Part III applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

## PART IV - MEDICAL PAYMENTS

**Medical Payments.** The Company will reimburse to the "insured" with relation to a motor vehicle accident occurring during the term of this policy, all usual and customary expenses paid by the insured for the services provided by individuals or hospitals licensed under the Medical Practice Act of Illinois or comparable law incurred within one year of an accident for reasonable and necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital and professional nursing charges. The reasonable expense of funeral services is also covered in this Part. The medical and funeral expenses covered herein must have been caused by accident and sustained by:

- **Division 1.** the named insured or a relative while occupying or through being struck by an automobile; or
- **Division 2.** any other person while lawfully occupying (a) an owned automobile while being operated or used by an insured, or (b) a non-owned automobile if the bodily injury results from its operation by an insured, provided that no such payment shall be made unless the person to or for whom such payment is made shall have executed a written agreement that the amount of such payment shall be applied toward the settlement of any claim or satisfaction of any judgment for damages entered in his/her favor, against any other person insured under the terms of this policy because

of bodily injury arising out of an accident to which the Liability Coverage applies, or toward any award under the Uninsured Motorist Coverage of this policy.

We will reimburse to the insured only those medical expenses that were paid within one (1) year from the date of the accident. Expenses for Medical and Funeral Services means usual and customary charges incurred for reasonable and necessary services rendered to or on behalf of an insured within one (1) year from the date of the accident for:
medical, surgical, x-ray, and dental services when performed by a licensed medical professional; pharmaceuticals, prosthetic devices; eye glasses; necessary ambulance, hospital, and professional nursing services when prescribed by a licensed medical professional; and funeral services.

Reasonable Medical expenses do not include expenses:
A. for treatment, services, products or procedures that are:
   1. experimental in nature, for research, or not primarily designed to serve a medical purpose; or
   2. not commonly and customarily recognized throughout the medical profession and within the United States as appropriate for the treatment of

the accident or six months of entry of the Court order of rehabilitation or liquidation by reason of insolvency;

(h) to any claim by a person who operated, occupied or used an automobile without a reasonable belief that he or she was entitled to do so, however, this exclusion does not apply to the named insured;

(i) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(j) to bodily injury or property damage which is either expected or intended by the insured.

(k) to bodily injury or property damage if Liability coverage or Underinsured Motorist coverage applies under this policy to the accident.

(l) while any vehicle is operated by an Excluded driver,

**Limits of Liability**

(a) The limit of Uninsured Motorist Coverage stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages due to bodily injury to one person. Bodily injury to one person includes all injury and damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Uninsured Motorist Coverage as stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same accident. The limits of liability are not increased because more than one person is insured at the time of the accident.

(b) Any amount payable under the terms of Part II because of bodily injury sustained in an accident by a person who is an insured under Part II shall be reduced by:

  (1) all sums paid on account of such bodily injury by or on behalf of (i) the owner or operator of the uninsured motor vehicle and (ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury including all sums paid under A of Part I, and

  (2) the amount paid and the present value of all amounts payable on account of such bodily injury under any workmen's compensation law, disability benefits law or any similar law.

(c) Any payment made under Part II to or for any insured shall be applied in reduction of the amount of the Limit of Liability under Part I.

(d) The Company shall not be obligated to pay under this coverage that part of the damages which the insured may be entitled to recover from the owner or operator of an uninsured automobile which represents medical payments paid or payable under Part IV.

(e) If more than one policy issued by this Company applies to Part II, the total limit of this Company's liability under all

the number of vehicles insured under the policy or the separate itemization of premiums therefor; and that coverage under this section shall not be "stacked" with any other similar or identical coverage that may be issued under this policy, including Underinsured Motorist Coverage (Part III).

(g) Uninsured Motorist Coverage does not apply nor is it applicable to any accident or loss where the insured has Underinsured Motorist Coverage which applies to such accident or loss.

(h) Any amount payable under Part II shall be reduced by all sums paid to the insured for property damage on behalf of the owner or operator of the uninsured automobile and any other person or organization jointly or severally liable together with such owner or operator.

(i) Property damage losses recoverable hereunder shall be limited to damages caused by the actual physical contact of an uninsured motor vehicle with the vehicle described in the policy.

(j) There shall be no coverage for loss of use of the insured motor vehicle and no coverage for loss or damage to personal property located in the insured motor vehicle, except with respect to replacement of a child restraint system that was in use by a child during an accident to which coverage is applicable.

(k) There shall be no liability imposed under the Uninsured Motorist Property Damage Coverage if the owner or the operator of the vehicle at fault or the hit-and-run motor vehicle cannot be identified.

(l) There shall be no coverage for the deductible amount of damage, as shown in the Declarations, to the property insured as the result of any one accident.

(m) If coverage is provided to a motor vehicle, defined herein as an uninsured motor vehicle, under a bond or insurance policy having limits less than required by the Illinois Financial Responsibility Law then the Company's maximum limit of liability under this Part for "each person" is the difference between the minimum limit required by the Illinois Financial Responsibility Law for injury to one person and the corresponding limit provided in such bond or insurance policy, and the Company's maximum limit of liability under this Part for "each accident" is the difference between the minimum limit required under the Illinois Financial Responsibility Law for injury to two or more persons and the corresponding limit provided in such bond or insurance policy.

**Other Insurance**. With respect to bodily injury to an insured while occupying a motor vehicle not owned by the named insured, the insurance under Part II shall apply only as excess insurance over any other similar insurance available to such insured and applicable to such motor vehicle as primary insurance and this insurance shall then apply only in the amount by which the limits of liability for this coverage exceeds the applicable limit of liability of such other insurance.

to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the Company shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

**Arbitration.** Any dispute with respect to the coverage and the amount of damages shall be submitted for arbitration to the American Arbitration Association and shall be subject to its rules governing the conduct of arbitration hearings as to all matters except medical opinions. If the amount of damages being sought is equal to or less than the amount provided for in Section 7-203 (or its successor) of the Illinois Motor Vehicle Code, then the current American Arbitration Association Rules shall apply as to medical opinions. If the amount being sought in an American Arbitration Association case exceeds that amount as set forth in Section 7-203 (or its successor) of the Illinois Motor Vehicle Code, then the Rules of Evidence that apply in the Illinois Court's for placing medical opinions into evidence shall govern. Alternatively, disputes with respect to damages and the coverage shall be determined in the following manner: Upon the insured requesting arbitration, each party to the dispute shall select an arbitrator and the 2 arbitrators so named shall select a third arbitrator. If such arbitrators are not selected within 45 days from such request, either party may request that the arbitration be submitted to the American Arbitration Association. Any decision made by the arbitrators shall be written and shall be binding for the amount of damages not exceeding $75,000 for bodily injury to or death of any one person, $150,000 for bodily injury to or death of 2 or more persons in any one motor vehicle accident, or the corresponding policy limits under this Part, whichever is less. Arbitrations before a three arbitrator panel shall be subject to the rules of evidence in Illinois Courts, except to the extent the use of such rules is modified by the Illinois Insurance Code. Each party shall bear the cost of his/her own arbitrator and shall share equally the cost of the

shall take place in the Illinois County in which the insured resides and in accordance with the usual rules governing procedures and admissions of evidence in Courts of law of that county and not in accordance with any Court mandated arbitration or mediation rules. If the person demanding arbitration does not reside in Illinois, then arbitration shall take place in any Illinois County in which the Company has an office. Any person making claim hereunder shall answer written questions under oath when served by the Company, as well as comply with the Company's request for production of documents supporting that person's claim. No arbitrator shall have authority to entertain or decide class or representative claims.

**Trust Agreement.** In the event of payment to any person under Part II:
(a) the Company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against a person or organization legally responsible for the bodily injury because of which such payment is made;
(b) such person shall hold in trust for the benefit of the Company all rights of recovery which he shall have against such other person or organization because of the damages which are the subject of claim made under Part II;
(c) such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights;
(d) if requested in writing by the Company, such person shall take, through any representative designated by the Company, such actions as may be necessary or appropriate to recover such payment as damages from such other person or organization, such action to be taken in the name of such person; in the event of a recovery, the Company shall be reimbursed out of such recovery to expenses, costs and attorneys' fees incurred by it in connection therewith;
(e) such person shall execute and deliver to the Company such instruments and papers as may be appropriate to secure the rights and obligations of such person and the Company established be these provisions.

## PART III – UNDERINSURED MOTORIST COVERAGE

**Underinsured Motorist Coverage.** To pay all damages which an insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury sustained by an insured. The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the underinsured motor vehicle provided, for the purposes of this coverage, determination as to whether the insured is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured and the Company or, if they fail to agree, by arbitration. No judgment against any person or organization alleged to be legally responsible for the bodily injury shall be conclusive, as between the insured and the Company, of the issues of liability of such person or organization or of the amount of damages to which the insured is legally entitled unless such judgment is

entered pursuant to an action prosecuted by the insured with the written consent of the Company. The Company shall not be obligated to pay under this coverage until after the limits of liability under all applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

**Definitions.** The definitions under Part I apply to Part III, the definitions of "insured" and "insured automobile" from Part II apply to Part III, and the following also apply under this Part III:

**"Underinsured motor vehicle"** means a motor vehicle whose ownership, maintenance or use has resulted in bodily injury or death of the insured, as defined in the policy, and for which the sum of the limits of liability under all bodily injury liability insurance policies or bonds or other security required to be maintained under Illinois law applicable to the

to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the Company shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

**Arbitration.** Any dispute with respect to the coverage and the amount of damages shall be submitted for arbitration to the American Arbitration Association and shall be subject to its rules governing the conduct of arbitration hearings as to all matters except medical opinions. If the amount of damages being sought is equal to or less than the amount provided for in Section 7-203 (or its successor) of the Illinois Motor Vehicle Code, then the current American Arbitration Association Rules shall apply as to medical opinions. If the amount being sought in an American Arbitration Association case exceeds that amount as set forth in Section 7-203 (or its successor) of the Illinois Motor Vehicle Code, then the Rules of Evidence that apply in the Illinois Court's for placing medical opinions into evidence shall govern. Alternatively, disputes with respect to damages and the coverage shall be determined in the following manner: Upon the insured requesting arbitration, each party to the dispute shall select an arbitrator and the 2 arbitrators so named shall select a third arbitrator. If such arbitrators are not selected within 45 days from such request, either party may request that the arbitration be submitted to the American Arbitration Association. Any decision made by the arbitrators shall be written and shall be binding for the amount of damages not exceeding $75,000 for bodily injury to or death of any one person, $150,000 for bodily injury to or death of 2 or more persons in any one motor vehicle accident, or the corresponding policy limits under this Part, whichever is less. Arbitrations before a three arbitrator panel shall be subject to the rules of evidence in Illinois Courts, except to the extent the use of such rules is modified by the Illinois Insurance Code. Each party shall bear the cost of his/her own arbitrator and shall share equally the cost of the

shall take place in the Illinois County in which the insured resides and in accordance with the usual rules governing procedures and admissions of evidence in Courts of law of that county and not in accordance with any Court mandated arbitration or mediation rules. If the person demanding arbitration does not reside in Illinois, then arbitration shall take place in any Illinois County in which the Company has an office. Any person making claim hereunder shall answer written questions under oath when served by the Company, as well as comply with the Company's request for production of documents supporting that person's claim. No arbitrator shall have authority to entertain or decide class or representative claims.

**Trust Agreement.** In the event of payment to any person under Part II:

(a) the Company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against a person or organization legally responsible for the bodily injury because of which such payment is made;

(b) such person shall hold in trust for the benefit of the Company all rights of recovery which he shall have against such other person or organization because of the damages which are the subject of claim made under Part II;

(c) such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights;

(d) if requested in writing by the Company, such person shall take, through any representative designated by the Company, such actions as may be necessary or appropriate to recover such payment as damages from such other person or organization, such action to be taken in the name of such person; in the event of a recovery, the Company shall be reimbursed out of such recovery to expenses, costs and attorneys' fees incurred by it in connection therewith;

(e) such person shall execute and deliver to the Company such instruments and papers as may be appropriate to secure the rights and obligations of such person and the Company established be these provisions.

## PART III – UNDERINSURED MOTORIST COVERAGE

**Underinsured Motorist Coverage.** To pay all damages which an insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury sustained by an insured. The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the underinsured motor vehicle provided, for the purposes of this coverage, determination as to whether the insured is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured and the Company or, if they fail to agree, by arbitration. No judgment against any person or organization alleged to be legally responsible for the bodily injury shall be conclusive, as between the insured and the Company, of the issues of liability of such person or organization or of the amount of damages to which the insured is legally entitled unless such judgment is

entered pursuant to an action prosecuted by the insured with the written consent of the Company. The Company shall not be obligated to pay under this coverage until after the limits of liability under all applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

**Definitions.** The definitions under Part I apply to Part III, the definitions of "insured" and "insured automobile" from Part II apply to Part III, and the following also apply under this Part III:

**"Underinsured motor vehicle"** means a motor vehicle whose ownership, maintenance or use has resulted in bodily injury or death of the insured, as defined in the policy, and for which the sum of the limits of liability under all bodily injury liability insurance policies or bonds or other security required to be maintained under Illinois law applicable to the

to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the Company shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

**Arbitration.** Any dispute with respect to the coverage and the amount of damages shall be submitted for arbitration to the American Arbitration Association and shall be subject to its rules governing the conduct of arbitration hearings as to all matters except medical opinions. If the amount of damages being sought is equal to or less than the amount provided for in Section 7-203 (or its successor) of the Illinois Motor Vehicle Code, then the current American Arbitration Association Rules shall apply as to medical opinions. If the amount being sought in an American Arbitration Association case exceeds that amount as set forth in Section 7-203 (or its successor) of the Illinois Motor Vehicle Code, then the Rules of Evidence that apply in the Illinois Court's for placing medical opinions into evidence shall govern. Alternatively, disputes with respect to damages and the coverage shall be determined in the following manner: Upon the insured requesting arbitration, each party to the dispute shall select an arbitrator and the 2 arbitrators so named shall select a third arbitrator. If such arbitrators are not selected within 45 days from such request, either party may request that the arbitration be submitted to the American Arbitration Association. Any decision made by the arbitrators shall be written and shall be binding for the amount of damages not exceeding $75,000 for bodily injury to or death of any one person, $150,000 for bodily injury to or death of 2 or more persons in any one motor vehicle accident, or the corresponding policy limits under this Part, whichever is less. Arbitrations before a three arbitrator panel shall be subject to the rules of evidence in Illinois Courts, except to the extent the use of such rules is modified by the Illinois Insurance Code. Each party shall bear the cost of his/her own arbitrator and shall share equally the cost of the

shall take place in the Illinois County in which the insured resides and in accordance with the usual rules governing procedures and admissions of evidence in Courts of law of that county and not in accordance with any Court mandated arbitration or mediation rules. If the person demanding arbitration does not reside in Illinois, then arbitration shall take place in any Illinois County in which the Company has an office. Any person making claim hereunder shall answer written questions under oath when served by the Company, as well as comply with the Company's request for production of documents supporting that person's claim. No arbitrator shall have authority to entertain or decide class or representative claims.

**Trust Agreement.** In the event of payment to any person under Part II:
(a) the Company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against a person or organization legally responsible for the bodily injury because of which such payment is made;
(b) such person shall hold in trust for the benefit of the Company all rights of recovery which he shall have against such other person or organization because of the damages which are the subject of claim made under Part II;
(c) such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights;
(d) if requested in writing by the Company, such person shall take, through any representative designated by the Company, such actions as may be necessary or appropriate to recover such payment as damages from such other person or organization, such action to be taken in the name of such person; in the event of a recovery, the Company shall be reimbursed out of such recovery to expenses, costs and attorneys' fees incurred by it in connection therewith;
(e) such person shall execute and deliver to the Company such instruments and papers as may be appropriate to secure the rights and obligations of such person and the Company established be these provisions.

## PART III – UNDERINSURED MOTORIST COVERAGE

**Underinsured Motorist Coverage.** To pay all damages which an insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury sustained by an insured. The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the underinsured motor vehicle provided, for the purposes of this coverage, determination as to whether the insured is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured and the Company or, if they fail to agree, by arbitration. No judgment against any person or organization alleged to be legally responsible for the bodily injury shall be conclusive, as between the insured and the Company, of the issues of liability of such person or organization or of the amount of damages to which the insured is legally entitled unless such judgment is

entered pursuant to an action prosecuted by the insured with the written consent of the Company. The Company shall not be obligated to pay under this coverage until after the limits of liability under all applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

**Definitions.** The definitions under Part I apply to Part III, the definitions of "insured" and "insured automobile" from Part II apply to Part III, and the following also apply under this Part III:

**"Underinsured motor vehicle"** means a motor vehicle whose ownership, maintenance or use has resulted in bodily injury or death of the insured, as defined in the policy, and for which the sum of the limits of liability under all bodily injury liability insurance policies or bonds or other security required to be maintained under Illinois law applicable to the

limits for Underinsured Motorist Coverage as stated on the Declarations or endorsement to this policy at the time of the accident.

*However,* "underinsured motor vehicle" does not include any vehicle:

(1) owned by or furnished or available for the regular use of the insured or any family member or person residing in the insured's household;

(2) owned by any governmental unit or agency;

(3) operated on rails or crawler treads;

(4) which is a farm type tractor or equipment designed mainly for use off public roads while not upon public roads;

(5) while located for use as a residence or premises;

(6) owned or operated by a person qualifying as a self-insurer under any applicable motor vehicle law;

(7) to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company denies coverage or is or becomes insolvent; or

(8) which is defined as an "uninsured motor vehicle" under Part II.

**Exclusions.** This policy does not apply under Part III:

(a) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(b) to any person using a vehicle without a reasonable belief that the person is entitled to do so;

(c) so as to inure, directly or indirectly, to the benefit of any worker's compensation or disability benefits insurer or any person or organization qualifying as a self insurer under any worker's compensation or disability benefits law or any similar law, provided, however, that there shall be no setoff or exclusion under this policy for amounts paid as disability benefits by the Social Security Administration or by any similar state or federal agency;

(d) to punitive or exemplary damage;

(e) to any claim against the Company submitted after the later of (i) two years after the date of accident, or (ii) six months after the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement; or

(f) to any claim by a person who operated, used or occupied an owned automobile or a non-owned automobile without a reasonable belief that he or she was entitled to do so.

**Limit of Liability.**

(a) The Company's maximum limit of liability for all damages due to bodily injury to one person is the limit of liability as shown in the Declarations for "each person" for Underinsured Motorist Coverage less those amounts actually recovered under the applicable bodily injury insurance

includes all injury and damages, including loss of service, society or consortium, to others resulting from this bodily injury. The Company's maximum limit of liability for all damages due to bodily injury to two or more persons in the same accident is the limit of liability as shown in the Declarations for "each occurrence" for Underinsured Motorist Coverage, subject to the above provision respecting each person, less those amounts actually recovered under the applicable bodily injury insurance policies, bonds or other security maintained on the underinsured motor vehicle. The limits of liability are not increased because more than one person is insured at the time of the accident. Any payment otherwise due under this coverage shall be reduced by a payment for bodily injury or medical expense under any other part of this policy. If more than one policy issued by this Company provides underinsured motorist coverage for the same bodily injury, the total limit of this Company's liability under all such policies shall not exceed the amount applicable under only one policy. In no event shall the total limit of the Company's liability exceed the limits set forth in the Declarations, regardless of the number of vehicles insured under the policy or the separate itemization of premiums therefor and coverage under this section shall not be "stacked" with any other similar or identical coverage that may be issued under this policy, including Uninsured Motorist Coverage.

(b) The Company shall not be obligated to make payment under this coverage until the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement. A judgment or settlement of the bodily injury claim in an amount less than the limits of the bodily injury coverages applicable to the claim shall not preclude the claimant from making an underinsured motorist claim against the Underinsured Motorist Coverage.

(c) Notwithstanding any of the above, if the Company and the insured or his/her legal representative agree that the insured suffered bodily injury as a result of negligent operation, use or maintenance of an underinsured motor vehicle, and without arbitration, agree also on the amount of damages that the insured is legally entitled to collect, then the maximum amount payable pursuant to such an underinsured motor vehicle insurance settlement agreement shall not exceed the amount by which the limits of the Underinsured Motorist Coverage exceed the limits of bodily injury liability insurance of the owner or operator of the underinsured motor vehicle. Any such agreement shall be final as to the amount due and shall be binding upon the insured and the Company regardless of the amount of any judgments, or any settlement reached between any insured and the person or persons responsible for this accident. No such settlement shall be concluded unless: (i) the insured has complied with all other applicable policy terms and conditions; and (ii) before the conclusion of the settlement agreement, the insured has filed a lawsuit against the underinsured motor vehicle owner or operator and has not abandoned the suit, or settled the lawsuit without preserving the rights of the Company, provided, however, that lawsuit

limits for Underinsured Motorist Coverage as stated on the Declarations or endorsement to this policy at the time of the accident.

*However,* "underinsured motor vehicle" does not include any vehicle:

(1) owned by or furnished or available for the regular use of the insured or any family member or person residing in the insured's household;

(2) owned by any governmental unit or agency;

(3) operated on rails or crawler treads;

(4) which is a farm type tractor or equipment designed mainly for use off public roads while not upon public roads;

(5) while located for use as a residence or premises;

(6) owned or operated by a person qualifying as a self-insurer under any applicable motor vehicle law;

(7) to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company denies coverage or is or becomes insolvent; or

(8) which is defined as an "uninsured motor vehicle" under Part II.

**Exclusions.** This policy does not apply under Part III:

(a) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(b) to any person using a vehicle without a reasonable belief that the person is entitled to do so;

(c) so as to inure, directly or indirectly, to the benefit of any worker's compensation or disability benefits insurer or any person or organization qualifying as a self insurer under any worker's compensation or disability benefits law or any similar law, provided, however, that there shall be no setoff or exclusion under this policy for amounts paid as disability benefits by the Social Security Administration or by any similar state or federal agency;

(d) to punitive or exemplary damage;

(e) to any claim against the Company submitted after the later of (i) two years after the date of accident, or (ii) six months after the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement; or

(f) to any claim by a person who operated, used or occupied an owned automobile or a non-owned automobile without a reasonable belief that he or she was entitled to do so.

**Limit of Liability.**

(a) The Company's maximum limit of liability for all damages due to bodily injury to one person is the limit of liability as shown in the Declarations for "each person" for Underinsured Motorist Coverage less those amounts actually recovered under the applicable bodily injury insurance

includes all injury and damages, including loss of service, society or consortium, to others resulting from this bodily injury. The Company's maximum limit of liability for all damages due to bodily injury to two or more persons in the same accident is the limit of liability as shown in the Declarations for "each occurrence" for Underinsured Motorist Coverage, subject to the above provision respecting each person, less those amounts actually recovered under the applicable bodily injury insurance policies, bonds or other security maintained on the underinsured motor vehicle. The limits of liability are not increased because more than one person is insured at the time of the accident. Any payment otherwise due under this coverage shall be reduced by a payment for bodily injury or medical expense under any other part of this policy. If more than one policy issued by this Company provides underinsured motorist coverage for the same bodily injury, the total limit of this Company's liability under all such policies shall not exceed the amount applicable under only one policy. In no event shall the total limit of the Company's liability exceed the limits set forth in the Declarations, regardless of the number of vehicles insured under the policy or the separate itemization of premiums therefor and coverage under this section shall not be "stacked" with any other similar or identical coverage that may be issued under this policy, including Uninsured Motorist Coverage.

(b) The Company shall not be obligated to make payment under this coverage until the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement. A judgment or settlement of the bodily injury claim in an amount less than the limits of the bodily injury coverages applicable to the claim shall not preclude the claimant from making an underinsured motorist claim against the Underinsured Motorist Coverage.

(c) Notwithstanding any of the above, if the Company and the insured or his/her legal representative agree that the insured suffered bodily injury as a result of negligent operation, use or maintenance of an underinsured motor vehicle, and without arbitration, agree also on the amount of damages that the insured is legally entitled to collect, then the maximum amount payable pursuant to such an underinsured motor vehicle insurance settlement agreement shall not exceed the amount by which the limits of the Underinsured Motorist Coverage exceed the limits of bodily injury liability insurance of the owner or operator of the underinsured motor vehicle. Any such agreement shall be final as to the amount due and shall be binding upon the insured and the Company regardless of the amount of any judgments, or any settlement reached between any insured and the person or persons responsible for this accident. No such settlement shall be concluded unless: (i) the insured has complied with all other applicable policy terms and conditions; and (ii) before the conclusion of the settlement agreement, the insured has filed a lawsuit against the underinsured motor vehicle owner or operator and has not abandoned the suit, or settled the lawsuit without preserving the rights of the Company, provided, however, that lawsuit

limits for Underinsured Motorist Coverage as stated on the Declarations or endorsement to this policy at the time of the accident.

*However,* "underinsured motor vehicle" does not include any vehicle:

(1) owned by or furnished or available for the regular use of the insured or any family member or person residing in the insured's household;

(2) owned by any governmental unit or agency;

(3) operated on rails or crawler treads;

(4) which is a farm type tractor or equipment designed mainly for use off public roads while not upon public roads;

(5) while located for use as a residence or premises;

(6) owned or operated by a person qualifying as a self-insurer under any applicable motor vehicle law;

(7) to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company denies coverage or is or becomes insolvent; or

(8) which is defined as an "uninsured motor vehicle" under Part II.

**Exclusions.** This policy does not apply under Part III:

(a) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(b) to any person using a vehicle without a reasonable belief that the person is entitled to do so;

(c) so as to inure, directly or indirectly, to the benefit of any worker's compensation or disability benefits insurer or any person or organization qualifying as a self insurer under any worker's compensation or disability benefits law or any similar law, provided, however, that there shall be no setoff or exclusion under this policy for amounts paid as disability benefits by the Social Security Administration or by any similar state or federal agency;

(d) to punitive or exemplary damage;

(e) to any claim against the Company submitted after the later of (i) two years after the date of accident, or (ii) six months after the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement; or

(f) to any claim by a person who operated, used or occupied an owned automobile or a non-owned automobile without a reasonable belief that he or she was entitled to do so.

**Limit of Liability.**

(a) The Company's maximum limit of liability for all damages due to bodily injury to one person is the limit of liability as shown in the Declarations for "each person" for Underinsured Motorist Coverage less those amounts actually recovered under the applicable bodily injury insurance

includes all injury and damages, including loss of service, society or consortium, to others resulting from this bodily injury. The Company's maximum limit of liability for all damages due to bodily injury to two or more persons in the same accident is the limit of liability as shown in the Declarations for "each occurrence" for Underinsured Motorist Coverage, subject to the above provision respecting each person, less those amounts actually recovered under the applicable bodily injury insurance policies, bonds or other security maintained on the underinsured motor vehicle. The limits of liability are not increased because more than one person is insured at the time of the accident. Any payment otherwise due under this coverage shall be reduced by a payment for bodily injury or medical expense under any other part of this policy. If more than one policy issued by this Company provides underinsured motorist coverage for the same bodily injury, the total limit of this Company's liability under all such policies shall not exceed the amount applicable under only one policy. In no event shall the total limit of the Company's liability exceed the limits set forth in the Declarations, regardless of the number of vehicles insured under the policy or the separate itemization of premiums therefor and coverage under this section shall not be "stacked" with any other similar or identical coverage that may be issued under this policy, including Uninsured Motorist Coverage.

(b) The Company shall not be obligated to make payment under this coverage until the limits of liability or portion thereof under all bodily injury liability insurance policies applicable to the underinsured motor vehicle and its operators have been partially or fully exhausted by payment of judgment or settlement. A judgment or settlement of the bodily injury claim in an amount less than the limits of the bodily injury coverages applicable to the claim shall not preclude the claimant from making an underinsured motorist claim against the Underinsured Motorist Coverage.

(c) Notwithstanding any of the above, if the Company and the insured or his/her legal representative agree that the insured suffered bodily injury as a result of negligent operation, use or maintenance of an underinsured motor vehicle, and without arbitration, agree also on the amount of damages that the insured is legally entitled to collect, then the maximum amount payable pursuant to such an underinsured motor vehicle insurance settlement agreement shall not exceed the amount by which the limits of the Underinsured Motorist Coverage exceed the limits of bodily injury liability insurance of the owner or operator of the underinsured motor vehicle. Any such agreement shall be final as to the amount due and shall be binding upon the insured and the Company regardless of the amount of any judgments, or any settlement reached between any insured and the person or persons responsible for this accident. No such settlement shall be concluded unless: (i) the insured has complied with all other applicable policy terms and conditions; and (ii) before the conclusion of the settlement agreement, the insured has filed a lawsuit against the underinsured motor vehicle owner or operator and has not abandoned the suit, or settled the lawsuit without preserving the rights of the Company, provided, however, that lawsuit

(m) to bodily injury or property damage due to war, whether or not declared, civil war, riot, insurrection, rebellion or revolution or to any act or condition incidental to any of the foregoing;

(n) to any automobile while being operated or used in the commission of a crime, other than a traffic violation;

(o) to the payment of punitive or exemplary damages;

(p) to any person who operated or used an owned automobile or a non-owned automobile without a reasonable belief that he or she is entitled to do so, however, this exclusion does not apply to the named insured;

(q) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(r) to the payment of civil fines, attorney fees and any other charges levied or claimed by a municipality or other division of government with respect to property damage or bodily injury;

(s) to liability assumed by an insured under any contract or other agreement;

(t) to bodily injury or property damage resulting from the pushing or pulling of a vehicle (other than a trailer) by an insured automobile, or the pushing and pulling of an insured automobile by another vehicle (other than a tow truck).

**Financial Responsibility Laws.** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by the policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The insured agrees to reimburse the Company

for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**Limits of Liability.** The limit of Bodily Injury Liability stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Bodily Injury Liability stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same occurrence. The limits of liability are not increased because more than one person is insured at the time of the accident. The limit of property damage liability stated in the Declarations is the total limit of the Company's liability for all damage to property of one or more persons arising out of the same occurrence. Any amounts payable under Part I of this policy will be reduced by any amounts paid or payable for the same elements of loss under Parts II, III or IV of this policy.

**Other Insurance.** If the insured is covered by other insurance or self-insurance against a loss covered by Part I of this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance and self-insurance against such loss; provided, however, the insurance under this policy with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any valid collectible insurance or self-insurance applicable to such temporary substitute automobile or non-owned automobile.

## PART II – UNINSURED MOTORIST COVERAGE

**Uninsured Motorist Coverage.** To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of property damage to a vehicle described in the policy and bodily injury, including death resulting therefrom, hereinafter called "bodily injury", sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured motor vehicle, provided, for the purposes of this coverage, determination of whether the insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured or such representative and the Company or, if they fail to agree, by arbitration. Recovery under this Part for "property damage" is subject to the payment of a specific separate premium for uninsured motorist property damage liability. No judgment against any person or organization alleged to be legally responsible for the bodily injury or property damage shall be conclusive, as between the insured

pursuant to an action prosecuted by the insured with the written consent of the Company.

**Definitions.** The definitions under Part I, except the definition of "insured" and where limited or altered under the Limits of Liability of this coverage, apply to Part II and under Part II:

"insured" means:

(a) the named insured and any relative of the named insured;

(b) any other person while lawfully occupying an insured automobile;

(c) any person, with respect to damages he is entitled to recover because of bodily injury to which this Part applies sustained by an insured under (a) or (b) above; and

(d) any other person who is not insured for uninsured motor vehicle coverage under another vehicle policy while occupying your auto, a temporary substitute auto, a newly acquired auto or a trailer attached to such auto. Such vehicle has to be used within the scope of the consent of the insured

(m) to bodily injury or property damage due to war, whether or not declared, civil war, riot, insurrection, rebellion or revolution or to any act or condition incidental to any of the foregoing;

(n) to any automobile while being operated or used in the commission of a crime, other than a traffic violation;

(o) to the payment of punitive or exemplary damages;

(p) to any person who operated or used an owned automobile or a non-owned automobile without a reasonable belief that he or she is entitled to do so, however, this exclusion does not apply to the named insured;

(q) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(r) to the payment of civil fines, attorney fees and any other charges levied or claimed by a municipality or other division of government with respect to property damage or bodily injury;

(s) to liability assumed by an insured under any contract or other agreement;

(t) to bodily injury or property damage resulting from the pushing or pulling of a vehicle (other than a trailer) by an insured automobile, or the pushing and pulling of an insured automobile by another vehicle (other than a tow truck).

**Financial Responsibility Laws**. When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by the policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The insured agrees to reimburse the Company

for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**Limits of Liability**. The limit of Bodily Injury Liability stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Bodily Injury Liability stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same occurrence. The limits of liability are not increased because more than one person is insured at the time of the accident. The limit of property damage liability stated in the Declarations is the total limit of the Company's liability for all damage to property of one or more persons arising out of the same occurrence. Any amounts payable under Part I of this policy will be reduced by any amounts paid or payable for the same elements of loss under Parts II, III or IV of this policy.

**Other Insurance**. If the insured is covered by other insurance or self-insurance against a loss covered by Part I of this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance and self-insurance against such loss; provided, however, the insurance under this policy with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any valid collectible insurance or self-insurance applicable to such temporary substitute automobile or non-owned automobile.

## PART II – UNINSURED MOTORIST COVERAGE

**Uninsured Motorist Coverage**. To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of property damage to a vehicle described in the policy and bodily injury, including death resulting therefrom, hereinafter called "bodily injury", sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured motor vehicle, provided, for the purposes of this coverage, determination of whether the insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured or such representative and the Company or, if they fail to agree, by arbitration. Recovery under this Part for "property damage" is subject to the payment of a specific separate premium for uninsured motorist property damage liability. No judgment against any person or organization alleged to be legally responsible for the bodily injury or property damage shall be conclusive, as between the insured

pursuant to an action prosecuted by the insured with the written consent of the Company.

**Definitions**. The definitions under Part I, except the definition of "insured" and where limited or altered under the Limits of Liability of this coverage, apply to Part II and under Part II:

"insured" means:

(a) the named insured and any relative of the named insured;

(b) any other person while lawfully occupying an insured automobile;

(c) any person, with respect to damages he is entitled to recover because of bodily injury to which this Part applies sustained by an insured under (a) or (b) above; and

(d) any other person who is not insured for uninsured motor vehicle coverage under another vehicle policy while occupying your auto, a temporary substitute auto, a newly acquired auto or a trailer attached to such auto. Such vehicle has to be used within the scope of the consent of the insured

(m) to bodily injury or property damage due to war, whether or not declared, civil war, riot, insurrection, rebellion or revolution or to any act or condition incidental to any of the foregoing;

(n) to any automobile while being operated or used in the commission of a crime, other than a traffic violation;

(o) to the payment of punitive or exemplary damages;

(p) to any person who operated or used an owned automobile or a non-owned automobile without a reasonable belief that he or she is entitled to do so, however, this exclusion does not apply to the named insured;

(q) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(r) to the payment of civil fines, attorney fees and any other charges levied or claimed by a municipality or other division of government with respect to property damage or bodily injury;

(s) to liability assumed by an insured under any contract or other agreement;

(t) to bodily injury or property damage resulting from the pushing or pulling of a vehicle (other than a trailer) by an insured automobile, or the pushing and pulling of an insured automobile by another vehicle (other than a tow truck).

**Financial Responsibility Laws.** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by the policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The insured agrees to reimburse the Company

for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**Limits of Liability.** The limit of Bodily Injury Liability stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Bodily Injury Liability stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same occurrence. The limits of liability are not increased because more than one person is insured at the time of the accident. The limit of property damage liability stated in the Declarations is the total limit of the Company's liability for all damage to property of one or more persons arising out of the same occurrence. Any amounts payable under Part I of this policy will be reduced by any amounts paid or payable for the same elements of loss under Parts II, III or IV of this policy.

**Other Insurance.** If the insured is covered by other insurance or self-insurance against a loss covered by Part I of this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance and self-insurance against such loss; provided, however, the insurance under this policy with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any valid collectible insurance or self-insurance applicable to such temporary substitute automobile or non-owned automobile.

## PART II – UNINSURED MOTORIST COVERAGE

**Uninsured Motorist Coverage.** To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of property damage to a vehicle described in the policy and bodily injury, including death resulting therefrom, hereinafter called "bodily injury", sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured motor vehicle, provided, for the purposes of this coverage, determination of whether the insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured or such representative and the Company or, if they fail to agree, by arbitration. Recovery under this Part for "property damage" is subject to the payment of a specific separate premium for uninsured motorist property damage liability. No judgment against any person or organization alleged to be legally responsible for the bodily injury or property damage shall be conclusive, as between the insured

pursuant to an action prosecuted by the insured with the written consent of the Company.

**Definitions.** The definitions under Part I, except the definition of "insured" and where limited or altered under the Limits of Liability of this coverage, apply to Part II and under Part II:

"insured" means:

(a) the named insured and any relative of the named insured;

(b) any other person while lawfully occupying an insured automobile;

(c) any person, with respect to damages he is entitled to recover because of bodily injury to which this Part applies sustained by an insured under (a) or (b) above; and

(d) any other person who is not insured for uninsured motor vehicle coverage under another vehicle policy while occupying your auto, a temporary substitute auto, a newly acquired auto or a trailer attached to such auto. Such vehicle has to be used within the scope of the consent of the insured

**"insured automobile"** means:

(a) an automobile described in the policy for which a specific premium charge indicated that coverage is afforded;

(b) a private passenger, farm or utility automobile, ownership of which is acquired by the named insured during the policy period, provided:

   (1) it replaces an insured automobile defined in (a) above and the insured notifies the Company in writing within 30 days after the date of said replacement;

   (2) the Company insures under this coverage all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the Company in writing within 30 days after the date of such acquisition of his election to make the Liability and Uninsured Motorist Coverages under this and no other policy issued by the Company applicable to such automobile;

(c) a temporary substitute automobile for an insured automobile as defined in (a) or (b) above;

(d) a non-owned automobile while being operated by the named insured, but shall not include:

   (1) any automobile or trailer owned by a resident of the same household as the named insured;

   (2) any automobile while used as a public or livery conveyance; or

   (3) any automobile while being used without the permission of the owner.

**"uninsured motor vehicle"** includes a trailer of any type and means:

(a) a motor vehicle or trailer with respect to the ownership, maintenance or use of which, there is no bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such automobile, or said bond or insurance policy has limits less than that required by the Illinois Financial Responsibility Law;

(b) a hit-and-run motor vehicle; or

(c) a motor vehicle where on, before, or after the accident date, the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified in the policy, because of the entry by a Court of competent jurisdiction of any order of rehabilitation or liquidation by reason of insolvency on or after the accident date, provided however that the insured notifies the Company of his/her claim under this provision within the later of 6 months from the date of such Court order of rehabilitation or insolvency or two years from the date of accident. To the extent that this provision conflicts with this policy's exclusion for claims submitted to the Company more than two years after the accident, this provision shall control;

*but* the term "uninsured motor vehicle" shall not include:

   (1) an insured motor vehicle or a motor vehicle furnished or available for the regular use of the named insured or of a relative which causes bodily injury or property damage in excess of the limit required under the Illinois Financial Responsibility Law;

similar law;

   (3) a motor vehicle or trailer owned by the United States of America, Canada, a state, a political subdivision of any such government or any agency of the foregoing or a municipal government;

   (4) a land motor vehicle or trailer if operated on rails or crawler-treads or while located for use as a residence or premises and not as a vehicle; or

   (5) a farm type tractor or equipment designed for use principally off public roads, except while actually upon public roads.

**"hit-and-run motor vehicle"** means a motor vehicle which causes bodily injury to an insured arising out of physical contact of such motor vehicle with the insured or with an automobile which the insured is occupying at the time of the accident, provided, (a) there cannot be ascertained the identity of either the operator or owner of such "hit-and-run motor vehicle", (b) the insured or someone on his behalf shall have reported the accident within 24 hours to a police, peace or judicial officer to the Commissioner of Motor Vehicles, and shall have filed with the Company within 30 days thereafter a statement under oath that the insured or his legal representative has a cause or causes of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and setting forth the facts in support thereof; and (c) at the Company's request, the insured or his legal representative makes available for inspection the motor vehicle which the insured was occupying at the time of the accident;

**"occupying"** means in or upon or entering into or alighting from;

**"state"** includes the District of Columbia, a territory or possession of the United States, and a province of Canada.

**Exclusions.** This policy does not apply under Part II:

(a) to bodily injury or property damage to an insured with respect to which such insured, his legal representative or any person entitled to payment under this coverage shall, without written consent of the Company, make any settlement with any person or organization who may be legally liable therefor;

(b) so as to inure directly or indirectly to the benefit of any workmen's compensation or disability benefits carrier or any person or organization qualifying as a self-insurer under any workmen's compensation or disability benefits law or any similar law;

(c) to any claim for punitive or exemplary damages;

(d) to property damage when the owned automobile has collision coverage or is described in any other policy of automobile insurance;

(e) to any claim received by the Company more than 2 years after the date of accident;

(f) to bodily injury of an insured while occupying a motor vehicle owned by, or furnished or available for the regular use of the insured, a resident spouse, or a resident relative, if that motor vehicle is not described in this policy or is not newly acquired or replacement motor vehicle covered under the terms of this policy;

**"insured automobile"** means:

(a) an automobile described in the policy for which a specific premium charge indicated that coverage is afforded;

(b) a private passenger, farm or utility automobile, ownership of which is acquired by the named insured during the policy period, provided:

(1) it replaces an insured automobile defined in (a) above and the insured notifies the Company in writing within 30 days after the date of said replacement;

(2) the Company insures under this coverage all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the Company in writing within 30 days after the date of such acquisition of his election to make the Liability and Uninsured Motorist Coverages under this and no other policy issued by the Company applicable to such automobile;

(c) a temporary substitute automobile for an insured automobile as defined in (a) or (b) above;

(d) a non-owned automobile while being operated by the named insured, but shall not include:

(1) any automobile or trailer owned by a resident of the same household as the named insured;

(2) any automobile while used as a public or livery conveyance; or

(3) any automobile while being used without the permission of the owner.

**"uninsured motor vehicle"** includes a trailer of any type and means:

(a) a motor vehicle or trailer with respect to the ownership, maintenance or use of which, there is no bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such automobile, or said bond or insurance policy has limits less than that required by the Illinois Financial Responsibility Law;

(b) a hit-and-run motor vehicle; or

(c) a motor vehicle where on, before, or after the accident date, the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified in the policy, because of the entry by a Court of competent jurisdiction of any order of rehabilitation or liquidation by reason of insolvency on or after the accident date, provided however that the insured notifies the Company of his/her claim under this provision within the later of 6 months from the date of such Court order of rehabilitation or insolvency or two years from the date of accident. To the extent that this provision conflicts with this policy's exclusion for claims submitted to the Company more than two years after the accident, this provision shall control;

*but* the term "uninsured motor vehicle" shall not include:

(1) an insured motor vehicle or a motor vehicle furnished or available for the regular use of the named insured or of a relative which causes bodily injury or property damage in excess of the limit required under the Illinois Financial Responsibility Law;

similar law;

(3) a motor vehicle or trailer owned by the United States of America, Canada, a state, a political subdivision of any such government or any agency of the foregoing or a municipal government;

(4) a land motor vehicle or trailer if operated on rails or crawler-treads or while located for use as a residence or premises and not as a vehicle; or

(5) a farm type tractor or equipment designed for use principally off public roads, except while actually upon public roads.

**"hit-and-run motor vehicle"** means a motor vehicle which causes bodily injury to an insured arising out of physical contact of such motor vehicle with the insured or with an automobile which the insured is occupying at the time of the accident, provided, (a) there cannot be ascertained the identity of either the operator or owner of such "hit-and-run motor vehicle", (b) the insured or someone on his behalf shall have reported the accident within 24 hours to a police, peace or judicial officer to the Commissioner of Motor Vehicles, and shall have filed with the Company within 30 days thereafter a statement under oath that the insured or his legal representative has a cause or causes of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and setting forth the facts in support thereof; and (c) at the Company's request, the insured or his legal representative makes available for inspection the motor vehicle which the insured was occupying at the time of the accident;

**"occupying"** means in or upon or entering into or alighting from;

**"state"** includes the District of Columbia, a territory or possession of the United States, and a province of Canada.

**Exclusions.** This policy does not apply under Part II:

(a) to bodily injury or property damage to an insured with respect to which such insured, his legal representative or any person entitled to payment under this coverage shall, without written consent of the Company, make any settlement with any person or organization who may be legally liable therefor;

(b) so as to inure directly or indirectly to the benefit of any workmen's compensation or disability benefits carrier or any person or organization qualifying as a self-insurer under any workmen's compensation or disability benefits law or any similar law;

(c) to any claim for punitive or exemplary damages;

(d) to property damage when the owned automobile has collision coverage or is described in any other policy of automobile insurance;

(e) to any claim received by the Company more than 2 years after the date of accident;

(f) to bodily injury of an insured while occupying a motor vehicle owned by, or furnished or available for the regular use of the insured, a resident spouse, or a resident relative, if that motor vehicle is not described in this policy or is not newly acquired or replacement motor vehicle covered under the terms of this policy;

5 | ILLINOIS PERSONAL AUTO POLICY ~ FORM ILPOL 10/15

the accident or six months of entry of the Court order of rehabilitation or liquidation by reason of insolvency;

(h) to any claim by a person who operated, occupied or used an automobile without a reasonable belief that he or she was entitled to do so, however, this exclusion does not apply to the named insured;

(i) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(j) to bodily injury or property damage which is either expected or intended by the insured.

(k) to bodily injury or property damage if Liability coverage or Underinsured Motorist coverage applies under this policy to the accident.

(l) while any vehicle is operated by an Excluded driver,

**Limits of Liability**
(a) The limit of Uninsured Motorist Coverage stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages due to bodily injury to one person. Bodily injury to one person includes all injury and damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Uninsured Motorist Coverage as stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same accident. The limits of liability are not increased because more than one person is insured at the time of the accident.

(b) Any amount payable under the terms of Part II because of bodily injury sustained in an accident by a person who is an insured under Part II shall be reduced by:
  (1) all sums paid on account of such bodily injury by or on behalf of (i) the owner or operator of the uninsured motor vehicle and (ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury including all sums paid under A of Part I, and
  (2) the amount paid and the present value of all amounts payable on account of such bodily injury under any workmen's compensation law, disability benefits law or any similar law.

(c) Any payment made under Part II to or for any insured shall be applied in reduction of the amount of the Limit of Liability under Part I.

(d) The Company shall not be obligated to pay under this coverage that part of the damages which the insured may be entitled to recover from the owner or operator of an uninsured automobile which represents medical payments paid or payable under Part IV.

(e) If more than one policy issued by this Company applies to Part II, the total limit of this Company's liability under all

the number of vehicles insured under the policy or the separate itemization of premiums therefor; and that coverage under this section shall not be "stacked" with any other similar or identical coverage that may be issued under this policy, including Underinsured Motorist Coverage (Part III).

(g) Uninsured Motorist Coverage does not apply nor is it applicable to any accident or loss where the insured has Underinsured Motorist Coverage which applies to such accident or loss.

(h) Any amount payable under Part II shall be reduced by all sums paid to the insured for property damage on behalf of the owner or operator of the uninsured automobile and any other person or organization jointly or severally liable together with such owner or operator.

(i) Property damage losses recoverable hereunder shall be limited to damages caused by the actual physical contact of an uninsured motor vehicle with the vehicle described in the policy.

(j) There shall be no coverage for loss of use of the insured motor vehicle and no coverage for loss or damage to personal property located in the insured motor vehicle, except with respect to replacement of a child restraint system that was in use by a child during an accident to which coverage is applicable.

(k) There shall be no liability imposed under the Uninsured Motorist Property Damage Coverage if the owner or the operator of the vehicle at fault or the hit-and-run motor vehicle cannot be identified.

(l) There shall be no coverage for the deductible amount of damage, as shown in the Declarations, to the property insured as the result of any one accident.

(m) If coverage is provided to a motor vehicle, defined herein as an uninsured motor vehicle, under a bond or insurance policy having limits less than required by the Illinois Financial Responsibility Law then the Company's maximum limit of liability under this Part for "each person" is the difference between the minimum limit required by the Illinois Financial Responsibility Law for injury to one person and the corresponding limit provided in such bond or insurance policy, and the Company's maximum limit of liability under this Part for "each accident" is the difference between the minimum limit required under the Illinois Financial Responsibility Law for injury to two or more persons and the corresponding limit provided in such bond or insurance policy.

**Other Insurance.** With respect to bodily injury to an insured while occupying a motor vehicle not owned by the named insured, the insurance under Part II shall apply only as excess insurance over any other similar insurance available to such insured and applicable to such motor vehicle as primary insurance and this insurance shall then apply only in the amount by which the limits of liability for this coverage exceeds the applicable limit of liability of such other insurance.

the accident or six months of entry of the Court order of rehabilitation or liquidation by reason of insolvency;

(h) to any claim by a person who operated, occupied or used an automobile without a reasonable belief that he or she was entitled to do so, however, this exclusion does not apply to the named insured;

(i) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(j) to bodily injury or property damage which is either expected or intended by the insured.

(k) to bodily injury or property damage if Liability coverage or Underinsured Motorist coverage applies under this policy to the accident.

(l) while any vehicle is operated by an Excluded driver,

## Limits of Liability

(a) The limit of Uninsured Motorist Coverage stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages due to bodily injury to one person. Bodily injury to one person includes all injury and damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Uninsured Motorist Coverage as stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same accident. The limits of liability are not increased because more than one person is insured at the time of the accident.

(b) Any amount payable under the terms of Part II because of bodily injury sustained in an accident by a person who is an insured under Part II shall be reduced by:

  (1) all sums paid on account of such bodily injury by or on behalf of (i) the owner or operator of the uninsured motor vehicle and (ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury including all sums paid under A of Part I, and

  (2) the amount paid and the present value of all amounts payable on account of such bodily injury under any workmen's compensation law, disability benefits law or any similar law.

(c) Any payment made under Part II to or for any insured shall be applied in reduction of the amount of the Limit of Liability under Part I.

(d) The Company shall not be obligated to pay under this coverage that part of the damages which the insured may be entitled to recover from the owner or operator of an uninsured automobile which represents medical payments paid or payable under Part IV.

(e) If more than one policy issued by this Company applies to Part II, the total limit of this Company's liability under all

the number of vehicles insured under the policy or the separate itemization of premiums therefor; and that coverage under this section shall not be "stacked" with any other similar or identical coverage that may be issued under this policy, including Underinsured Motorist Coverage (Part III).

(g) Uninsured Motorist Coverage does not apply nor is it applicable to any accident or loss where the insured has Underinsured Motorist Coverage which applies to such accident or loss.

(h) Any amount payable under Part II shall be reduced by all sums paid to the insured for property damage on behalf of the owner or operator of the uninsured automobile and any other person or organization jointly or severally liable together with such owner or operator.

(i) Property damage losses recoverable hereunder shall be limited to damages caused by the actual physical contact of an uninsured motor vehicle with the vehicle described in the policy.

(j) There shall be no coverage for loss of use of the insured motor vehicle and no coverage for loss or damage to personal property located in the insured motor vehicle, except with respect to replacement of a child restraint system that was in use by a child during an accident to which coverage is applicable.

(k) There shall be no liability imposed under the Uninsured Motorist Property Damage Coverage if the owner or the operator of the vehicle at fault or the hit-and-run motor vehicle cannot be identified.

(l) There shall be no coverage for the deductible amount of damage, as shown in the Declarations, to the property insured as the result of any one accident.

(m) If coverage is provided to a motor vehicle, defined herein as an uninsured motor vehicle, under a bond or insurance policy having limits less than required by the Illinois Financial Responsibility Law then the Company's maximum limit of liability under this Part for "each person" is the difference between the minimum limit required by the Illinois Financial Responsibility Law to one person and the corresponding limit provided in such bond or insurance policy, and the Company's maximum limit of liability under this Part for "each accident" is the difference between the minimum limit required under the Illinois Financial Responsibility Law for injury to two or more persons and the corresponding limit provided in such bond or insurance policy.

**Other Insurance**. With respect to bodily injury to an insured while occupying a motor vehicle not owned by the named insured, the insurance under Part II shall apply only as excess insurance over any other similar insurance available to such insured and applicable to such motor vehicle as primary insurance and this insurance shall then apply only in the amount by which the limits of liability for this coverage exceeds the applicable limit of liability of such other insurance.

6 | Illinois Personal Auto Policy ~ Form ILPOL 10/15

(847) 623-3020

Not Responsible For Loss Or Damage To Vehicle
In Case of Fire, Theft Or Any Other Cause Beyond
Our Control.

029991

| DATE 12/31/18 | TIME 12:06 | ☐ A.M. ☐ P.M. | REQUESTED BY C.O.D |
|---|---|---|---|

LOCATION OF VEHICLE

NAME JONES

ADDRESS 1616 S Milwaukee Libertyville    PHONE (870) 362-9116

| MILEAGE | | SERVICE TIME | | EXTRA PERSON |
|---|---|---|---|---|
| FINISH | | FINISH | | FINISH |
| START | | START | | START |
| TOTAL | | TOTAL | | TOTAL |

| YEAR 77 | MAKE-MODEL/COLOR FORD EXPOLER | DRIVER DION |
|---|---|---|
| STATE IL | LIC. NO. AF 65989 | VEHICLE I.D. NO. N/A |

| PROBLEM REPORTED | SERVICE RENDERED | SPECIAL EQUIPMENT | INDICATE DAMAGED AREAS ON VEHICLE |
|---|---|---|---|
| ☐ LOCK OUT | ☐ SLING/HOIST TOW | ☐ SINGLE LINE WINCHING | |
| ☐ FLAT TIRE | ☐ WHEEL LIFT | ☐ DUAL LINE WINCHING | |
| ☐ OUT OF GAS | ☐ FLAT BED/RAMP | ☐ SNATCH BLOCKS | |
| ☐ WRECK | ☐ START | ☐ SCOTCH BLOCKS | |
| ☐ RECOVERY | ☐ | ☐ DOLLY | |
| ☐ | ☐ | ☐ | KEYS LEFT   RADIO   Y N    Y N |

VEHICLE TOWED TO WAUKEGAN IL

REMARKS

Paid
CASH

| | | |
|---|---|---|
| | MILEAGE CHARGE | |
| | TOWING CHARGE | |
| OPERATOR'S SIGNATURE | LABOR CHARGE | |
| | STORAGE CHARGE | |

AUTHORIZED SIGNATURE

X _____

This company assumes no responsibility for loss or damage by theft, fire or
any other cause beyond our control.

RSB-142-3
PRINTED IN U.S.A

TOTAL 125.00

Thank You

(847) 623-3020

Not Responsible For Loss Or Damage To Vehicle
In Case of Fire, Theft Or Any Other Cause Beyond
Our Control.

029991

| DATE 2/31/18 | TIME 12:06 | A.M. P.M. | REQUESTED BY C.O.D |
|---|---|---|---|

LOCATION OF VEHICLE

| NAME | JONES | | |
|---|---|---|---|
| ADDRESS | 1616 S Milwaukee | PHONE (870) 362-9116 | Libertyville CE |

| | MILEAGE | | SERVICE TIME | | EXTRA PERSON |
|---|---|---|---|---|---|
| FINISH | | FINISH | | FINISH | |
| START | | START | | START | |
| TOTAL | | TOTAL | | TOTAL | |

| YEAR 77 | MAKE-MODEL/COLOR FORD EXPLORER | DRIVER Dion |
|---|---|---|
| STATE IL | LIC. NO. AL 65989 | VEHICLE I.D. NO. N117 |

| PROBLEM REPORTED | SERVICE RENDERED | SPECIAL EQUIPMENT | INDICATE DAMAGED AREAS ON VEHICLE |
|---|---|---|---|
| ☐ LOCK OUT | ☐ SLING/HOIST TOW | ☐ SINGLE LINE WINCHING | |
| ☐ FLAT TIRE | ☐ WHEEL LIFT | ☐ DUAL LINE WINCHING | |
| ☐ OUT OF GAS | ☐ FLAT BED-RAMP | ☐ SNATCH BLOCKS | |
| ☐ WRECK | ☐ START | ☐ SCOTCH BLOCKS | |
| ☐ RECOVERY | ☐ | ☐ DOLLY | |
| ☐ | ☐ | ☐ | KEYS LEFT  Y  N     RADIO  Y  N |

VEHICLE TOWED TO  WAUKEGAN IL

REMARKS

Paid

CASH

| | MILEAGE CHARGE | |
|---|---|---|
| | TOWING CHARGE | |
| | LABOR CHARGE | |
| | STORAGE CHARGE | |

OPERATOR'S SIGNATURE

AUTHORIZED SIGNATURE

X

This company assumes no responsibility for loss or damage by theft, fire or
any other cause beyond our control.

RSB-142-3
PRINTED IN U.S.A.

| TOTAL | 125.06 |
|---|---|

Thank You

(847) 623-3020

Not Responsible For Loss Or Damage To Vehicle
In Case of Fire, Theft Or Any Other Cause Beyond
Our Control.

029991

| DATE 12/31/18 | TIME 12:06 | A.M. / P.M. | REQUESTED BY C.O.D |
|---|---|---|---|

LOCATION OF VEHICLE

NAME JONES

ADDRESS (870) 362-9116

1616 S Milwaukee LibertyVille CE

PHONE (870) 362-9116

| MILEAGE | | SERVICE TIME | | EXTRA PERSON | |
|---|---|---|---|---|---|
| FINISH | | FINISH | | FINISH | |
| START | | START | | START | |
| TOTAL | | TOTAL | | TOTAL | |

| YEAR 77 | MAKE-MODEL/COLOR FORD EXPLORER | DRIVER DION |
|---|---|---|
| STATE IL | LIC. NO. AE 65989 | VEHICLE I.D. NO. N117 |

| PROBLEM REPORTED | SERVICE RENDERED | SPECIAL EQUIPMENT | INDICATE DAMAGED AREAS ON VEHICLE |
|---|---|---|---|
| ☐ LOCK OUT | ☐ SLING/HOIST TOW | ☐ SINGLE LINE WINCHING | |
| ☐ FLAT TIRE | ☐ WHEEL LIFT | ☐ DUAL LINE WINCHING | |
| ☐ OUT OF GAS | ☐ FLAT BED/RAMP | ☐ SNATCH BLOCKS | |
| ☐ WRECK | ☐ START | ☐ SCOTCH BLOCKS | |
| ☐ RECOVERY | ☐ | ☐ DOLLY | |
| ☐ | ☐ | ☐ | KEYS LEFT  Y  N   RADIO  Y  N |

VEHICLE TOWED TO WAUKEGAN IL

REMARKS

Paid

CASH

| | |
|---|---|
| MILEAGE CHARGE | |
| TOWING CHARGE | |
| LABOR CHARGE | |
| STORAGE CHARGE | |

OPERATOR'S SIGNATURE

AUTHORIZED SIGNATURE

X _____

This company assumes no responsibility for loss or damage by theft, fire or
any other cause beyond our control.

RSS-142-3
PRINTED IN U.S.A.

| TOTAL | 125.00 |
|---|---|

Thank You

P.O. Box 580 · Joliet, IL 60434-0580
**Return Service Requested**

DECEMBER 11, 2018

00000155 FIBS642S121218150350 000001 111111 0

EDWARD JONES JR
1607 N BERWICK BLVD APT 1E
WAUKEGAN IL 60085

Dear Valued Client:

We appreciate your business and the opportunity to meet your financial needs. Based on your relationship with the Bank, we strive to pay your overdrafts when possible at those times when your account's available balance is not sufficient to cover the items that you have presented against it. We do so in anticipation that you will be making an immediate deposit to bring your account to a positive balance. This practice is our way of providing excellent service, but it is important to note that the Bank is under no obligation to pay items presented against your account when there are not enough funds to cover the items you've presented for payment. For example, we typically do not pay overdrafts if your account is not in good standing or if you are not making regular deposits.

The items below were processed and exceeded the available balance in your account, #6035612.

| Item Description | Amount of Item | Paid or Returned | Fee |
|---|---|---|---|
| Bank Card Purchase | 2.00 | Paid | Waived |

Please deduct the Overdraft and/or Returned Item Fee(s) of $.00 from your account records based on the information provided above. The total amount of overdraft (including Overdraft/Returned Item Fee (s) is $-8.82. In order to avoid a Continuous Overdraft Fee, please bring your account balance positive as soon as possible. Also note, while your account is overdrawn you may also be subject to additional Overdraft Fees and Returned Item Fees for each item we process before you make a deposit to your account sufficient to pay the overdraft amount. For more information about our overdraft fees, please refer to your Account Agreement.

Presenting overdrafts or returned items can be an expensive practice. First Midwest offers other less expensive alternatives to handle overdrafts or returned items that may better suit your needs. If you would like to discuss these alternatives, such as a line of credit (subject to credit approval) or account transfers from your savings to manage your account, or if you have other financial needs, please call us at (800) 322-3623 or visit one of our banking centers.

If you do not want the Bank to pay items that will create an overdraft and you want to direct the Bank to return any item that exceeds the available balance in your account, please notify us by mail at 3800 Rock Creek Blvd, Joliet, IL 60431, Attn: Customer Service, or by telephone at (800) 322-3623. You will be charged a Return Item Fee for each such item we return.

Thank you for banking at First Midwest Bank. We look forward to serving you in the future.

Sincerely,

First Midwest Bank





Member FDIC

P.O. Box 580 · Joliet, IL 60434-0580
**Return Service Requested**

DECEMBER 11, 2018

00000155 FIBS642S121218150350 000001 111111 0

EDWARD JONES JR
1607 N BERWICK BLVD APT 1E
WAUKEGAN IL 60085

Dear Valued Client:

We appreciate your business and the opportunity to meet your financial needs. Based on your relationship with the Bank, we strive to pay your overdrafts when possible at those times when your account's available balance is not sufficient to cover the items that you have presented against it. We do so in anticipation that you will be making an immediate deposit to bring your account to a positive balance. This practice is our way of providing excellent service, but it is important to note that the Bank is under no obligation to pay items presented against your account when there are not enough funds to cover the items you've presented for payment. For example, we typically do not pay overdrafts if your account is not in good standing or if you are not making regular deposits.

The items below were processed and exceeded the available balance in your account, #6035612.

| Item Description | Amount of Item | Paid or Returned | Fee |
|---|---|---|---|
| Bank Card Purchase | 2.00 | Paid | Waived |

Please deduct the Overdraft and/or Returned Item Fee(s) of $.00 from your account records based on the information provided above. The total amount of overdraft (including Overdraft/Returned Item Fee (s) is $-8.82. In order to avoid a Continuous Overdraft Fee, please bring your account balance positive as soon as possible. Also note, while your account is overdrawn you may also be subject to additional Overdraft Fees and Returned Item Fees for each item we process before you make a deposit to your account sufficient to pay the overdraft amount. For more information about our overdraft fees, please refer to your Account Agreement.

Presenting overdrafts or returned items can be an expensive practice. First Midwest offers other less expensive alternatives to handle overdrafts or returned items that may better suit your needs. If you would like to discuss these alternatives, such as a line of credit (subject to credit approval) or account transfers from your savings to manage your account, or if you have other financial needs, please call us at (800) 322-3623 or visit one of our banking centers.

If you do not want the Bank to pay items that will create an overdraft and you want to direct the Bank to return any item that exceeds the available balance in your account, please notify us by mail at 3800 Rock Creek Blvd, Joliet, IL 60431, Attn: Customer Service, or by telephone at (800) 322-3623. You will be charged a Return Item Fee for each such item we return.

Thank you for banking at First Midwest Bank. We look forward to serving you in the future.

Sincerely,

First Midwest Bank



Member FDIC

Edward Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

Premium Loan 1 due by:  6/20/2016                    $35.64          $35.64

Agency Products Billed by Your Agent:

     134/B Towbuster 6mo                                          $10.00

Send your Payment to:

Confie Premium Finance
P.O. Box 91005
Baton Rouge, LA 70821

Pay-by-Phone 1-877-926-4600

**Total Payment Due**                                            $45.64

Add Late Charge on Loan Payment

     Received on or after:  6/25/2016                            $1.78

**Payment Due with Late Charge**                                 $47.42

- Detach Here -

The above payment coupon is included here for your first monthly installment payment only. We will mail your entire payment coupon book within the next week.

## To Make Your Payment:

1. Indicate the amounts you are paying in the "Payment" boxes on the coupon above
2. Include the late charge if your payment will reach our offices on or after
3. Choose your method of payment -- with options to pay anytime
   - ✓ By Phone – Through our automated Phone Payment System – Call 1-877-926-4600
   - ✓ On our Website – Logon to www.confiepremiumfinance.com
   - ✓ By Mail
     - Mail check or money order payable to
     - Don not send cash
     - Write your account number on your check/money order
     - Allow sufficient time for your payment to be received before the due date
     - Detach and mail the coupon above with your payment to:

          Confie Premium Finance
          P.O. Box 91005
          Baton Rouge, LA 70821

- ✓ With your Customer Service Representative – Call 1-877-926-4600 to make your payment with one of our friendly customer service representatives or visit your insurance agent's neighborhood store.



**Making Your Payment is Quick and Easy!**



| | | |
|---|---|---|
| Edward Jones Jr<br>709 GRAND AVE<br>WAUKEGAN, IL 60085 | Premium Loan_1 due by:   6/20/2016 | $35.64 | $35.64 |
| | Agency Products Billed by Your Agent: | | |
| | 134/B Towbuster 6mo | $10.00 | |

*Send your Payment to:*

Confie Premium Finance
P.O. Box 91005
Baton Rouge, LA 70821

**Total Payment Due**

Add Late Charge on Loan Payment

    Received on or after:  6/25/2016          $1.78

$45.64

Pay-by-Phone  1-877-926-4600

**Payment Due with Late Charge**          $47.42

*- Detach Here -*

The above payment coupon is included here for your first monthly installment payment only.  We will mail your entire payment coupon book within the next week.

## To Make Your Payment:

1.   Indicate the amounts you are paying in the "Payment" boxes on the coupon above
2.  Include the late charge if your payment will reach our offices on or after
3.  Choose your method of payment -- with options to pay anytime
    - ✓ By Phone – Through our automated Phone Payment System – Call 1-877-926-4600
    - ✓ On our Website – Logon to www.confiepremiumfinance.com
    - ✓ By Mail
        - Mail check or money order payable to
        - Don not send cash
        - Write your account number on your check/money order
        - Allow sufficient time for your payment to be received before the due date
        - Detach and mail the coupon above with your payment to:

                Confie Premium Finance
                P.O. Box 91005
                Baton Rouge, LA 70821

- ✓ With your Customer Service Representative – Call 1-877-926-4600 to make your payment with one of our friendly customer service representatives or visit your insurance agent's neighborhood store.



**Making Your Payment is Quick and Easy!**



Edward Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

Premium Loan 1 due by: 6/20/2016    $35.64    $35.64

Agency Products Billed by Your Agent:

     134/B Towbuster 6mo      $10.00

*Send your Payment to:*

Confie Premium Finance
P.O. Box 91005
Baton Rouge, LA 70821

Pay-by-Phone 1-877-926-4600

**Total Payment Due**    $45.64

Add Late Charge on Loan Payment

     Received on or after: 6/25/2016    $1.78

**Payment Due with Late Charge**    $47.42

- Detach Here -

The above payment coupon is included here for your first monthly installment payment only. We will mail your entire payment coupon book within the next week.

## To Make Your Payment:

1. Indicate the amounts you are paying in the "Payment" boxes on the coupon above
2. Include the late charge if your payment will reach our offices on or after
3. Choose your method of payment -- with options to pay anytime
   - ✓ By Phone – Through our automated Phone Payment System – Call 1-877-926-4600
   - ✓ On our Website – Logon to www.confiepremiumfinance.com
   - ✓ By Mail
     - Mail check or money order payable to
     - Don not send cash
     - Write your account number on your check/money order
     - Allow sufficient time for your payment to be received before the due date
     - Detach and mail the coupon above with your payment to:

            Confie Premium Finance
            P.O. Box 91005
            Baton Rouge, LA 70821

   - ✓ With your Customer Service Representative – Call 1-877-926-4600 to make your payment with one of our friendly customer service representatives or visit your insurance agent's neighborhood store.



**Making Your Payment is Quick and Easy!**



Account: IL-991330

Insured:

Edward  Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

## Monthly Billing of Agency Products

At the time you purchased your insurance policy, you may have also purchased optional memberships and other products from your agency ("Agency Products") and elected to pay these thorough monthly installments.  The Agency Products you purchased are listed below:

| Member No. | Product Description | Total Price | Monthly Billing |
|---|---|---|---|
| 1303701 | 134/B Towbuster 6mo | $60.00 | $10.00 |

As a convenience to you, the Agency Products will be included on your monthly payment coupon.  A summary of the amounts you owe under your premium finance loan, as well as any amounts you will be billed on your monthly payment coupon for Agency Products, is presented below:

| | |
|---|---|
| Monthly Payment Due on Premium Loan Agency Products billed monthly by your Agent (not part of your loan) | $35.64 |
| 134/B Towbuster 6mo | $10.00 |

**Total Monthly Payment, Including Agency Products**

$45.64

Any amounts payable related to Agency Products are not included in your Insurance Premium Finance and Security Agreement and are not part of your premium finance loan.  As such, no finance charges, interest or late fees will be charged to you on amounts related to these Agency Products.

You may, at any time, choose to terminate any of the Agency Products by not remitting that portion of the monthly installment for the Agency Product you wish to terminate.  Your decision to discontinue any Agency Product will have no effect on your premium finance loan and will not adversely impact your underlying auto insurance coverage as long as your premium finance loan remains current under the term s of your Insurance Premium Finance and Security Agreement.

Should you have any questions, please contact your insurance agent during normal business hours or call Confie Premium Finance Customer Service at 1-877-926-4600 between the hours of 8:00am and 6:00pm CST Monday thru Friday or between the hours of 7:00am and 4:00pm Saturday.

Account: IL-991330

Insured:

Edward Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

## Monthly Billing of Agency Products

At the time you purchased your insurance policy, you may have also purchased optional memberships and other products from your agency ("Agency Products") and elected to pay these thorough monthly installments. The Agency Products you purchased are listed below:

| Member No. | Product Description | Total Price | Monthly Billing |
|---|---|---|---|
| 1303701 | 134/B Towbuster 6mo | $60.00 | $10.00 |

As a convenience to you, the Agency Products will be included on your monthly payment coupon. A summary of the amounts you owe under your premium finance loan, as well as any amounts you will be billed on your monthly payment coupon for Agency Products, is presented below:

| | |
|---|---|
| Monthly Payment Due on Premium Loan | |
| Agency Products billed monthly by your Agent (not part of your loan) | $35.64 |
| 134/B Towbuster 6mo | $10.00 |

**Total Monthly Payment, Including Agency Products**

$45.64

Any amounts payable related to Agency Products are not included in your Insurance Premium Finance and Security Agreement and are not part of your premium finance loan. As such, no finance charges, interest or late fees will be charged to you on amounts related to these Agency Products.

You may, at any time, choose to terminate any of the Agency Products by not remitting that portion of the monthly installment for the Agency Product you wish to terminate. Your decision to discontinue any Agency Product will have no effect on your premium finance loan and will not adversely impact your underlying auto insurance coverage as long as your premium finance loan remains current under the term s of your Insurance Premium Finance and Security Agreement.

Should you have any questions, please contact your insurance agent during normal business hours or call Confie Premium Finance Customer Service at 1-877-926-4600 between the hours of 8:00am and 6:00pm CST Monday thru Friday or between the hours of 7:00am and 4:00pm Saturday.

Account: IL-991330

Insured:

Edward  Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

## Monthly Billing of Agency Products

At the time you purchased your insurance policy, you may have also purchased optional memberships and other products from your agency ("Agency Products") and elected to pay these thorough monthly installments.  The Agency Products you purchased are listed below:

| Member No. | Product Description | Total Price | Monthly Billing |
|---|---|---|---|
| 1303701 | 134/B Towbuster 6mo | $60.00 | $10.00 |

As a convenience to you, the Agency Products will be included on your monthly payment coupon.  A summary of the amounts you owe under your premium finance loan, as well as any amounts you will be billed on your monthly payment coupon for Agency Products, is presented below:

| | |
|---|---|
| Monthly Payment Due on Premium Loan | |
| Agency Products billed monthly by your Agent (not part of your loan) | $35.64 |
| 134/B Towbuster 6mo | $10.00 |

***Total Monthly Payment, Including Agency Products***

$45.64

Any amounts payable related to Agency Products are not included in your Insurance Premium Finance and Security Agreement and are not part of your premium finance loan.  As such, no finance charges, interest or late fees will be charged to you on amounts related to these Agency Products.

You may, at any time, choose to terminate any of the Agency Products by not remitting that portion of the monthly installment for the Agency Product you wish to terminate.  Your decision to discontinue any Agency Product will have no effect on your premium finance loan and will not adversely impact your underlying auto insurance coverage as long as your premium finance loan remains current under the term s of your Insurance Premium Finance and Security Agreement.

Should you have any questions, please contact your insurance agent during normal business hours or call Confie Premium Finance Customer Service at 1-877-926-4600 between the hours of 8:00am and 6:00pm CST Monday thru Friday or between the hours of 7:00am and 4:00pm Saturday.

Account: IL-1125625

Insured:

Edward Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

## Monthly Billing of Agency Products

At the time you purchased your insurance policy, you may have also purchased optional memberships and other products from your agency ("Agency Products") and elected to pay these thorough monthly installments. The Agency Products you purchased are listed below:

| Member No. | Product Description | Total Price | Monthly Billing |
|---|---|---|---|
| 1467496 | 134/B Towbuster 6mo | $60.00 | $10.00 |

As a convenience to you, the Agency Products will be included on your monthly payment coupon. A summary of the amounts you owe under your premium finance loan, as well as any amounts you will be billed on your monthly payment coupon for Agency Products, is presented below:

| | |
|---|---|
| Monthly Payment Due on Premium Loan | $33.99 |
| Agency Products billed monthly by your Agent (not part of your loan) | |
| 134/B Towbuster 6mo | $10.00 |
| **Total Monthly Payment, Including Agency Products** | $43.99 |

Any amounts payable related to Agency Products are not included in your Insurance Premium Finance and Security Agreement and are not part of your premium finance loan. As such, no finance charges, interest or late fees will be charged to you on amounts related to these Agency Products.

You may, at any time, choose to terminate any of the Agency Products by not remitting that portion of the monthly installment for the Agency Product you wish to terminate. Your decision to discontinue any Agency Product will have no effect on your premium finance loan and will not adversely impact your underlying auto insurance coverage as long as your premium finance loan remains current under the term s of your Insurance Premium Finance and Security Agreement.

Should you have any questions, please contact your insurance agent during normal business hours or call Confie Premium Finance Customer Service at 1-877-926-4600 between the hours of 8:00am and 6:00pm CST Monday thru Friday or between the hours of 7:00am and 4:00pm Saturday.



Account: IL-1125625

Insured:

Edward Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

## Monthly Billing of Agency Products

At the time you purchased your insurance policy, you may have also purchased optional memberships and other products from your agency ("Agency Products") and elected to pay these thorough monthly installments. The Agency Products you purchased are listed below:

| Member No. | Product Description | Total Price | Monthly Billing |
|---|---|---|---|
| 1467496 | 134/B Towbuster 6mo | $60.00 | $10.00 |

As a convenience to you, the Agency Products will be included on your monthly payment coupon. A summary of the amounts you owe under your premium finance loan, as well as any amounts you will be billed on your monthly payment coupon for Agency Products, is presented below:

| | |
|---|---|
| Monthly Payment Due on Premium Loan | $33.99 |
| Agency Products billed monthly by your Agent (not part of your loan) | |
| 134/B Towbuster 6mo | $10.00 |

| | |
|---|---|
| ***Total Monthly Payment, Including Agency Products*** | $43.99 |

Any amounts payable related to Agency Products are not included in your Insurance Premium Finance and Security Agreement and are not part of your premium finance loan. <u>As such, no finance charges, interest or late fees will be charged to you on amounts related to these Agency Products.</u>

<u>You may, at any time, choose to terminate any of the Agency Products by not remitting that portion of the monthly installment for the Agency Product you wish to terminate.</u> Your decision to discontinue any Agency Product will have no effect on your premium finance loan and will not adversely impact your underlying auto insurance coverage as long as your premium finance loan remains current under the term s of your Insurance Premium Finance and Security Agreement.

Should you have any questions, please contact your insurance agent during normal business hours or call Confie Premium Finance Customer Service at 1-877-926-4600 between the hours of 8:00am and 6:00pm CST Monday thru Friday or between the hours of 7:00am and 4:00pm Saturday.



Account: IL-1125625

Insured:

Edward Jones Jr
709 GRAND AVE
WAUKEGAN, IL 60085

## Monthly Billing of Agency Products

At the time you purchased your insurance policy, you may have also purchased optional memberships and other products from your agency ("Agency Products") and elected to pay these thorough monthly installments. The Agency Products you purchased are listed below:

| Member No. | Product Description | Total Price | Monthly Billing |
|---|---|---|---|
| 1467496 | 134/B Towbuster 6mo | $60.00 | $10.00 |

As a convenience to you, the Agency Products will be included on your monthly payment coupon. A summary of the amounts you owe under your premium finance loan, as well as any amounts you will be billed on your monthly payment coupon for Agency Products, is presented below:

| | |
|---|---|
| Monthly Payment Due on Premium Loan | $33.99 |
| Agency Products billed monthly by your Agent (not part of your loan) 134/B Towbuster 6mo | $10.00 |

**Total Monthly Payment, Including Agency Products**

$43.99

Any amounts payable related to Agency Products are not included in your Insurance Premium Finance and Security Agreement and are not part of your premium finance loan. <u>As such, no finance charges, interest or late fees will be charged to you on amounts related to these Agency Products.</u>

<u>You may, at any time, choose to terminate any of the Agency Products by not remitting that portion of the monthly installment for the Agency Product you wish to terminate.</u> Your decision to discontinue any Agency Product will have no effect on your premium finance loan and will not adversely impact your underlying auto insurance coverage as long as your premium finance loan remains current under the term s of your Insurance Premium Finance and Security Agreement.

Should you have any questions, please contact your insurance agent during normal business hours or call Confie Premium Finance Customer Service at 1-877-926-4600 between the hours of 8:00am and 6:00pm CST Monday thru Friday or between the hours of 7:00am and 4:00pm Saturday.



# American Alliance Casualty Company

Policy Number: ILAA-0247178-01
Policy Effective Date: 12/17/2016

## SCHEDULE OF COVERAGES

| Coverage | Limits | | Deductible | Premium Veh. 1 | Veh. 2 | Veh. 3 | Veh. 4 |
|---|---|---|---|---|---|---|---|
| Bodily Injury | $25,000/ | each person | | $60.00 | | | |
| | $50,000 | each accident | | | | | |
| Property Damage | $20,000 | each accident | | $35.00 | | | |
| Medical Payments | $1,000 | each person | | $10.00 | | | |
| Uninsured Motorist - | $25,000/ | each person | | $65.00 | | | |
| Bodily Injury | $50,000 | each accident | | | | | |

### Vehicle 1  Limits

| Coverage | | Deductible | Premium Veh. 1 |
|---|---|---|---|
| Uninsured Motorist Property Damage | | $15,000 - $250 | $25.00 |
| Towing & Labor | | | N/A |
| Rental Reimbursement | | | N/A |
| Comprehensive | | | N/A |
| Collision | | | N/A |

| | |
|---|---|
| **Total Premium** | $195.00 |

The following discounts and surcharges have been applied to your policy:

- Renewal (10%)
- AntiTheft (5%)

Your automobile policy consists of this Policy Declaration and the documents listed below.  Please keep them together.

Policy Declaration Page - ILDEC 01/15
ID Card
Illinois Policy - ILPOL 07/16 - Available online at www.myamericanalliance.com or request a copy by calling (847) 916-3200.

# American Alliance Casualty Company

Policy Number: ILAA-0247178-01
Policy Effective Date: 12/17/2016

## SCHEDULE OF COVERAGES

| Coverage | Limits | | Deductible | Premium Veh. 1 | Veh. 2 | Veh. 3 | Veh. 4 |
|---|---|---|---|---|---|---|---|
| Bodily Injury | $25,000/ | each person | | $60.00 | | | |
| | $50,000 | each accident | | | | | |
| Property Damage | $20,000 | each accident | | $35.00 | | | |
| Medical Payments | $1,000 | each person | | $10.00 | | | |
| Uninsured Motorist - | $25,000/ | each person | | $65.00 | | | |
| Bodily Injury | $50,000 | each accident | | | | | |

### Vehicle 1  Limits

| | | Deductible | Veh. 1 | | | |
|---|---|---|---|---|---|---|
| Uninsured Motorist  Property Damage | | $15,000 - $250 | $25.00 | | | |
| Towing & Labor | | | N/A | | | |
| Rental Reimbursement | | | N/A | | | |
| Comprehensive | | | N/A | | | |
| Collision | | | N/A | | | |

**Total Premium**   $195.00

The following discounts and surcharges have been applied to your policy:

- Renewal (10%)
- AntiTheft (5%)

Your automobile policy consists of this Policy Declaration and the documents listed below.  Please keep them together.

Policy Declaration Page - ILDEC 01/15
ID Card
Illinois Policy - ILPOL 07/16 - Available online at www.myamericanalliance.com or request a copy by calling (847) 916-3200.

# American Alliance Casualty Company

Policy Number: ILAA-0247178-01
Policy Effective Date: 12/17/2016

## SCHEDULE OF COVERAGES

| Coverage | Limits | | Deductible | Premium Veh. 1 | Veh. 2 | Veh. 3 | Veh. 4 |
|---|---|---|---|---|---|---|---|
| Bodily Injury | $25,000/ | each person | | $60.00 | | | |
| | $50,000 | each accident | | | | | |
| Property Damage | $20,000 | each accident | | $35.00 | | | |
| Medical Payments | $1,000 | each person | | $10.00 | | | |
| Uninsured Motorist - | $25,000/ | each person | | $65.00 | | | |
| Bodily Injury | $50,000 | each accident | | | | | |

**Vehicle 1  Limits**

| Coverage | | Deductible | Premium Veh. 1 |
|---|---|---|---|
| Uninsured Motorist Property Damage | | $15,000 - $250 | $25.00 |
| Towing & Labor | | | N/A |
| Rental Reimbursement | | | N/A |
| Comprehensive | | | N/A |
| Collision | | | N/A |

**Total Premium**   $195.00

The following discounts and surcharges have been applied to your policy:

- Renewal (10%)
- AntiTheft (5%)

Your automobile policy consists of this Policy Declaration and the documents listed below.  Please keep them together.

Policy Declaration Page - ILDEC 01/15
ID Card
Illinois Policy - ILPOL 07/16 - Available online at www.myamericanalliance.com or request a copy by calling (847) 916-3200.



# AMERICANALLIANCE

## CASUALTY COMPANY

## PERSONAL AUTOMOBILE
## INSURANCE POLICY
### ILLINOIS

This is your policy of insurance.

Your policy has been issued based upon your statements contained and the information as provided in your application which is incorporated into this policy. Please take the time to review your entire policy, including any enclosures or attachments. If you find any errors, please immediately contact the Company.

**In the event of an Accident**, immediately contact our
Claims Department at **(847) 916-3200**
or
at our website at **www.myamericanalliance.com**.

Case: 1:19-cv-00317 Document #: 1 Filed: 01/16/19 Page 83 of 149 PageID #:83



# AMERICANALLIANCE

## CASUALTY COMPANY

# PERSONAL AUTOMOBILE
# INSURANCE POLICY
## ILLINOIS

This is your policy of insurance.

Your policy has been issued based upon your statements contained and the information as provided in your application which is incorporated into this policy. Please take the time to review your entire policy, including any enclosures or attachments. If you find any errors, please immediately contact the Company.

**In the event of an Accident**, immediately contact our
Claims Department at **(847) 916-3200**
or
at our website at **www.myamericanalliance.com**.



# AMERICANALLIANCE

### CASUALTY COMPANY

## PERSONAL AUTOMOBILE
## INSURANCE POLICY
### ILLINOIS

This is your policy of insurance.

Your policy has been issued based upon your statements contained and the information as provided in your application which is incorporated into this policy. Please take the time to review your entire policy, including any enclosures or attachments. If you find any errors, please immediately contact the Company.

**In the event of an Accident**, immediately contact our
Claims Department at **(847) 916-3200**
or
at our website at **www.myamericanalliance.com**.

# AMERICAN ALLIANCE CASUALTY COMPANY

Rosemont, Illinois (the "Company")

agrees with the insured, named in the Declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Application made a part hereof, and subject to the Declarations and all the terms of this policy:

## PART I - LIABILITY

**A - Bodily Injury Liability; B - Property Damage Liability**. To pay on behalf of the insured, but only to the extent of the applicable policy limits, all sums which the insured shall become legally obligated to pay as damages because of:

    A. bodily injury, or

    B. property damage

arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile, and the Company shall defend any lawsuit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the lawsuit are groundless, false or fraudulent; but the Company may make such investigation and settlement of any claim or lawsuit as it deems expedient. It is understood and agreed that the Company has no obligation to any insured after the applicable limits of the policy have been exhausted by payment; it is further understood and agreed that the Company is not obligated to pay, and shall not pay, attorney fees for any legal or investigative work unless such attorneys are specifically selected by the Company; it is further understood and agreed that the Company is not obligated to pay, and shall not pay, any sum which the insured may be legally obligated to pay as a result of a lawsuit unless the Company received actual notice of said lawsuit before any judgment had been entered in said lawsuit. It is understood and agreed that the Company has the sole right to settle or defend any lawsuit including, but not limited, to the right to accept or reject arbitration awards entered in such suit.

**Supplementary Payments**. To pay, in addition to the applicable limits of liability:

(a) all expenses incurred by the Company, all costs taxed against the insured in any such lawsuit and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

(b) premiums on appeal bonds required in any such lawsuit, premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of an automobile insured hereunder, not to exceed $100 per bail bond, but without any obligation to apply for or furnish any such bonds;

(c) all reasonable expenses, other than loss of earnings, incurred by the insured at the Company's request.

(1) the named insured,

(2) any other person using such automobile to whom the named insured has given permission, provided the use is within the scope of such permission;

(b) with respect to a non-owned automobile;

(1) the named insured, provided the named insured received the permission of its owner, and the use is within the scope of such permission,

(2) a relative, but only with respect to a private passenger automobile, provided the person using such automobile has received the permission of its owner and the use is within the scope of such permission;

(c) any other person or organization legally responsible for the use of:

(1) an owned automobile, or

(2) a non-owned automobile, if such automobile is not owned or hired by such person or organization, provided the actual use thereof is by a person who is an insured under (a) or (b) above with respect to such owned automobile or non-owned automobile; and

(d) any other person who is not insured for liability coverage by any other insurance policy, a self-insurance program, or a liability bond while using either the owned or non-owned autos. The use of such owned or non-owned auto must be within the scope of consent of insured or your spouse.

The insurance afforded under Part I applies separately to each insured against whom claim is made or suit is brought, but neither the inclusion herein of more than one insured nor the application of the policy to more than one automobile shall operate to increase the limits of liability stated in the Declarations for the liability coverages.

**Definitions**. Under Part I:

**"named insured"** means the individual named as Named Insured of the Declarations and also includes his or her spouse, if a resident of the same household;

**"spouse"** means a lawfully wedded spouse and also means a person joined in a civil union according to statute;

**"insured"** means a person or organization described under "Persons Insured";

**"relative"** means a person related to the named insured or his spouse by blood, marriage or adoption and who is a resident of the same household as the insured or spouse and is either a non-driver or is listed on the Application for this insurance as a driver, provided neither such relative nor his spouse owns a private passenger automobile;

**"owned automobile"** means:

(a) a private passenger, farm or utility automobile described in this policy;

(b) a private passenger, farm or utility automobile,

# AMERICAN ALLIANCE CASUALTY COMPANY

Rosemont, Illinois (the "Company")

agrees with the insured, named in the Declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Application made a part hereof, and subject to the Declarations and all the terms of this policy:

## PART I - LIABILITY

**A - Bodily Injury Liability; B - Property Damage Liability**. To pay on behalf of the insured, but only to the extent of the applicable policy limits, all sums which the insured shall become legally obligated to pay as damages because of:

    A. bodily injury, or

    B. property damage

arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile, and the Company shall defend any lawsuit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the lawsuit are groundless, false or fraudulent; but the Company may make such investigation and settlement of any claim or lawsuit as it deems expedient. It is understood and agreed that the Company has no obligation to any insured after the applicable limits of the policy have been exhausted by payment; it is further understood and agreed that the Company is not obligated to pay, and shall not pay, attorney fees for any legal or investigative work unless such attorneys are specifically selected by the Company; it is further understood and agreed that the Company is not obligated to pay, and shall not pay, any sum which the insured may be legally obligated to pay as a result of a lawsuit unless the Company received actual notice of said lawsuit before any judgment had been entered in said lawsuit. It is understood and agreed that the Company has the sole right to settle or defend any lawsuit including, but not limited, to the right to accept or reject arbitration awards entered in such suit.

**Supplementary Payments**. To pay, in addition to the applicable limits of liability:

(a) all expenses incurred by the Company, all costs taxed against the insured in any such lawsuit and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

(b) premiums on appeal bonds required in any such lawsuit, premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of an automobile insured hereunder, not to exceed $100 per bail bond, but without any obligation to apply for or furnish any such bonds;

(c) all reasonable expenses, other than loss of earnings, incurred by the insured at the Company's request.

(1) the named insured,

(2) any other person using such automobile to whom the named insured has given permission, provided the use is within the scope of such permission;

(b) with respect to a non-owned automobile;

(1) the named insured, provided the named insured received the permission of its owner, and the use is within the scope of such permission,

(2) a relative, but only with respect to a private passenger automobile, provided the person using such automobile has received the permission of its owner and the use is within the scope of such permission;

(c) any other person or organization legally responsible for the use of:

(1) an owned automobile, or

(2) a non-owned automobile, if such automobile is not owned or hired by such person or organization, provided the actual use thereof is by a person who is an insured under (a) or (b) above with respect to such owned automobile or non-owned automobile; and

(d) any other person who is not insured for liability coverage by any other insurance policy, a self-insurance program, or a liability bond while using either the owned or non-owned autos. The use of such owned or non-owned auto must be within the scope of consent of insured or your spouse.

The insurance afforded under Part I applies separately to each insured against whom claim is made or suit is brought, but neither the inclusion herein of more than one insured nor the application of the policy to more than one automobile shall operate to increase the limits of liability stated in the Declarations for the liability coverages.

**Definitions**. Under Part I:

**"named insured"** means the individual named as Named Insured of the Declarations and also includes his or her spouse, if a resident of the same household;

**"spouse"** means a lawfully wedded spouse and also means a person joined in a civil union according to statute;

**"insured"** means a person or organization described under "Persons Insured";

**"relative"** means a person related to the named insured or his spouse by blood, marriage or adoption and who is a resident of the same household as the insured or spouse and is either a non-driver or is listed on the Application for this insurance as a driver, provided neither such relative nor his spouse owns a private passenger automobile;

**"owned automobile"** means:

(a) a private passenger, farm or utility automobile described in this policy;

(b) a private passenger, farm or utility automobile,

# AMERICAN ALLIANCE CASUALTY COMPANY

Rosemont, Illinois (the "Company")

agrees with the insured, named in the Declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Application made a part hereof, and subject to the Declarations and all the terms of this policy:

## PART I - LIABILITY

**A - Bodily Injury Liability; B - Property Damage Liability**. To pay on behalf of the insured, but only to the extent of the applicable policy limits, all sums which the insured shall become legally obligated to pay as damages because of:

    A. bodily injury, or

    B. property damage

arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile, and the Company shall defend any lawsuit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the lawsuit are groundless, false or fraudulent; but the Company may make such investigation and settlement of any claim or lawsuit as it deems expedient. It is understood and agreed that the Company has no obligation to any insured after the applicable limits of the policy have been exhausted by payment; it is further understood and agreed that the Company is not obligated to pay, and shall not pay, attorney fees for any legal or investigative work unless the Company has specifically selected the Company; it is further understood and agreed that the Company is not obligated to pay, and shall not pay, any sum which the insured may be legally obligated to pay as a result of a lawsuit unless the Company received actual notice of said lawsuit before any judgment had been entered in said lawsuit. It is understood and agreed that the Company has the sole right to settle or defend any lawsuit including, but not limited, to the right to accept or reject arbitration awards entered in such suit.

**Supplementary Payments**. To pay, in addition to the applicable limits of liability:

(a) all expenses incurred by the Company, all costs taxed against the insured in any such lawsuit and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

(b) premiums on appeal bonds required in any such lawsuit, premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of an automobile insured hereunder, not to exceed $100 per bail bond, but without any obligation to apply for or furnish any such bonds;

(c) all reasonable expenses, other than loss of earnings, incurred by the insured at the Company's request.

(1) the named insured,

(2) any other person using such automobile to whom the named insured has given permission, provided the use is within the scope of such permission;

(b) with respect to a non-owned automobile;

(1) the named insured, provided the named insured received the permission of its owner, and the use is within the scope of such permission,

(2) a relative, but only with respect to a private passenger automobile, provided the person using such automobile has received the permission of its owner and the use is within the scope of such permission;

(c) any other person or organization legally responsible for the use of:

(1) an owned automobile, or

(2) a non-owned automobile, if such automobile is not owned or hired by such person or organization, provided the actual use thereof is by a person who is an insured under (a) or (b) above with respect to such owned automobile or non-owned automobile; and

(d) any other person who is not insured for liability coverage by any other insurance policy, a self-insurance program, or a liability bond while using either the owned or non-owned autos. The use of such owned or non-owned auto must be within the scope of consent of insured or your spouse.

The insurance afforded under Part I applies separately to each insured against whom claim is made or suit is brought, but neither the inclusion herein of more than one insured nor the application of the policy to more than one automobile shall operate to increase the limits of liability stated in the Declarations for the liability coverages.

**Definitions**. Under Part I:

**"named insured"** means the individual named as Named Insured of the Declarations and also includes his or her spouse, if a resident of the same household;

**"spouse"** means a lawfully wedded spouse and also means a person joined in a civil union according to statute;

**"insured"** means a person or organization described under "Persons Insured";

**"relative"** means a person related to the named insured or his spouse by blood, marriage or adoption and who is a resident of the same household as the insured or spouse and is either a non-driver or is listed on the Application for this insurance as a driver, provided neither such relative nor his spouse owns a private passenger automobile;

**"owned automobile"** means:

(a) a private passenger, farm or utility automobile described in this policy;

(b) a private passenger, farm or utility automobile,

(1) that the acquired automobile replaces an automobile described in this policy; that neither the named insured nor any resident of his household retains ownership of the described replaced automobile, and that the named insured notified the Company in writing within 30 days after the acquisition of his intention to make this policy applicable to such acquired replacement automobile;

(2) that the Company insures all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the Company in writing within 30 days after the date of such acquisition of his election to make this and no other policy issued by the Company applicable to such automobile; or,

(c) a temporary substitute automobile:

"temporary substitute automobile" means any automobile not owned by the named insured, or by any resident of the same household, while temporarily used as a substitute for the owned automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;

"non-owned automobile" means an automobile not owned by, furnished or available for the regular use of either the named insured or any resident of the same household, while said automobile is in the possession or custody of the named insured or any resident of the same household, or is being operated by him or her, other than a temporary substitute automobile;

"private passenger automobile" means a four wheel private passenger, station wagon or jeep type automobile;

"farm automobile" means an automobile of the truck type with a load capacity of fifteen hundred pounds or less not used for business or commercial purposes other than farming;

"utility automobile" means an automobile, other than a farm automobile, with a load capacity of fifteen hundred pounds or less of the pick-up body, sedan delivery or panel truck type not used for business or commercial purposes;

"trailer" means a trailer designed for use with a private passenger automobile, if not being used for business or commercial purposes with other than a private passenger, farm or utility automobile, or a farm wagon or farm implement while used with a farm automobile, and if not a home, office, store, display or passenger trailer;

"automobile business" means the business or occupation of selling, repairing, servicing, storing or parking automobiles;

"Property damage" mean physical injury to, destruction of, or loss of use to tangible property which is caused by an accident covered under this policy and occurring while the policy is in force

"use" of an automobile includes the loading and unloading thereof;

"war" means war, whether or not declared, civil war, insurrection, rebellion or revolution, or any act or condition incident to any of the foregoing.

**Exclusions.** This policy *does not apply under Part I.*

insured. The term "insured" as used in this exclusion means the person against whom the claim is made or lawsuit is brought. This exclusion shall not apply when a third party acquires the right of contribution against a member of the injured person's family. Nor shall this exclusion apply when any person not residing in the household of the named insured was driving the vehicle insured under this policy at the time of the accident that is the subject of the claim or lawsuit;

(b) to any automobile while used as a public or livery conveyance, but this exclusion does not apply to the named insured with respect to bodily injury or property damage which results from the named insured's occupancy of a non-owned automobile other than as the operator thereof;

(c) to bodily injury or property damage caused intentionally by or at the direction of the insured;

(d) to bodily injury or property damage arising out of the operation of farm machinery;

(e) to bodily injury of any employee of the insured arising out of and in the course of employment by the insured if such injury arises out of the ownership, maintenance or use of an owned automobile or of a non-owned automobile;

(f) to bodily injury to any fellow employee of the insured injured in the course and scope of his/her employment if such injury arises out of the ownership, maintenance or use of an automobile in the business of the insured's employer;

(g) to an owned automobile while used in the automobile business, but this exclusion does not apply to the named insured, a relative, a partnership in which the named insured or such relative is a partner, or any partner, agent or employee of the named insured, such relative or partnership;

(h) to a non-owned automobile while used (1) in the automobile business by the insured or (2) in any other business or occupation of the insured except a private passenger automobile operated or occupied by the named insured or by his private chauffeur or domestic servant, or a trailer used therewith or with an owned automobile;

(i) to injury to or destruction of (1) property owned or transported by the insured or (2) property rented to or in charge of the insured other than a residence or private garage or (3) property as to which the insured is for any purpose exercising physical control. An automobile used, operated or maintained by an insured is considered property in charge of that insured;

(j) to any automobile, farm automobile or utility automobile, or any other type of motor vehicle, rented or leased by the insured where other valid and collectible insurance has been purchased by or furnished to the insured in connection with such rental or lease;

(k) to bodily injury or property damage with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability;

(l) to any automobile designed for racing while being

(1) that the acquired automobile replaces an automobile described in this policy; that neither the named insured nor any resident of his household retains ownership of the described replaced automobile, and that the named insured notified the Company in writing within 30 days after the acquisition of his intention to make this policy applicable to such acquired replacement automobile;

(2) that the Company insures all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the Company in writing within 30 days after the date of such acquisition of his election to make this and no other policy issued by the Company applicable to such automobile; or,

(c) a temporary substitute automobile;

**"temporary substitute automobile"** means any automobile not owned by the named insured, or by any resident of the same household, while temporarily used as a substitute for the owned automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;

**"non-owned automobile"** means an automobile not owned by, furnished or available for the regular use of either the named insured or any resident of the same household, while said automobile is in the possession or custody of the named insured or any resident of the same household, or is being operated by him or her, other than a temporary substitute automobile;

**"private passenger automobile"** means a four wheel private passenger, station wagon or jeep type automobile;

**"farm automobile"** means an automobile of the truck type with a load capacity of fifteen hundred pounds or less not used for business or commercial purposes other than farming;

**"utility automobile"** means an automobile, other than a farm automobile, with a load capacity of fifteen hundred pounds or less of the pick-up body, sedan delivery or panel truck type not used for business or commercial purposes;

**"trailer"** means a trailer designed for use with a private passenger automobile, if not being used for business or commercial purposes with other than a private passenger, farm or utility automobile, or a farm wagon or farm implement while used with a farm automobile, and if not a home, office, store, display or passenger trailer;

**"automobile business"** means the business or occupation of selling, repairing, servicing, storing or parking automobiles;

**"Property damage"** mean physical injury to, destruction of, or loss of use to tangible property which is caused by an accident covered under this policy and occurring while the policy is in force

**"use"** of an automobile includes the loading and unloading thereof;

**"war"** means war, whether or not declared, civil war, insurrection, rebellion or revolution, or any act or condition incident to any of the foregoing.

**Exclusions.** This policy does not apply under Part I

insured. The term "insured" as used in this exclusion means the person against whom the claim is made or lawsuit is brought. This exclusion shall not apply when a third party acquires the right of contribution against a member of the injured person's family. Nor shall this exclusion apply when any person not residing in the household of the named insured was driving the vehicle insured under this policy at the time of the accident that is the subject of the claim or lawsuit;

(b) to any automobile while used as a public or livery conveyance, but this exclusion does not apply to the named insured with respect to bodily injury or property damage which results from the named insured's occupancy of a non-owned automobile other than as the operator thereof;

(c) to bodily injury or property damage caused intentionally by or at the direction of the insured;

(d) to bodily injury or property damage arising out of the operation of farm machinery;

(e) to bodily injury of any employee of the insured arising out of and in the course of employment by the insured if such injury arises out of the ownership, maintenance or use of an owned automobile or of a non-owned automobile;

(f) to bodily injury to any fellow employee of the insured injured in the course and scope of his/her employment if such injury arises out of the ownership, maintenance or use of an automobile in the business of the insured's employer;

(g) to an owned automobile while used in the automobile business, but this exclusion does not apply to the named insured, a relative, a partnership in which the named insured or such relative is a partner, or any partner, agent or employee of the named insured, such relative or partnership;

(h) to a non-owned automobile while used (1) in the automobile business by the insured or (2) in any other business or occupation of the insured except a private passenger automobile operated or occupied by the named insured or by his private chauffeur or domestic servant, or a trailer used therewith or with an owned automobile;

(i) to injury to or destruction of (1) property owned or transported by the insured or (2) property rented to or in charge of the insured other than a residence or private garage or (3) property as to which the insured is for any purpose exercising physical control. An automobile used, operated or maintained by an insured is considered property in charge of that insured;

(j) to any automobile, farm automobile or utility automobile, or any other type of motor vehicle, rented or leased by the insured where other valid and collectible insurance has been purchased by or furnished to the insured in connection with such rental or lease;

(k) to bodily injury or property damage with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability;

(l) to any automobile designed for racing while being

(1) that the acquired automobile replaces an automobile described in this policy; that neither the named insured nor any resident of his household retains ownership of the described replaced automobile, and that the named insured notified the Company in writing within 30 days after the acquisition of his intention to make this policy applicable to such acquired replacement automobile;

(2) that the Company insures all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the Company in writing within 30 days after the date of such acquisition of his election to make this and no other policy issued by the Company applicable to such automobile; or,

(c) a temporary substitute automobile;

**"temporary substitute automobile"** means any automobile not owned by the named insured, or by any resident of the same household, while temporarily used as a substitute for the owned automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;

**"non-owned automobile"** means an automobile not owned by, furnished or available for the regular use of either the named insured or any resident of the same household, while said automobile is in the possession or custody of the named insured or any resident of the same household, or is being operated by him or her, other than a temporary substitute automobile;

**"private passenger automobile"** means a four wheel private passenger, station wagon or jeep type automobile;

**"farm automobile"** means an automobile of the truck type with a load capacity of fifteen hundred pounds or less not used for business or commercial purposes other than farming;

**"utility automobile"** means an automobile, other than a farm automobile, with a load capacity of fifteen hundred pounds or less of the pick-up body, sedan delivery or panel truck type not used for business or commercial purposes;

**"trailer"** means a trailer designed for use with a private passenger automobile, if not being used for business or commercial purposes with other than a private passenger, farm or utility automobile, or a farm wagon or farm implement while used with a farm automobile, and if not a home, office, store, display or passenger trailer;

**"automobile business"** means the business or occupation of selling, repairing, servicing, storing or parking automobiles;

**"Property damage"** mean physical injury to, destruction of, or loss of use to tangible property which is caused by an accident covered under this policy and occurring while the policy is in force

**"use"** of an automobile includes the loading and unloading thereof;

**"war"** means war, whether or not declared, civil war, insurrection, rebellion or revolution, or any act or condition incident to any of the foregoing.

**Exclusions.** This policy does not apply under Part I

insured. The term "insured" as used in this exclusion means the person against whom the claim is made or lawsuit is brought. This exclusion shall not apply when a third party acquires the right of contribution against a member of the injured person's family. Nor shall this exclusion apply when any person not residing in the household of the named insured was driving the vehicle insured under this policy at the time of the accident that is the subject of the claim or lawsuit;

(b) to any automobile while used as a public or livery conveyance, but this exclusion does not apply to the named insured with respect to bodily injury or property damage which results from the named insured's occupancy of a non-owned automobile other than as the operator thereof;

(c) to bodily injury or property damage caused intentionally by or at the direction of the insured;

(d) to bodily injury or property damage arising out of the operation of farm machinery;

(e) to bodily injury of any employee of the insured arising out of and in the course of employment by the insured if such injury arises out of the ownership, maintenance or use of an owned automobile or of a non-owned automobile;

(f) to bodily injury to any fellow employee of the insured injured in the course and scope of his/her employment if such injury arises out of the ownership, maintenance or use of an automobile in the business of the insured's employer;

(g) to an owned automobile while used in the automobile business, but this exclusion does not apply to the named insured, a relative, a partnership in which the named insured or such relative is a partner, or any partner, agent or employee of the named insured, such relative or partnership;

(h) to a non-owned automobile while used (1) in the automobile business by the insured or (2) in any other business or occupation of the insured except a private passenger automobile operated or occupied by the named insured or by his private chauffeur or domestic servant, or a trailer used therewith or with an owned automobile;

(i) to injury to or destruction of (1) property owned or transported by the insured or (2) property rented to or in charge of the insured other than a residence or private garage or (3) property as to which the insured is for any purpose exercising physical control. An automobile used, operated or maintained by an insured is considered property in charge of that insured;

(j) to any automobile, farm automobile or utility automobile, or any other type of motor vehicle, rented or leased by the insured where other valid and collectible insurance has been purchased by or furnished to the insured in connection with such rental or lease;

(k) to bodily injury or property damage with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability;

(l) to any automobile designed for racing while being operated

(m) to bodily injury or property damage due to war, whether or not declared, civil war, riot, insurrection, rebellion or revolution or to any act or condition incidental to any of the foregoing;

(n) to any automobile while being operated or used in the commission of a crime, other than a traffic violation;

(o) to the payment of punitive or exemplary damages;

(p) to any person who operated or used an owned automobile or a non-owned automobile without a reasonable belief that he or she is entitled to do so, however, this exclusion does not apply to the named insured;

(q) to any person while engaged in use of a vehicle (1) to carry persons or property for compensation or a fee, including but not limited to delivery of food or any other products, messenger services; or (2) for snow removal;

(r) to the payment of civil fines, attorney fees and any other charges levied or claimed by a municipality or other division of government with respect to property damage or bodily injury;

(s) to liability assumed by an insured under any contract or other agreement;

(t) to bodily injury or property damage resulting from the pushing or pulling of a vehicle (other than a trailer) by an insured automobile, or the pushing and pulling of an insured automobile by another vehicle (other than a tow truck).

**Financial Responsibility Laws.** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by the policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The insured agrees to reimburse the Company

for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**Limits of Liability.** The limit of Bodily Injury Liability stated in the Declarations as applicable to "each person" is the maximum limit of the Company's liability for all damages, including loss of service, society or consortium, to others resulting from the bodily injury. The limit of Bodily Injury Liability stated in the Declarations as applicable to "each occurrence" is the maximum amount of coverage, subject to the above provision respecting each person, for all bodily injury to two or more persons in the same occurrence. The limits of liability are not increased because more than one person is insured at the time of the accident. The limit of property damage liability stated in the Declarations is the total limit of the Company's liability for all damage to property of one or more persons arising out of the same occurrence. Any amounts payable under Part I of this policy will be reduced by any amounts paid or payable for the same elements of loss under Parts II, III or IV of this policy.

**Other Insurance.** If the insured is covered by other insurance or self-insurance against a loss covered by Part I of this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance and self-insurance against such loss; provided, however, the insurance under this policy with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any valid collectible insurance or self-insurance applicable to such temporary substitute automobile or non-owned automobile.

## PART II – UNINSURED MOTORIST COVERAGE

**Uninsured Motorist Coverage.** To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of property damage to a vehicle described in the policy and bodily injury, including death resulting therefrom, hereinafter called "bodily injury", sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured motor vehicle, provided, for the purposes of this coverage, determination of whether the insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the insured or such representative and the Company or, if they fail to agree, by arbitration. Recovery under this Part for "property damage" is subject to the payment of a specific separate premium for uninsured motorist property damage liability. No judgment against any person or organization alleged to be legally responsible for the bodily injury or property damage shall be conclusive, as between the insured

pursuant to an action prosecuted by the insured with the written consent of the Company.

**Definitions.** The definitions under Part I, except the definition of "insured" and where limited or altered under the Limits of Liability of this coverage, apply to Part II and under Part II:

"insured" means:

(a) the named insured and any relative of the named insured;

(b) any other person while lawfully occupying an insured automobile;

(c) any person, with respect to damages he is entitled to recover because of bodily injury to which this Part applies sustained by an insured under (a) or (b) above; and

(d) any other person who is not insured for uninsured motor vehicle coverage under another vehicle policy while occupying your auto, a temporary substitute auto, a newly acquired auto or a trailer attached to such auto. Such vehicle has to be used within the scope of the consent of the insured





**Napleton Ford** in Libertyville

1010 S. Milwaukee Ave. - Libertyville, IL 60048
(847) 362-4550

**SERVICE DEPARTMENT HOURS**
7:00 a.m. to 5:30 p.m. Monday - Friday
8:00 a.m. to 3:00 p.m. Saturday

Service Center
www.napletoncare.com

| R/O Open Date | R/O Number |
|---|---|
| 12/19/18 | 6078066/2 |
| R/O Close Date | Status |
| 12/22/18 | Pre-Invoice |
| Mileage In | Mileage Out |
| 128350 | 128350 |
| Service Advisor / Tag # | |
| MASATO TAKAKI/977 | |

| JONES, EDWARD | Work Phone | Vehicle Identification Number |
|---|---|---|
| 1607 NORTH BERWICK BLVD | | 1FMDU34X8VUA16862 |
| WAUKEGAN, IL 60085 | Home Phone | Delivery Date | In-Service Date |
| | 870-362-9116 | | |

| Year | Make | Model | Body | Color | License Number |
|---|---|---|---|---|---|
| 1997 | FORD | EXPLORER | 4DR 112" WB XLT 4 | GREEN | |

| DESCRIPTION OF SERVICE AND PARTS | AMOUNT |
|---|---|
| $309 WILL NEED APPR. | |
| Tech: CARLO WILSON        (483) | |
| BRAKE FLUID CONTAMINATED-NOT WORTH FIXING -VERY UN SAFE FOR THE ROAD | |
| Sub Total: .00 | |
| -------------------------------------------------------- | |
| #6 * 00FOZ: QUICK SERVICE | |
| ADDED OPERATION | |
| CUSTOMER TOW IN | |
| Sub Total: .00 | |
| -------------------------------------------------------- | |
| Please Note: VEHICLE WORKED ON BY MOTRIX AUTO LLC 8845 SHERIDAN | |
| RD STE D KENOSHA, WI 53143 262-412-7126 847226724 | |
| 9 | |
| ************************************************************ | |
| * Thank you for choosing Napleton Ford in Libertyville for * | |
| * your automotive needs. We really appreciate your business* | |
| ************************************************************ | |

PAID DEC 3 1 2018

**TERMS:** STRICTLY CASH UNLESS ARRANGEMENTS ARE MADE. "I hereby authorize the repair work hereinafter to be done along with the necessary material and agree that you are not responsible for loss or damage to vehicle or articles left in the vehicle in case of fire, theft, or any other cause beyond your control or for any delays caused by unavailability of parts or delays in parts shipments by the supplier or transporter. I hereby grant you or your employees permission to operate the vehicle herein described on streets, highways, or elsewhere for the purpose of testing and/or inspection. An express mechanic's lien is hereby acknowledged on above vehicle to secure the amount of repairs thereto."

**DISCLAIMER OF WARRANTIES.** Any warranties on the products sold hereby are those made by the manufacturer. The seller hereby expressly disclaims all warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and the seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of said products. Any limitation contained herein does not apply where prohibited by law.

**OUR ADDITIONAL CONTACT WITH YOU:** Such contact may include automated maintenance reminders, scheduling, post service warranty info, recall notices, customer satisfaction calls or texts. You may receive one marketing type message per month. Reply STOP to opt out at any time.

| LABOR | .00 |
|---|---|
| PARTS | .00 |
| DEDUCTIBLE | .00 |
| SUBLET | 120.00 |
| SHOP SUPPLIES | .00 |
| HAZARDOUS MATERIALS | .00 |
| SALES TAX OR TAX I.D. | .00 |
| SPECIAL ORDER DEPOSIT | .00 |
| DISCOUNTS | .00 |
| TOTAL DUE | 120.00 |

**NO RETURN ON ELECTRICAL OR SAFETY ITEMS OR SPECIAL ORDERS.**

X

(C) 2010 DEALERTRACK SYSTEMS, Inc. - Dealership Application Group (800) 845-1028

**Napleton Ford** in Libertyville

1010 S. Milwaukee Ave. - Libertyville, IL 60048
(847) 362-4550
**SERVICE DEPARTMENT HOURS**
7:00 a.m. to 5:30 p.m. Monday - Friday
8:00 a.m. to 3:00 p.m. Saturday

**Napleton Care**
Service Center
www.napletoncare.com

| R/O Open Date | R/O Number |
|---|---|
| 12/19/18 | 6078066/1 |
| R/O Close Date | Status |
| 12/22/18 | Pre-Invoice |
| Mileage In | Mileage Out |
| 128350 | 128350 |
| Service Advisor / Tag # | |
| MASATO TAKAKI/977 | |

JONES, EDWARD
1607 NORTH BERWICK BLVD
WAUKEGAN, IL   60085

| | |
|---|---|
| Work Phone | Vehicle Identification Number |
| | 1FMDU34X8VUA16862 |
| Home Phone | Delivery Date / In-Service Date |
| 870-362-9116 | |

| Year | Make | Model | Body | Color | License Number |
|---|---|---|---|---|---|
| 1997 | FORD | EXPLORER | 4DR 112" WB XLT 4 | GREEN | |

| DESCRIPTION OF SERVICE AND PARTS | AMOUNT |
|---|---|
| Email: edwardjonesjr@gmail.com | |
| | |
| #1 - TEXT: BY PROVIDING A TELEPHONE NUMBER YOU WARRANT THAT YOU ARE THE CURRENT OWNER/CUSTOMARY USER OF THE NUMBER PROVIDED AND YOU AUTHORIZE NAPLETON TO CONTACT YOU VIA TEXT ABOUT YOUR VEHICLE REPAIR OR NEEDS. Sub Total: .00 | |
| #2 - 11FOZ03: CHECK FOR OPEN RECALLS Sub Total: .00 | |
| #3 - 99FOZ99P: COMPLEMENTARY MULTI-POINT VEHICLE INSPECTION($69.95 VALUE) FREE MULTI-POINT INSPECTION Sub Total: .00 | |
| #4 - 00FOZ: QUICK SERVICE TOW IN Work performed by 149 : .      Labor:: Work performed by 149 :          Parts: Sub Total:Sub-Total:   Sublet: 120.00 | 120.00 |
| #5 - 40FOZ01: INSPECT BRAKES CUSTOMER STATES VEHICLE WAS WORKED ON AT ANOTHER PLACE AND BELIEVES WORK WAS DONE WRONG. HAS 0 BRAKE PRESSURE CHECK MASTER CYL AND ADV. DO NOT EXCEED | |

TERMS: STRICTLY CASH UNLESS ARRANGEMENTS ARE MADE. "I hereby authorize the repair work hereinafter to be done along with the necessary material and agree that you are not responsible for loss or damage to vehicle or articles left in the vehicle in case of fire, theft, or any other cause beyond your control or for any delays caused by unavailability of parts or delays in parts shipments by the supplier or transporter. I hereby grant you or your employees permission to operate the vehicle herein described on streets, highways, or elsewhere for the purpose of testing and/or inspection. An express mechanic's lien is hereby acknowledged on above vehicle to secure the amount of repairs thereto."

DISCLAIMER OF WARRANTIES. Any warranties on the products sold hereby are those made by the manufacturer. The seller hereby expressly disclaims all warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and the seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of said products. Any limitation contained herein does not apply where prohibited by law.

OUR ADDITIONAL CONTACT WITH YOU: Such contact may include automated maintenance reminders, scheduling, post service warranty info, recall notices, customer satisfaction calls or texts. You may receive one marketing type message per month. Reply STOP to opt out at any time.

| | |
|---|---|
| LABOR | |
| PARTS | |
| DEDUCTIBLE | |
| SUBLET | |
| SHOP SUPPLIES | |
| HAZARDOUS MATERIALS | |
| SALES TAX OR TAX I.D. | |
| SPECIAL ORDER DEPOSIT | |
| DISCOUNTS | |
| TOTAL DUE | |

**NO RETURN ON ELECTRICAL OR SAFETY ITEMS OR SPECIAL ORDERS.**

X

(C) 2010 DEALERTRACK SYSTEMS, Inc. - Dealership Application Group (800) 945-1028




**Napleton Ford** in Libertyville

**Napleton Care**
Service Center

1010 S. Milwaukee Ave. - Libertyville, IL 60048
(847) 362-4550
**SERVICE DEPARTMENT HOURS**
7:00 a.m. to 5:30 p.m.
Monday - Friday
8:00 a.m. to 3:00 p.m. Saturday

| R/O Open Date | R/O Number |
|---|---|
| 12/19/18 | 6078066/1 |
| Time Received | Time Promised |
| 11:51 | Waiting |
| Current Mileage | Mileage Out |
| 128350 | |
| Estimate of Repairs | Service Advisor / Key Tag # |
| 27.95 | MASATO TAKAKI/977 |

JONES, EDWARD
1607 NORTH BERWICK BLVD
WAUKEGAN, IL  60085

| Work Phone | Vehicle Identification Number |
|---|---|
| | 1FMDU34X8VUA16862 |
| Home Phone | Delivery Date |  In-Service Date |
| 870-362-9116 | | |

| Year | Make | Model | Body | Color | License Number |
|---|---|---|---|---|---|
| 1997 | FORD | EXPLORER | 4DR 112" WB X | GREEN | |

Email: edwardjonesjr@gmail.com

```
#1 - TEXT: BY PROVIDING A TELEPHONE NUMBER YOU WARRANT            C
     THAT YOU ARE THE CURRENT OWNER/CUSTOMARY USER OF             C
     THE NUMBER PROVIDED AND YOU AUTHORIZE NAPLETON TO            C
      CONTACT YOU VIA TEXT ABOUT YOUR VEHICLE REPAIR OR           C
      NEEDS.                                                      C
                                    Estimate:     .00       .00

#2 - 11FOZ03: CHECK FOR OPEN RECALLS                             C
                                    Estimate:     .00       .00

#3 - 99FOZ99P: COMPLEMENTARY MULTI-POINT VEHICLE INSPECTION      C
     ($69.95 VALUE)                                              C
     FREE MULTI-POINT INSPECTION                                 C
                                    Estimate:     .00       .00

#4 - 00FOZ: QUICK SERVICE                                        C
     TOW IN                                                      C
                                    Estimate:     .00       .00

#5 - 40FOZ01: INSPECT BRAKES                                     C
     CUSTOMER STATES VEHICLE WAS WORKED ON AT ANOTHER P          C
     LACE AND BELIEVES WORK WAS DONE WRONG. HAS 0 BRAKE          C
      PRESSURE CHECK MASTER CYL AND ADV. DO NOT EXCEED           C
     $309 WILL NEED APPR.                                        C
                                    Estimate:     .00     27.95
```

TERMS: STRICTLY CASH UNLESS ARRANGEMENTS MADE

"I hereby authorize the repair work above to be done along with the necessary material and agree that you are not responsible for loss or damage to vehicle or articles left in the vehicle in case of fire, theft, or any other cause beyond your control or for any delays caused by unavailability of parts or delays in parts shipments by the supplier or transporter. I hereby grant you or your employees permission to operate the vehicle herein described on streets, highways, or elsewhere for testing and/or inspection. An express mechanic's lien is hereby acknowledged on above vehicle to secure the amount of repairs thereto."

DISCLAIMER OF WARRANTIES.

Any warranties on the products sold hereby are those made by the manufacturer. The seller hereby expressly disclaims all warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose and the seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of said products. Any limitation contained herein does not apply where prohibited by law.

OUR ADDITIONAL CONTACT WITH YOU:

Such contact may include automated maintenance reminders, scheduling, post service warranty info, recall notices, customer satisfaction calls or texts. You may receive one marketing type message per month. Reply STOP to opt out at any time.

X _____

(C) 2010 DEALERTRACK SYSTEMS, Inc - Dealership Application Group (800)845-1025





Service Center

**Napleton Ford** in Libertyville
1010 S. Milwaukee Ave. - Libertyville, IL 60048
(847) 362-4550
**SERVICE DEPARTMENT HOURS**
7:00 a.m. to 5:30 p.m.
Monday - Friday
8:00 a.m. to 3:00 p.m. Saturday

| | |
|---|---|
| R/O Open Date | R/O Number |
| 12/19/18 | 6078066/2 |
| Time Received | Time Promised |
| 11:51 | Waiting |
| Current Mileage | Mileage Out |
| 128350 | |
| Estimate of Repairs | Service Advisor / Key Tag # |
| 27.95 | MASATO TAKAKI/977 |

JONES, EDWARD
1607 NORTH BERWICK BLVD
WAUKEGAN, IL   60085

| Work Phone | Vehicle Identification Number |
|---|---|
| | 1FMDU34X8VUA16862 |
| Home Phone | Delivery Date / In-Service Date |
| 870-362-9116 | |

| Year | Make | Model | Body | Color | License Number |
|---|---|---|---|---|---|
| 1997 | FORD | EXPLORER | 4DR 112" WB X | GREEN | |

Total Estimate: 27.95

CO#-----RO#-----Date-----Miles--Service Writer------------Tech----Time--Total

TERMS: STRICTLY CASH UNLESS ARRANGEMENTS MADE

"I hereby authorize the repair work above to be done along with the necessary material and agree that you are not responsible for loss or damage to vehicle or articles left in the vehicle in case of fire, theft, or any other cause beyond your control or for any delays caused by unavailability of parts or delays in parts shipments by the supplier or transporter.  I hereby grant you or your employees permission to operate the vehicle herein described on streets, highways, or elsewhere for testing and/or inspection.  An express mechanic's lien is hereby acknowledged on above vehicle to secure the amount of repairs thereto."

DISCLAIMER OF WARRANTIES.

Any warranties on the products sold hereby are those made by the manufacturer. The seller hereby expressly disclaims all warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose and the seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of said products.  Any limitation contained herein does not apply where prohibited by law.

OUR ADDITIONAL CONTACT WITH YOU:

Such contact may include automated maintenance reminders, scheduling, post service warranty info, recall notices, customer satisfaction calls or texts.  You may receive one marketing type message per month. Reply STOP to opt out at any time.

X _____     27.95

(C) 2010 DEALERTRACK SYSTEMS, Inc - Dealership Application Group (800)645-1028

**BUCKINGHAM PLACE APARTMENTS**
3080 W 8th Street, Waukegan IL 60085
PHONE: 847-625-9600    FAX: 847-625-9620
EMAIL: bpa3080@gmail.com

# APPLICATION PROCESS:

RENTAL RATES AND PROCESSING FEES ARE SUBJECT TO CHANGE WITHOUT NOTICE. RENTING AN APARTMENT THE DAY OF VIEWING GUARANTEES THE RENTAL AMOUNT QUOTED FOR THE SPECIFIC APARTMENT REQUESTED FOR THE DURATION OF YOUR 1ST LEASE TERM AGREEMENT.

All prospective residents wishing to reserve an apartment must complete and submit the following forms and money orders:

1. Application Agreement
2. Authorization Form
3. A valid photo ID (i.e. driver's license, state id, passport, and or visa)
4. Application processing fee of $50.00. Non-refundable. (MONEY ORDER)
5. Security deposit hold fee of $200.00 (MONEY ORDER)

**The application fee and hold fee must be paid in the form of cashier's check or money order.** We cannot accept personal checks for the application process. If there are more than two applicants the additional applicant will be required to pay an additional $25.00 for the application. If there are four applicants the application fee is $100.00

The $200.00 hold fee is used to withhold the apartment from further rentals until status of the application for that apartment is decided. The hold fee will then roll over towards your security deposit, once lease is signed. The hold fee is non-refundable, if you are approved and decide you do not want the apartment. If you are denied the hold fee is refundable.

All applications must be completed in its entirety before approval.
If applicant is approved, applicant(s) must occupy the apartment within 30 days of application date. Should applicant(s) not occupy the apartment within 30 days of application date, the applicant must start the entire process over including all money orders.

Income requirements- You must make three times the amount of monthly rent in gross wages. (BEFORE TAXES). *Two recent pay stubs are required.*

Rental Verifications- If you have ever rented an apartment before, we will contact the previous landlords to verify your rental history.

**Credit-** **Is approved on an individual basis. Every applicant is subject to the same criteria. We do not approve applicants with recent evictions.**

**Denial of Application:**
    **Under the Fair Credit Reporting Act, if an applicant is denied the applicant will be notified after the application process has been completed. Applicant(s) will receive a refund of the $200.00 hold fee ONLY within 10 business days.**

# PRICE LIST:

| | |
|---|---|
| **ONE BEDROOM** | **$725.00-$750.00** |
| **TWO BEDROOM** | **$850.00-$875.00** |
| **THREE BEDROOM TWO BATH** | **$1025.00-$1050.00** |

**\*WE HAVE A $300.00 NON-REFUNDABLE SECURITY DEPOSIT FOR CATS ONLY. NO OTHER PETS ALLOWED!**

**\*SECURITY DEPOSIT IS CALCULATED BY APPLICANTS CREDIT HISTORY.**



## BUCKINGHAM PLACE APARTMENTS
### 3080 W 8th Street, Waukegan IL 60085
### PHONE: 847-625-9600    FAX: 847-625-9620
### EMAIL: bpa3080@gmail.com

# APPLICATION PROCESS:

**RENTAL RATES AND PROCESSING FEES ARE SUBJECT TO CHANGE WITHOUT NOTICE. RENTING AN APARTMENT THE DAY OF VIEWING GUARANTEES THE RENTAL AMOUNT QUOTED FOR THE SPECIFIC APARTMENT REQUESTED FOR THE DURATION OF YOUR 1ST LEASE TERM AGREEMENT.**

**All prospective residents wishing to reserve an apartment must complete and submit the following forms and money orders:**
1. **Application Agreement**
2. **Authorization Form**
3. **A valid photo ID (i.e. driver's license, state id, passport, and or visa)**
4. **Application processing fee of $50.00. Non-refundable.*(MONEYORDER)**
5. **Security deposit hold fee of $200.00(MONEY ORDER)**

**The application fee and hold fee must be paid in the form of cashier's check or money order. We cannot accept personal checks for the application process. If there are more than two applicants the additional applicant will be required to pay an additional $25.00 for the application. If there are four applicants the application fee is $100.00**

**The $200.00 hold fee is used to withhold the apartment from further rentals until status of the application for that apartment is decided. The hold fee will then roll over towards your security deposit, once lease is signed. The hold fee is non-refundable, if you are approved and decide you do not want the apartment. If you are denied the hold fee is refundable.**

**All applications must be completed in its entirety before approval.**
**If applicant is approved, applicant(s) must occupy the apartment within 30 days of application date. Should applicant(s) not occupy the apartment within 30 days of application date, the applicant must start the entire process over including all money orders.**

**Income requirements- You must make three times the amount of monthly rent in gross wages. (BEFORE TAXES). _Two recent pay stubs are required._**

**Rental Verifications- If you have ever rented an apartment before, we will contact the previous landlords to verify your rental history.**

<u>Credit</u>- Is approved on an individual basis. Every applicant is subject to the same criteria. We do not approve applicants with recent evictions.

<u>Denial of Application:</u>

Under the Fair Credit Reporting Act, if an applicant is denied the applicant will be notified after the application process has been completed. Applicant(s) will receive a refund of the $200.00 hold fee ONLY within 10 business days.

# PRICE LIST:

| | |
|---|---|
| ONE BEDROOM | $725.00-$750.00 |
| TWO BEDROOM | $850.00-$875.00 |
| THREE BEDROOM TWO BATH | $1025.00-$1050.00 |

*WE HAVE A $300.00 NON-REFUNDABLE SECURITY DEPOSIT FOR CATS ONLY. <u>NO OTHER PETS ALLOWED!</u>

*SECURITY DEPOSIT IS CALCULATED BY APPLICANTS CREDIT HISTORY.

Buckingham Place Apartments
3080 W. 8th Street
Waukegan, IL. 60085
847-625-9600
Fax: 847-625-9620

Date: _____
Bldg. # _____ Apt. # _____
Rent $ _____ S/D$ _____
Move in date _____
Comments: _____
Referred By: _____

## INFORMATION REGARDING APPLICANT(S)
### FORM MUST BE COMPLETED IN IT'S ENTIRETY

**APPLICANT**
NAME: Edward Jones JR   Social Security # 650   Date of Birth: 02-16-1949
Current Address: 1607 "A" Berwick City: Waukegon State: Illinois Zip Code: 60085
Phone #: 870-362-9116   How Long at Current Address: _____ Monthly Payment $ _____ ?
*****Current Landlord: _____ Address: Niles Terrace Apt. Phone: 847-662-7177

**SPOUSE/ CO APPLICANT**
NAME: NO SPOUSE   Social Security # -0-   Date of Birth: 0
Current address N/A
State: N/A   Zip code: _____ Phone # n/A

**Children- Name(s) and ages**   No Children

HAVE YOU EVER FILED BANKUPTCY? NO Never File For Bankruptcy   When? Never
HAVE YOU EVER BEEN EVICTED? NO Never   When? Never
PETS: NO Pets

**EMPLOYMENT HISTORY**

**APPLICANT EMPLOYER** QLS   Supervisor Silena   Phone: _____
Employer's Address _____ City: _____ State: _____ Zip Code: _____
Position: _____ Length of Service: _____ Monthly Income $ _____

**SPOUSE/ CO APPLICANT EMPLOYER** No Co Applicant   Supervisor none   Phone: _____
Employer's Address Not Any   City: _____ State: _____ Zip Code: _____
Position: _____ Length of Service: _____ Monthly Income $ _____

Other Source of Income _____ Received When _____ Amount $ _____

PLEASE PROVIDE DOCUMENTATION SUPPORTING ALL INCOME
**(Current Bank Statements will verify all direct deposit checks, last two recent paycheck stubs )**

**EMERGENCY CONTACT**
APPLICANT Kim L. Jones   Relationship Patient Represent   Phone 224-610-15
Address 3001 Buckley Rd   City Waukegon State Ill. Zip Code 60085
SPOUSE _____ Relationship _____ Phone _____
Address _____ City _____ State _____ Zip Code _____

**APPLICANT**   Explorer   **AUTOMOBILES**
Auto Make Ford Model 1997 Year _____ Color Green   License Plate # _____ State _____
**SPOUSE**
Auto Make _____ Model _____ Year _____ Color _____   License Plate # _____ State _____

### PLEASE READ CAREFULLY AND SIGN BELOW
Applicant(s) has deposited <u>$250.00</u> in consideration of this application. When application is approved, the amount of deposit (less $50.00 per adult 18 years or older processing fee) will be applied to the required Security Deposit, the balance due within 10 days of application date. Amount

# ASSET INCOME VERIFICATION

*The information provided is required by IRS LIHTC Program and will be used strictly for the purpose of verifying assets as part of applicant/tenant annual income.*

Bank/Financial Institution: _____

Applicant/Tenant: *Edward Jones*

Social Security #: 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

Project: **Buckingham Place Apartments**
**3080 W. 8th Street**
**Waukegan, Il. 60085**

---

**I.    Checking Accounts:**

| Account # | 6 Month Average Balance | Interest Rate (NA if no interest) |
|---|---|---|
| # 6035612 | $ 824.00 | % |
| # | $ | % |
| # | $ | % |
| # | $ | % |

**II.    Savings Accounts:**

| Account # | Current Balance | Interest Rate (NA if no interest) |
|---|---|---|
| # 55 35 3100 | $ 6.00 | % |
| # | $ | % |
| # | $ | % |
| # | $ | % |

**III.    Certificates of Deposit:**

| Account # | Amount | Interest Rate | Date of Maturity | Early Withdraw Penalty |
|---|---|---|---|---|
| # | $ | % | | |
| # | $ | % | | |
| # | $ | % | | |
| # | $ | % | | |

**IV.    Bonds /Other Securities:** If applicable, describe assets amount and income projected for the next 12 months.

Type of Asset:                                      Projected Income:

_____                $_____

_____                $_____

---

Bank or Financial Institution Verification:

Signature: *Edward Jones*

Title: _____

Date: _____

Tel. #: _____

Email: _____

Return to: Buckingham Place Apartments
          3080 W. 8th Street
          Waukegan, IL. 60085
          Phone # (847) 625-9600
          Email: bpa3080@gmail.com

X: _____                    Date: _____
Signature of Account Holder(s)

X: _____                    Date: _____
Signature of Account Holder(s)

## TAX CREDIT PROGRAM
## CHECKLIST FOR ASSETS

Dear Applicant/Tenant:

*Before you interview, please complete this form. If you do not understand one or more questions on this form, please ask the person who interviews you for clarification. Bring the completed checklist with you to your interview. **All items checked "yes" will be verified.*** **You MUST bring proof at time of interview for ALL items checked YES.**

CHECKLIST FOR :

**Address:** _____ **City:** _____ **State**: IL **Zip:** _____

### I. ASSETS: Do you or any member of your household have/own:

1. Checking accounts? (Yes) No _____
   How many? _1_
2. Savings accounts? (Yes) No _____
   How many? _1_
3. Safety Deposit Boxes? Yes ___ (No)
4. Savings Certificates or certificates or Deposit? Yes ___ (No)
   How many?
5. Stocks or Bonds? Yes ___ (No)
6. Treasury Bills? Yes ___ (No)
7. Money Market Accounts? Yes ___ (No)
   How many? _0_
8. IRA/Keoghs or Retirement Plan? (Yes) No ___

9. Personal Property held as investments? Yes ___ No ___
10. Inheritance? Yes ___ (No)
11. Insurance Settlements? Yes ___ No (No)
12. Any homes, mobile homes, farmland or other real estate property? Yes ___ (No)
13. Any business interests? Yes ___ (No)
14. Winnings or Cash Gifts? Yes ___ (No)
15. A Trust? Yes ___ (No)
16. Rental Property? Yes ___ (No)

17. Have you sold any real estate on contract, i.e., contract for deed, etc., for which you have not received the final payment? Yes ___ No ___
18. Have you established a trust fund for anyone else? Yes ___ No ___
19. Are the beneficiary of a trust fund established by you or by someone else for you? Yes ___ No ___
20. Do you have a funeral trust? Yes ___ No ___
    Do you or any member of your household have any assets that have been disposed of during the past two (2) years? Yes ___ No ___
    If 'yes', were they disposed of for less than fair market value? Yes ___ No ___
    If 'yes' please explain:

### II. INCOME: Are you or any member of your household receiving:

1. Social Security? (Yes) No ___
2. Any type of Social Security Disability? (Yes) No ___
3. Railroad Retirement Benefits? (Yes) No ___
4. VA Benefits? (Yes) No ___
5. Unemployment Benefits? Yes ___ (No)
6. Severance pay, workman's compensation, disability pay, etc.? Yes ___ (No)
7. Retirement Pension? Yes ___ (No)
8. Income from Annuity Funds? Yes ___ (No)

9. Public Aid? (Yes) No ___
   Food Stamps 69 Medical yes TANF
10. Income from insurance policies? Yes ___ (No)
11. Income generated from a trust? Yes ___ (No)
12. Emergency Relief Funds? Yes ___ (No)
13. Child Support? Yes ___ (No)
14. An allowance from parent or guardian? Yes ___ (No)
15. Alimony/Maintenance? Yes ___ (No)
16. Employment Income? Yes ___ (No)

9. Is the money received by you or any member of your household from any source; example, recurring contributions from your relatives? If 'yes', explain: NO (Yes) No ___
10. Are any bills generally paid for you or any member of the household by someone else; example, a son who does not live with you pays the electric bill from his own funds. If 'yes', please explain: Yes ___ (No)

11. Are any repetitive gifts made to you or any member of your household by someone else; example, a daughter who does not live with you buys groceries for you each week from her own funds and gives them to you? If 'yes', please explain: Yes ___ (No)

### III. STUDENT STATUS: Are you or any member of your household a fulltime student? Yes ___ (No)
If 'yes', please indicate who:

### IV. MARITAL STATUS: _____ (Single) _____ Married _____ Divorced _____ Separated _____ Widowed

 **Social Security Administration**

Date: December 14, 2016
Claim Number: XXX-XX-6049A

EDWARD JONES JR
PO BOX 8791
GURNEE MILLS IL 60031-7021

You asked us for information from your record. The information that you requested is shown below. If you want anyone else to have this information, you may send them this letter.

### Information About Current Social Security Benefits

Beginning December 2016, the full monthly Social Security benefit before any deductions is $824.80.

We deduct $0.00 for medical insurance premiums each month.

The regular monthly Social Security payment is $824.00.
(We must round down to the whole dollar.)

Social Security benefits for a given month are paid the following month. (For example, Social Security benefits for March are paid in April.)

Your Social Security benefits are paid on or about the third of each month.

### Information About Past Social Security Benefits

From December 2014 to November 2016, the full monthly Social Security benefit before any deductions was $822.40.

We deducted $0.00 for medical insurance premiums each month.

The regular monthly Social Security payment was $822.00.
(We must round down to the whole dollar.)

RECEIVED

JUL 2 6 2018

### Type of Social Security Benefit Information

WAUKEGAN HOUSING AUTHORITY

OMB Approval No. 2502-0204

(4) charges for unreturned keys, as described in paragraph 9.

d. The Landlord agrees to refund the amount computed in paragraph 8c within 30 days after the Tenant has permanently moved out of the unit, returned possession of the unit to the Landlord, and given his/her new address to the Landlord. The Landlord will also give the Tenant a written list of charges that were subtracted from the deposit. If the Tenant disagrees with the Landlord concerning the amounts deducted and asks to meet with the Landlord, the Landlord agrees to meet with the Tenant and informally discuss the disputed charges.

e. If the unit is rented by more than one person, the Tenants agree that they will work out the details of dividing any refund among themselves. The Landlord may pay the refund to any Tenant identified in Paragraph 1 of this Agreement.

f. The Tenant understands that the Landlord will not count the Security Deposit towards the last month's rent or towards repair charges owed by the Tenant in accordance with paragraph 11.

**9. Keys and Locks:**
The Tenant agrees not to install additional or different locks or gates on any doors or windows of the unit without the written permission of the Landlord. If the Landlord approves the Tenant's request to install such locks, the Tenant agrees to provide the Landlord with a key for each lock. When this Agreement ends, the Tenant agrees to return all keys to the dwelling unit to the Landlord. The Landlord may charge the Tenant $25 'KEYS/LOCKS' transaction code found for each key not returned.

**10. Maintenance:**
a. The Landlord agrees to:

    (1) regularly clean all common areas of the project;

    (2) maintain the common areas and facilities in a safe condition;

    (3) arrange for collection and removal of trash and garbage;

    (4) maintain all equipment and appliances in safe and working order;

    (5) make necessary repairs with reasonable promptness;

    (6) maintain exterior lighting in good working order;

    (7) provide extermination services, as necessary; and

    (8) maintain grounds and shrubs.

b. The Tenant agrees to:

    (1) keep the unit clean;

    (2) use all appliances, fixtures and equipment in a safe manner and only for the purposes for which they are intended;

    (3) not litter the grounds or common areas of the project;

    (4) not destroy, deface, damage or remove any part of the unit, common areas, or project grounds;

    (5) give the Landlord prompt notice of any defects in the plumbing, fixtures, appliances, heating and cooling equipment or any other part of the unit or related facilities; and

    (6) remove garbage and other waste from the unit in a clean and safe manner.

**11. Damages:**
Whenever damage is caused by carelessness, misuse, or neglect on the part of the Tenant, his/her family or visitors, the Tenant agrees to pay:

    a. the cost of all repairs and do so within 30 days after receipt of the Landlord's demand for the repairs charges; and



Form HUD-90105-a
12/2007

OMB Approval No. 2502-0204

b. rent for the period the unit is damaged whether or not the unit is habitable. The Tenant understands that HUD will not make assistance payments for any period in which the unit is not habitable. For any such period, the Tenant agrees to pay the HUD-approved market rent rather than the Tenant rent shown in paragraph 3 of this agreement.

## 12. Restrictions on Alterations:

No alteration, addition, or improvements shall be made in or to the premises without the prior consent of the Landlord in writing. The Landlord agrees to provide reasonable accommodation to an otherwise eligible tenant's disability, including making changes to rules, policies, or procedures, and making and paying for structural alterations to a unit or common areas. The Landlord is not required to provide accommodations that constitute a fundamental alteration to the Landlord's program or which would pose a substantial financial and administrative hardship. See the regulations at 24 CFR Part 8. In addition, if a requested structural modification does pose a substantial financial and administrative hardship, the Landlord must then allow the tenant to make and pay for the modification in accordance with the Fair Housing Act.

## 13. General Restrictions:

The Tenant must live in the unit and the unit must be the Tenant's only place of residence  The Tenant shall use the premises only as a private dwelling for himself/herself and the individuals listed on the Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures, Attachment 1.  The Tenant agrees to permit other individuals to reside in the unit only after obtaining the prior written approval of the Landlord.  The Tenant agrees not to:

    a. sublet or assign the unit, or any part of the unit;

    b. use the unit for unlawful purposes;

    c. engage in or permit unlawful activities in the unit, in the common areas or on the project grounds;

    d. have pets or animals of any kind in the unit without the prior written permission of the Landlord, but the Landlord will allow the tenant to keep an animal needed as a reasonable accommodation to the tenant's disability, and will allow animals to accompany visitors with disabilities who need such animals as an accommodation to their disabilities; or

    e. make or permit noises or acts that will disturb the rights or comfort of neighbors.  The Tenant agrees to keep the volume of any radio, phonograph, television or musical instrument at a level which will not disturb the neighbors.

## 14. Rules:

The Tenant agrees to obey the House Rules which are Attachment No. 3 to this Agreement.  The Tenant agrees to obey additional rules established after the effective date of this Agreement if;

    a. the rules are reasonably related to the safety, care and cleanliness of the building and the safety, comfort and convenience of the Tenants; and

    b. the Tenant receives written notice of the proposed rule at least 30 days before the rule is enforced.

## 15. Regularly Scheduled Recertifications:

Every year around the first day of , the Landlord will request the Tenant to report the income and composition of the Tenant's household and to supply any other information required by HUD for the purposes of determining the Tenant's rent and assistance payment, if any.  The Tenant agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request.  The Landlord will verify the information supplied by the Tenant and use the verified information to recompute the amount of the Tenant's rent and assistance payment, if any.

a. If the Tenant does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may impose the following penalties.  The Landlord may implement these penalties only in accordance with the administrative procedures and time frames specified in HUD's regulations, handbooks and instructions related to the administration of multifamily subsidy programs.

    (1) Require the Tenant to pay the higher, HUD-approved market rent for the unit.

    (2) Implement any increase in rent resulting from the recertification processing without providing the 30-day notice otherwise required by paragraph 4 of this Agreement.



Form HUD-90105-a
12/2007

OMB Approval No. 2502-0204

b. The Tenant may request to meet with the Landlord to discuss any change in rent or assistance payment resulting from the recertification processing. If the Tenant requests such a meeting, the Landlord agrees to meet with the Tenant and discuss how the Tenant's rent and assistance payment, if any, were computed.

**16. Reporting Changes Between Regularly Scheduled Recertifications:**
a. If any of the following changes occur, the Tenant agrees to advise the Landlord immediately.

(1) Any household member moves out of the unit.

(2) An adult member of the household who was reported as unemployed on the most recent certification or recertification obtains employment.

(3) The household's income cumulatively increases by $200 or more a month.

b. The Tenant may report any decrease in income or any change in other factors considered in calculating the Tenant's rent. Unless the Landlord has confirmation that the decrease in income or change in other factors will last less than one month, the Landlord will verify the information and make the appropriate rent reduction. However, if the Tenant's income will be partially or fully restored within two months, the Landlord may delay the certification process until the new income is known, but the rent reduction will be retroactive and the Landlord may not evict the Tenant for nonpayment of rent due during the period of the reported decrease and the completion of the certification process. The Tenant has thirty days after receiving written notice of any rent due for the above described time period to pay or the Landlord can evict for nonpayment of rent. (Revised 03/22/89)

c. If the Tenant does not advise the Landlord of these interim changes, the Landlord may increase the Tenant's rent to the HUD - approved market rent. The Landlord may do so only in accordance with the time frames and administrative procedures set forth in HUD's regulations, handbooks and instructions on the administration of multifamily subsidy programs.

d. The Tenant may request to meet with the Landlord to discuss how any change in income or other factors affected his/her rent or assistance payment, if any. If the Tenant requests such a meeting, the Landlord agrees to meet with the Tenant and explain how the Tenant's rent or assistance payment, if any, was computed.

**17. Removal of Subsidy**:
a. The Tenant understands that assistance made available on his/her behalf may be terminated if events in either items 1 or 2 below occur. Termination of assistance means that the Landlord may make the assistance available to another Tenant and the Tenant's rent will be recomputed. In addition, if the Tenant's assistance is terminated because of criterion (1) below, the Tenant will be required to pay the HUD-approved market rent for the unit.

(1) The Tenant does not provide the Landlord with the information or reports required by paragraph 15 or 16 within 10 calendar days after receipt of the Landlord's notice of intent to terminate the Tenant's assistance payment.

(2) The amount the Tenant would be required to pay towards rent and utilities under HUD rules and regulations equals the Family Gross Rent shown on Attachment 1.

b. The Landlord agrees to give the Tenant written notice of the proposed termination. The notice will advise the Tenant that, during the ten calendar days following the date of the notice, he/she may request to meet with the Landlord to discuss the proposed termination of assistance. If the Tenant requests a discussion of the proposed termination, the Landlord agrees to meet with the Tenant.

c. Termination of assistance shall not affect the Tenant's other rights under this Agreement, including the right to occupy the unit. Assistance may subsequently be reinstated if the Tenant submits the income or other data required by HUD procedures, the Landlord determines the Tenant is eligible for assistance, and assistance is available.

**18. Tenant Obligation to Repay:**
If the tenant submits false information on any application, certification or request for interim adjustment or does not report interim changes in family income or other factors as required by paragraph 16 of this Agreement, and as a result, is charged a rent less than the amount required by HUD's rent formulas, the Tenant agrees to reimburse the Landlord for the difference between the rent he/she should have paid and the rent he/she was charged. The Tenant is not required to reimburse the Landlord for undercharges caused solely by the Landlord's failure to follow HUD's procedures for computing rent or assistance payments.

**19. Size of Dwelling:**



Form HUD-90105-a
12/2007

OMB Approval No. 2502-0204

The Tenant understands that HUD requires the Landlord to assign units in accordance with the Landlord's written occupancy standards. These standards include consideration of unit size, relationship of family members, age and sex of family members and family preference. If the Tenant is or becomes eligible for a different size unit, and the required size unit becomes available, the Tenant agrees to:

a. move within 30 days after the Landlord notifies him/her that a unit of the required size is available within the project; or

b. remain in the same unit and pay the HUD-approved market rent.

**20. Access by Landlord:**
a. The Landlord agrees to enter the unit only during reasonable hours, to provide reasonable advance notice of his/her intent to enter the unit, and to enter the unit only after receiving the Tenant's consent to do so, except when urgency situations make such notices impossible or except under paragraph (c) below.

b. The Tenant consents in advance to the following entries into the unit:

   (i)   The tenant agrees to permit the Landlord, his/her agents or other persons, when authorized by the Landlord, to enter the unit for the purpose of making reasonable repairs and periodic inspections.

   (ii)  After the Tenant has given a notice of intent to move, the Tenant agrees to permit the Landlord to show the unit to prospective tenants during reasonable hours.

c. If the Tenant moves before this Agreement ends, the Landlord may enter the unit to decorate, remodel, alter or otherwise prepare the unit for re-occupancy.

**21. Discrimination Prohibited:**
The Landlord agrees not to discriminate based upon race, color, religion, creed, National origin, sex, age, familial status and disability.

**22. Change in Rental Agreement:**
The Landlord may, with the prior approval of HUD, change the terms and conditions of this Agreement. Any changes will become effective only at the end of the initial term or a successive term. The Landlord must notify the Tenant of any change and must offer the Tenant a new Agreement or an amendment to the existing Agreement. The Tenant must receive the notice at least 60 days before the proposed effective date of the change. The Tenant may accept the changed terms and conditions by signing the new Agreement or the amendment to the existing Agreement and returning it to the Landlord. The Tenant may reject the changed terms and conditions by giving the Landlord written notice that he/she intends to terminate the tenancy. The Tenant must give such notice at least 30 days before the proposed change will go into effect. If the Tenant does not accept the amended agreement, the Landlord may require the Tenant to move from the project, as provided in paragraph 23.

**23. Termination of Tenancy:**
a. To terminate this Agreement, the Tenant must give the Landlord 30-days written notice before moving from the unit.

b. Any termination of this Agreement by the Landlord must be carried out in accordance with HUD regulations, State and local law, and the terms of this Agreement.

c. The Landlord may terminate this Agreement only for the following reasons:

   1.   the Tenant's material noncompliance with the terms of this Agreement;

   2.   the Tenant's material failure to carry out obligations under any State Landlord and Tenant Act;

   3.   drug related criminal activity engaged in or on or near the premises, by any tenant, household member, or guest, and any such activity engaged in on the premises by any other person under the tenant's control;

   4.   determination made by the Landlord that a household member is illegally using a drug;

   5.   determination made by the Landlord that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents;

   6.   criminal activity by a tenant, any member of the tenant's household, a guest or another person under the tenant's control:



Form HUD-90105-a
12/2007

OMB Approval No. 2502-0204

(a) that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises); or

(b) that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises;

7. if the tenant is fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that in the case of the State of New Jersey, is a high misdemeanor;

8. if the tenant is violating a condition of probation or parole under Federal or State law;

9. determination made by the Landlord that household member's abuse or pattern of abuse of alcohol threatens the health, safety, or right to peaceful enjoyment of the premises by other residents;

10. if the Landlord determines that the tenant, any member of the tenant's household, a guest or another person under the tenant's control has engaged in the criminal activity, regardless of whether the tenant, any member of the tenant's household, a guest or another person under the tenant's control has been arrested or convicted for such activity.

d. The Landlord may terminate this Agreement for other good cause, which includes, but is not limited to, the tenant's refusal to accept change to this agreement. Terminations for "other good cause" may only be effective as of the end of any initial or successive term.

The term material noncompliance with the lease includes:

(1) one or more substantial violations of the lease;

(2) repeated minor violations of the lease that: (a) disrupt the livability of the project, (b) adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities, (c) interfere with the management of the project, or (d) have an adverse financial effect on the project;

(3) failure of the tenant to timely supply all required information on the income and composition, or eligibility factors, of the tenant household (including, but not limited to, failure to meet the disclosure and verification requirements for Social Security Numbers, or failure to sign and submit consent forms for the obtaining of wage and claim information from State Wage Information Collection Agencies), and

(4) non-payment of rent or any other financial obligation due under the lease beyond any grace period permitted under State law. The payment of rent or any other financial obligation due under the lease after the due date but within the grace period permitted under State law constitutes a minor violation.

e. If the Landlord proposes to terminate this Agreement, the Landlord agrees to give the Tenant written notice and the grounds for the proposed termination. If the Landlord is terminating this agreement for "other good cause", the termination notice must be mailed to the Tenant and hand-delivered to the dwelling unit in the manner required by HUD at least 30 days before the date the Tenant will be required to move from the unit and in accordance with the State law requirements. Notices of proposed termination for other reasons must be given in accordance with any time frames set forth in State and local law. Any HUD-required notice period may run concurrently with any notice period required by State or local law. All termination notices must:

o   specify the date this Agreement will be terminated;

o   state the grounds for termination with enough detail for the Tenant to prepare a defense;

o   advise the Tenant that he/she has 10 days within which to discuss the proposed termination of tenancy with the Landlord. The 10-day period will begin on the earlier of the date the notice was hand-delivered to the unit or the day after the date the notice is mailed. If the Tenant requests the meeting, the Landlord agrees to discuss the proposed termination with the Tenant; and

o   advise the Tenant of his/her right to defend the action in court.

f. If an eviction is initiated, the Landlord agrees to rely only upon those grounds cited in the termination notice required by paragraph (e).



Form HUD-90105-a
12/2007

OMB Approval No. 2502-0204

**24. Hazards:**
The Tenant shall not undertake, or permit his/her family or guests to undertake, any hazardous acts or do anything that will increase the project's insurance premiums. Such action constitutes a material non-compliance. If the unit is damaged by fire, wind, or rain to the extent that the unit cannot be lived in and the damage is not caused or made worse by the Tenant, the Tenant will be responsible for rent only up to the date of the destruction. Additional rent will not accrue until the unit has been repaired to a livable condition.

**25. Penalties for Submitting False Information:**
Knowingly giving the Landlord false information regarding income or other factors considered in determining Tenant's eligibility and rent is a material noncompliance with the lease subject to termination of tenancy. In addition, the Tenant could become subject to penalties available under Federal law. Those penalties include fines up to $10,000 and imprisonment for up to five years.

**26. Contents of this Agreement:**
This Agreement and its Attachments make up the entire agreement between the Landlord and the Tenant regarding the unit. If any Court declares a particular provision of this Agreement to be invalid or illegal, all other terms of this Agreement will remain in effect and both the Landlord and the Tenant will continue to be bound by them.

**27. Attachments to the Agreement:** The Tenant certifies that he/she has received a copy of this Agreement and the following Attachments to this Agreement and understands that these Attachments are part of this Agreement.

a. Attachment No. 1 - Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures, form HUD-50059.

b. Attachment No. 2 - Unit Inspection Report.

c. Attachment No. 3 - House Rules (if any).

**28. Tenants' right to organize:** Landlord agrees to allow tenant and tenant organizers to conduct on the property the activities related to the establishment or operation of a tenant organization set out in accordance with HUD requirements.

**29. Tenant Income Verification:** The Tenant must promptly provide the Landlord with any letter or other notice by HUD to a member of the family that provides information concerning the amount or verification of family income in accordance with HUD requirements.

**30.** The lease agreement will terminate automatically, if the Section 8 Housing Assistance contract terminates for any reason.

**31. Signatures**:

**TENANT**
BY:

1. _Edward Jones_

_____/_____/ 2017
**Date Signed**

2. _____

_____/_____/_____
**Date Signed**

3. _____

_____/_____/_____
**Date Signed**

RECEIVED

FEB 1 7 2017

WAUKEGAN HOUSING AUTHORITY

**LANDLORD**
BY:

1. _____

02/08/2017
**Date Signed**



Form HUD-90105-a
12/2007

OMB Approval No. 2502-0204

*Public reporting burden - HUD is not requesting approval of any burden hours for the model leases since use of leases are a standard business practice in the housing rental industry. This information is required to obtain benefits. The request and required supporting documentation are sent to HUD or the Contract Administrator (CA) for approval. The lease is a contract between the owner of the project and the tenant(s) that explains the terms for residing in the unit. Leases are a standard business practice in the housing rental industry. Owners are required to use the HUD model lease which includes terms normally covered by leases used in the housing rental industry plus terms required by HUD for the program under which the project was built and/or the program providing rental assistance to the tenants.*

*This information is authorized by 24 CFR 5.360, 236.750, 880.606, 883.701, 884.215, 886.127, 891.425, 891.625 and 891.765 cover lease requirements and provisions. This information is considered non-sensitive and does not require any special protection.*



Form HUD-90105-a
12/2007

# Waukegan Housing Authority
# 215 S. Martin Luther King Jr. Ave
# Waukegan, IL 60085

### Section 8 Housing Program Participants

## LANDLORD HISTORY/TENANT REFERRAL FORM

RE: _____

Dear Prospective Landlord,

In accordance with Section 8 Program regulations we are required to provide rental history of all program participants, if available to potential landlord. Our record indicates the following history for the above referenced applicant.

We ask that each prospective landlord sign below acknowledging the required information was supplied.

Buckingham place apartments     11-03-2018
Prospective Landlord                    Date

## CURRENT LANDLORD INFORMATION

Participants address: Bogda Kirkiewicz 1601Berwick LLC

Current Landlord Name: Bogda Kirkiewiz

Current Landlord Address: 605 N Berwick Blvd, Suite A

Current Landlord Phone #: 847-662-7172  -FAX 847-662-7178

## PRIOR LANDLORD INFORMATION

Prior Landlord Name: Christ Jenson

Prior Landlord Address: 917 Grand Ave

Prior Landlord Phone #: _____

# Voucher
Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB No. 2577-0169
(exp. 04/30/2018)

Public Reporting Burden for this collection of information is estimated to average 0.05 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. Assurances of confidentiality are not provided under this collection. This collection of information is authorized under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program.

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names is mandatory. The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family voucher issuance.

| | | |
|---|---|---|
| Please read **entire** document before completing form. Fill in all blanks below. Type or print clearly. | | Voucher Number **VO-001-WHA-VASH(8)** |
| 1. Insert **unit size** in number of bedrooms. (This is the number of bedrooms for which the Family qualifies, and is used in determining the amount of assistance to be paid on behalf of the Family to the owner.) | | 1. Unit Size **1** |
| 2. **Date Voucher Issued (mm/dd/yyyy)** Insert Actual Date the Voucher is issued to the Family | | 2. Issue Date (mm/dd/yyyy) **02/01/2019** |
| 3. **Date Voucher Expires (mm/dd/yyyy)** Insert date sixty days after date Voucher is issued (See section 6 of this form.) | | 3. Expiration Date (mm/dd/yyyy) **04/01/2019** |
| 4. **Date Extension Expires** (if applicable) (mm/dd/yyyy) **(See** Section 6 of this form) | | 4. Date Extension Expires (mm/dd/yyyy) |
| 5. Name of Family Representative **Edward Jones** | 6. Signature of Family Representative | Date Signed (mm/dd/yyyy) |

7. Name of Public Housing Agency (PHA)

**Waukegan Housing Authority**

| 8. Name and Title of PHA Official **DAMARIXA MONTOYA, HCV SUPERVISOR** | 9. Signature of PHA Official | Date Signed (mm/dd/yyyy) 10/10/18 |
|---|---|---|

## 1. Housing Choice Voucher Program

A. The public housing agency (PHA) has determined that the above named family (item 5) is eligible to participate in the housing choice voucher program. Under this program, the family chooses a decent, safe and sanitary unit to live in. If the owner agrees to lease the unit to the family under the housing choice voucher program, and if the PHA approves the unit, the PHA will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

B. The PHA determines the amount of the monthly housing assistance payment to be paid to the owner. Generally, the monthly housing assistance payment by the PHA is the difference between the applicable payment standard and 30 percent of monthly adjusted family income. In determining the maximum initial housing assistance payment for the family, the PHA will use the payment standard in effect on the date the tenancy is approved by the PHA. The family may choose to rent a unit for more than the payment standard, but this choice does not change the amount of the PHA's assistance payment. The actual amount of the PHA's assistance payment will be determined using the gross rent for the unit selected by the family.

## 2. Voucher

A. When issuing this voucher the PHA expects that if the family finds an approvable unit, the PHA will have the money available to enter into a HAP contract with the owner. However, the PHA is under no obligation to the family, to any owner, or to any other person, to approve a tenancy. The PHA does not have any liability to any party by the issuance of this Voucher.

B. The voucher does not give the family any right to participate in the PHA's housing choice voucher program. The family becomes a participant in the PHA's housing choice voucher program when the HAP contract between the PHA and the owner takes effect.

C. During the initial or any extended term of this voucher, the PHA may require the family to report progress in leasing a unit at such intervals and times as determined by the PHA.

**3. PHA Approval or Disapproval of Unit or Lease**

A. When the family finds a suitable unit where the owner is willing to participate in the program, the family must give the PHA the request for tenancy approval (on the form supplied by the PHA), signed by the owner and the family, and a copy of the lease, including the HUD-prescribed tenancy addendum. **Note: Both documents must be given to the PHA no later than the expiration date stated in item 3 or 4 on top of page one of this voucher.**

B. The family must submit these documents in the manner that is required by the PHA. PHA policy may prohibit the family from submitting more than one request for tenancy approval at a time.

C. The lease must include, word-for-word, all provisions of the tenancy addendum required by HUD and supplied by the PHA. This is done by adding the HUD tenancy addendum to the lease used by the owner. If there is a difference between any provisions of the HUD tenancy addendum and any provisions of the owner's lease, the provisions of the HUD tenancy addendum shall control.

D. After receiving the request for tenancy approval and a copy of the lease, the PHA will inspect the unit. The PHA may not give approval for the family to lease the unit or execute the HAP contract until the PHA has determined that all the following program requirements are met: the unit is eligible; the unit has been inspected by the PHA and passes the housing quality standards (HQS); the rent is reasonable; and the landlord and tenant have executed the lease including the HUD-prescribed tenancy addendum.

E. If the PHA approves the unit, the PHA will notify the family and the owner, and will furnish two copies of the HAP contract to the owner.

1. The owner and the family must execute the lease.

2. The owner must sign both copies of the HAP contract and must furnish to the PHA a copy of the executed lease and both copies of the executed HAP contract.

3. The PHA will execute the HAP contract and return an executed copy to the owner.

F. If the PHA determines that the unit or lease cannot be approved for any reason, the PHA will notify the owner and the family that:

1. The proposed unit or lease is disapproved for specified reasons, and

2. If the conditions requiring disapproval are remedied to the satisfaction of the PHA on or before the date specified by the PHA, the unit or lease will be approved.

**4. Obligations of the Family**

A. When the family's unit is approved and the HAP contract executed, the family must follow the rules listed below in order to continue participating in the housing choice voucher program.

B. The family must:

1. Supply any information that the PHA or HUD determines to be necessary including evidence of citizenship or eligible immigration status, and information for use in a regularly scheduled reexamination or interim reexamination of family income and composition.

2. Disclose and verify social security numbers and sign and submit consent forms for obtaining information.

3. Supply any information requested by the PHA to verify that the family is living in the unit or information related to family absence from the unit.

4. Promptly notify the PHA in writing when the family is away from the unit for an extended period of time in accordance with PHA policies.

5. Allow the PHA to inspect the unit at reasonable times and after reasonable notice.

6. Notify the PHA and the owner in writing before moving out of the unit or terminating the lease.

7. Use the assisted unit for residence by the family. The unit must be the family's only residence.

8. Promptly notify the PHA in writing of the birth, adoption, or court-awarded custody of a child.

9. Request PHA written approval to add any other family member as an occupant of the unit.

10. Promptly notify the PHA in writing if any family member no longer lives in the unit. Give the PHA a copy of any owner eviction notice.

11. Pay utility bills and provide and maintain any appliances that the owner is not required to provide under the lease.

C. Any information the family supplies must be true and complete.

D. The family (including each family member) must not:

1. Own or have any interest in the unit (other than in a cooperative, or the owner of a manufactured home leasing a manufactured home space).

2. Commit any serious or repeated violation of the lease.

3. Commit fraud, bribery or any other corrupt or criminal act in connection with the program.

4. Engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.

5. Sublease or let the unit or assign the lease or transfer the unit.

6. Receive housing choice voucher program housing assistance while receiving another housing subsidy, for the same unit or a different unit under any other Federal, State or local housing assistance program.

7. Damage the unit or premises (other than damage from ordinary wear and tear) or permit any guests to damage the unit or premises.

8. Receive housing choice voucher program housing assistance while residing in a unit owned by a parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9. Engage in abuse of alcohol in a way that threatens the health, safety or right to peaceful enjoyment of the other residents and persons residing in the immediate vicinity of the premises.

**5. Illegal Discrimination**

If the family has reason to believe that, in its search for suitable housing, it has been discriminated against on the basis of age, race, color, religion, sex, disability, national origin, or familial status, the family may file a housing discrimination complaint with any HUD Field Office in person, by mail, or by telephone. The PHA will give the family information on how to fill out and file a complaint.

**6. Expiration and Extension of Voucher**

The voucher will expire on the date stated in item 3 on the top of page one of this voucher unless the family requests an extension of the voucher in writing and the PHA grants a written extension of the voucher in which case the Voucher will expire on the date stated in item 4. At its discretion, the PHA may grant a family's request for one or more extensions of the initial term.

**Voucher**

Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**

Office of Public and Indian Housing

OMB No. 2577-0169
(exp. 04/30/2018)

Public Reporting Burden for this collection of information is estimated to average 0.05 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. Assurances of confidentiality are not provided under this collection. This collection of information is authorized under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program.

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names is mandatory. The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family voucher issuance.

| Please read **entire** document before completing form. Fill in all blanks below. Type or print clearly. | Voucher Number **VO-001-WHA-VASH(8)** |
|---|---|
| 1. Insert **unit size** in number of bedrooms. (This is the number of bedrooms for which the Family qualifies, and is used in determining the amount of assistance to be paid on behalf of the Family to the owner.) | 1. Unit Size **1** |
| 2. **Date Voucher Issued (mm/dd/yyyy)** Insert Actual Date the Voucher is issued to the Family | 2. Issue Date (mm/dd/yyyy) **02/01/2018** |
| 3. **Date Voucher Expires (mm/dd/yyyy)** Insert date sixty days after date Voucher is issued (See section 6 of this form.) | 3. Expiration Date (mm/dd/yyyy) **04/01/2018** |
| 4. **Date Extension Expires** (if applicable) (mm/dd/yyyy) (See Section 6 of this form) | 4. Date Extension Expires (mm/dd/yyyy) |
| 5. Name of Family Representative **Edward Jones** | 6. Signature of Family Representative | Date Signed (mm/dd/yyyy) |
| 7. Name of Public Housing Agency (PHA) **Waukegan Housing Authority** | | |
| 8. Name and Title of PHA Official **DAMARIXA MONTOYA, LEAD CASE MANAGER/VASH COORDINATOR** | 9. Signature of PHA Official | Date Signed (mm/dd/yyyy) 10/4/17 |

**1. Housing Choice Voucher Program**

A. The public housing agency (PHA) has determined that the above named family (item 5) is eligible to participate in the housing choice voucher program. Under this program, the family chooses a decent, safe and sanitary unit to live in. If the owner agrees to lease the unit to the family under the housing choice voucher program, and if the PHA approves the unit, the PHA will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

B. The PHA determines the amount of the monthly housing assistance payment to be paid to the owner. Generally, the monthly housing assistance payment by the PHA is the difference between the applicable payment standard and 30 percent of monthly adjusted family income. In determining the maximum initial housing assistance payment for the family, the PHA will use the payment standard in effect on the date the tenancy is approved by the PHA. The family may choose to rent a unit for more than the payment standard, but this choice does not change the amount of the PHA's assistance payment. The actual amount of the PHA's assistance payment will be determined using the gross rent for the unit selected by the family.

**2. Voucher**

A. When issuing this voucher the PHA expects that if the family finds an approvable unit, the PHA will have the money available to enter into a HAP contract with the owner. However, the PHA is under no obligation to the family, to any owner, or to any other person, to approve a tenancy. The PHA does not have any liability to any party by the issuance of this Voucher.

B. The voucher does not give the family any right to participate in the PHA's housing choice voucher program. The family becomes a participant in the PHA's housing choice voucher program when the HAP contract between the PHA and the owner takes effect.

C. During the initial or any extended term of this voucher, the PHA may require the family to report progress in leasing a unit at such intervals and times as determined by the PHA.

3. **PHA Approval or Disapproval of Unit or Lease**

   A. When the family finds a suitable unit where the owner is willing to participate in the program, the family must give the PHA the request for tenancy approval (on the form supplied by the PHA), signed by the owner and the family, and a copy of the lease, including the HUD-prescribed tenancy addendum. **Note: Both documents must be given to the PHA no later than the expiration date stated in item 3 or 4 on top of page one of this voucher.**

   B. The family must submit these documents in the manner that is required by the PHA. PHA policy may prohibit the family from submitting more than one request for tenancy approval at a time.

   C. The lease must include, word-for-word, all provisions of the tenancy addendum required by HUD and supplied by the PHA. This is done by adding the HUD tenancy addendum to the lease used by the owner. If there is a difference between any provisions of the HUD tenancy addendum and any provisions of the owner's lease, the provisions of the HUD tenancy addendum shall control.

   D. After receiving the request for tenancy approval and a copy of the lease, the PHA will inspect the unit. The PHA may not give approval for the family to lease the unit or execute the HAP contract until the PHA has determined that all the following program requirements are met: the unit is eligible; the unit has been inspected by the PHA and passes the housing quality standards (HQS); the rent is reasonable; and the landlord and tenant have executed the lease including the HUD-prescribed tenancy addendum.

   E. If the PHA approves the unit, the PHA will notify the family and the owner, and will furnish two copies of the HAP contract to the owner.

      1. The owner and the family must execute the lease.

      2. The owner must sign both copies of the HAP contract and must furnish to the PHA a copy of the executed lease and both copies of the executed HAP contract.

      3. The PHA will execute the HAP contract and return an executed copy to the owner.

   F. If the PHA determines that the unit or lease cannot be approved for any reason, the PHA will notify the owner and the family that:

      1. The proposed unit or lease is disapproved for specified reasons, and

      2. If the conditions requiring disapproval are remedied to the satisfaction of the PHA on or before the date specified by the PHA, the unit or lease will be approved.

4. **Obligations of the Family**

   A. When the family's unit is approved and the HAP contract executed, the family must follow the rules listed below in order to continue participating in the housing choice voucher program.

   B. The family must:

      1. Supply any information that the PHA or HUD determines to be necessary including evidence of citizenship or eligible immigration status, and information for use in a regularly scheduled reexamination or interim reexamination of family income and composition.

      2. Disclose and verify social security numbers and sign and submit consent forms for obtaining information.

      3. Supply any information requested by the PHA to verify that the family is living in the unit or information related to family absence from the unit.

      4. Promptly notify the PHA in writing when the family is away from the unit for an extended period of time in accordance with PHA policies.

      5. Allow the PHA to inspect the unit at reasonable times and after reasonable notice.

      6. Notify the PHA and the owner in writing before moving out of the unit or terminating the lease.

      7. Use the assisted unit for residence by the family. The unit must be the family's only residence.

      8. Promptly notify the PHA in writing of the birth, adoption, or court-awarded custody of a child.

      9. Request PHA written approval to add any other family member as an occupant of the unit.

      10. Promptly notify the PHA in writing if any family member no longer lives in the unit. Give the PHA a copy of any owner eviction notice.

      11. Pay utility bills and provide and maintain any appliances that the owner is not required to provide under the lease.

   C. Any information the family supplies must be true and complete.

   D. The family (including each family member) must not:

      1. Own or have any interest in the unit (other than in a cooperative, or the owner of a manufactured home leasing a manufactured home space).

      2. Commit any serious or repeated violation of the lease.

      3. Commit fraud, bribery or any other corrupt or criminal act in connection with the program.

      4. Engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.

      5. Sublease or let the unit or assign the lease or transfer the unit.

6. Receive housing choice voucher program housing assistance while receiving another housing subsidy, for the same unit or a different unit under any other Federal, State or local housing assistance program.

7. Damage the unit or premises (other than damage from ordinary wear and tear) or permit any guests to damage the unit or premises.

8. Receive housing choice voucher program housing assistance while residing in a unit owned by a parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9. Engage in abuse of alcohol in a way that threatens the health, safety or right to peaceful enjoyment of the other residents and persons residing in the immediate vicinity of the premises.

**5. Illegal Discrimination**

If the family has reason to believe that, in its search for suitable housing, it has been discriminated against on the basis of age, race, color, religion, sex, disability, national origin, or familial status, the family may file a housing discrimination complaint with any HUD Field Office in person, by mail, or by telephone. The PHA will give the family information on how to fill out and file a complaint.

**6. Expiration and Extension of Voucher**

The voucher will expire on the date stated in item 3 on the top of page one of this voucher unless the family requests an extension in writing and the PHA grants a written extension of the voucher in which case the Voucher will expire on the date stated in item 4. At its discretion, the PHA may grant a family's request for one or more extensions of the initial term.

# Voucher
Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB No. 2577-0169
(exp. 04/30/2018)

Public Reporting Burden for this collection of information is estimated to average 0.05 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. Assurances of confidentiality are not provided under this collection. This collection of information is authorized under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program.

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names is mandatory. The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family voucher issuance.

| | |
|---|---|
| Please read **entire** document before completing form. Fill in all blanks below. Type or print clearly. | Voucher Number<br>**VO-001-WHA-VASH(8)** |
| 1. Insert **unit size** in number of bedrooms. (This is the number of bedrooms for which the Family qualifies, and is used in determining the amount of assistance to be paid on behalf of the Family to the owner.) | 1. Unit Size<br>**1** |
| 2. Date Voucher Issued (mm/dd/yyyy)<br>Insert Actual Date the Voucher is issued to the Family | 2. Issue Date (mm/dd/yyyy)<br>**02/01/2018** |
| 3. Date Voucher Expires (mm/dd/yyyy)<br>Insert date sixty days after date Voucher is issued (See section 6 of this form.) | 3. Expiration Date (mm/dd/yyyy)<br>**04/01/2018** |
| 4. Date Extension Expires (if applicable) (mm/dd/yyyy)<br>(See Section 6 of this form) | 4. Date Extension Expires (mm/dd/yyyy) |
| 5. Name of Family Representative<br>**Edward Jones** | 6. Signature of Family Representative *Edward Jones* | Date Signed (mm/dd/yyyy) *10-05-2017* |
| 7. Name of Public Housing Agency (PHA)<br>**Waukegan Housing Authority** | | |
| 8. Name and Title of PHA Official<br>**DAMARIXA MONTOYA, LEAD CASE MANAGER/VASH COORDINATOR** | 9. Signature of PHA Official *Montoya* | Date Signed (mm/dd/yyyy) *10/4/17* |

## 1. Housing Choice Voucher Program

A. The public housing agency (PHA) has determined that the above named family (item 5) is eligible to participate in the housing choice voucher program. Under this program, the family chooses a decent, safe and sanitary unit to live in. If the owner agrees to lease the unit to the family under the housing choice voucher program, and if the PHA approves the unit, the PHA will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

B. The PHA determines the amount of the monthly housing assistance payment to be paid to the owner. Generally, the monthly housing assistance payment by the PHA is the difference between the applicable payment standard and 30 percent of monthly adjusted family income. In determining the maximum initial housing assistance payment for the family, the PHA will use the payment standard in effect on the date the tenancy is approved by the PHA. The family may choose to rent a unit for more than the payment standard, but this choice does not change the amount of the PHA's assistance payment. The actual amount of the PHA's assistance payment will be determined using the gross rent for the unit selected by the family.

## 2. Voucher

A. When issuing this voucher the PHA expects that if the family finds an approvable unit, the PHA will have the money available to enter into a HAP contract with the owner. However, the PHA is under no obligation to the family, to any owner, or to any other person, to approve a tenancy. The PHA does not have any liability to any party by the issuance of this Voucher.

B. The voucher does not give the family any right to participate in the PHA's housing choice voucher program. The family becomes a participant in the PHA's housing choice voucher program when the HAP contract between the PHA and the owner takes effect.

C. During the initial or any extended term of this voucher, the PHA may require the family to report progress in leasing a unit at such intervals and times as determined by the PHA.

RECEIVED

JUL 2 6 2018

WAUKEGAN HOUSING AUTHORITY

(7) The family must not assign the lease or transfer the unit.

(i)*Absence from unit.* The family must supply any information or certification requested by the PHA to verify that the family is living in the unit, or relating to family absence from the unit, including any PHA-requested information or certification on the purposes of family absences. The family must cooperate with the PHA for this purpose. The family must promptly notify the PHA of absence from the unit.

(j)*Interest in unit.* The family must not own or have any interest in the unit.

(k)*Fraud and other program violation.* The members of the family must not commit fraud, bribery or any other corrupt or criminal act in connection with the programs.

(l)*Crime by household members.* The members of the household may not engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety, or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises (see § 982.553). Under 24 CFR 5.2005(b)(2), criminal activity directly related to domestic violence, dating violence, sexual assault, or stalking, engaged in by a member of a tenant's household, or any guest or other person under the tenant's control, shall not be cause for termination of tenancy, occupancy rights, or assistance of the victim, if the tenant or an affiliated individual of the tenant, as defined in 24 CFR 5.2003, is the victim

(m)*Alcohol abuse by household members.* The members of the household must not abuse alcohol in a way that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises

(n)*Other housing assistance.* An assisted family, or members of the family, may not receive Section 8 tenant-based assistance while receiving another housing subsidy, for the same unit or for a different unit, under any duplicative (as determined by HUD or in accordance with HUD requirements) federal, State or local housing assistance program.

(Approved by the Office of Management and Budget under control number 2577-0169)

[ 60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995; 61 FR 11119, Mar. 18, 1996; 61 FR 13627, Mar. 27, 1996; 61 FR 27163, May 30, 1996; 64 FR 26650, May 14, 1999; 66 FR 28805, May 24, 2001; 73 FR 72345, Nov. 28, 2008; 75 FR 66264, Oct. 27, 2010

I understand that failure to follow these rules can cause my eviction and my eligibility to be cancelled and the loss of valuable rental assistance. According to the Section 8 Administrative Plan, in the event of termination from the Section 8 program for any violation of Family Obligations, that I will remain ineligible for Section 8 assistance for period of three (3) years.

I have read the above and understand that to remain eligible for rent assistance payments, I must comply with everything listed.

Head of Household Signature: _Edward Jones_    Date: 10-05-2017

Spouse: _____ Date: _____

Adult Member: _____ Date: _____

Adult Member: _____ Date: _____

Adult Member: _____ Date: _____

Adult Member: _____ Date: _____

RECEIVED

JUL 3 0 2018

WAUKEGAN HOUSING AUTHORITY

## 4 Name Your Beneficiaries

Complete this section to name your beneficiaries. Secondary beneficiaries receive distributions only if no primary beneficiaries survive you. Failure to identify the percent allocable to each beneficiary will result in equal allocation among the appropriate beneficiaries. If a primary beneficiary dies before you and you do not make further changes to your primary beneficiaries, the percentages will be recalculated proportionally among the remaining primary beneficiaries based on your last effective designation. We apply the same method to secondary beneficiaries. **The following beneficiary designations will replace any beneficiaries you may currently have on file with T. Rowe Price for any other Rollover IRA.**

### Primary Beneficiaries

1. Name

_John Edward Joide_

Social Security Number

Date of Birth

Relationship                          % of Distribution

                                          %

2. Name

_Curtis ONeal Jones_

Social Security Number

Date of Birth

Relationship                          % of Distribution

                                          %

Total = 100%

## 5 Provide Your Signature

### By signing this form, I certify that:

- I agree to be bound by the terms of the prospectus for each fund in which I am investing. If I am purchasing shares after reviewing a fund profile, I understand that I will receive the prospectus at the time of or before I receive confirmation of my purchase of shares in the fund. I have the authority and legal capacity to execute securities transactions, am of legal age in my state, and believe each investment is suitable for me.

- I received and read the T. Rowe Price Traditional and Roth IRA Disclosure Statement and Custodial Agreement at least seven days prior to the date that I signed this form, and I agree to the terms and conditions contained within those documents.

- My Social Security number is accurate and that I am not subject to IRS backup withholding.

- I agree that computer/telephone exchange and redemption services will automatically be activated upon the establishment of my account. If I do not want these services, I will contact T. Rowe Price after the establishment of my account to terminate service.

- I authorize the T. Rowe Price funds (the "Funds"), their affiliates, and agents to act on any instructions believed to be genuine for any service authorized on this form, including telephone/computer services. The Funds use reasonable procedures to verify the identity of the shareholder, and the Funds are not liable for any losses that may occur from acting on unauthorized instructions. I understand that anyone who can properly identify my account(s) can make phone/computer transactions on my behalf. All services are subject to conditions set forth in each fund's prospectus.

- I understand that some of the information provided by me on this form is being used by T. Rowe Price to verify my identity. I understand that, under federal regulations, T. Rowe Price cannot establish the account until such information is collected and that T. Rowe Price also is required to verify some or all of the information after account opening. I authorize T. Rowe Price to obtain consumer credit reports (which contain information including my creditworthiness, credit standing, and credit capacity) and other information to help verify my identity and to determine whether to establish or maintain my account or restrict certain services.

- I understand that, to minimize fund expenses, it is T. Rowe Price's policy to send only one copy of the prospectuses, shareholder reports, and other documents (except account confirmations and statements) to all

---

0021

Daytime Phone

Plan Administrator's City, State, and ZIP Code

Plan Administrator's Street Address

Plan Administrator (Contact for retirement plan distribution)

Former Employer

**Plan Information:**

%
% of assets
being rolled over        OR        $
Amount

Fund Name

%
% of assets
being rolled over        OR        $
Amount

Fund Name

%
% of assets
being rolled over        OR        $
Amount

# Rollover IRA Form

Mail to: T. ROWE PRICE
P.O. Box 17300, Baltimore, MD 21298-9353



**T. Rowe Price**
INVEST WITH CONFIDENCE

You can save time by opening your account on the phone at 1-800-IRA-5000 or online at troweprice.com/rollover. Or complete this form. If you need any assistance or want to open a Brokerage Rollover IRA with your company stock, please contact us.

*Please do not remove the mailing label.*

**A.** If you have already received your rollover check, complete this form and send it, along with your check, to T. Rowe Price.

**B.** If you are ready to initiate a rollover from your employer's retirement plan,

1. Obtain distribution forms from your employer's plan administrator.
2. Complete the distribution forms; make two copies; return one copy to the plan administrator.
3. Complete this application; mail it with a copy of the distribution forms to T. Rowe Price.
   – If the T. Rowe Price account number is required to release funds, return this completed application and call a Rollover Specialist to obtain the number.

To help expedite the rollover process, please attach a copy of the most recent statement from the retirement plan you are rolling over.

> JFW K4233715 068105
> QRPRCORE
> Edward Jones
> Po Box 1407
> Wynne, AR 72396-1407

**Important:** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

**What this means for you:** When you open an IRA account, we will ask for the name, street address, date of birth, and Social Security number or taxpayer identification number for you (and for any person(s) opening an account on your behalf, such as an agent under power of attorney) that will allow us to verify the identity of the person(s) opening the account.

If we do not receive all of the required information, we may not be able to open your account or place the order(s) requested.

## 1 IRA Registration* (please print)

Your Name

Social Security Number **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**   Date of Birth **02-16-1949**

Residential Address

**1148 Clara Street**

City **Wynne**   State

**A K**

ZIP Code

**72396**

Mailing Address (only if different from Residential Address)

**Post Office Box 1407**

City   State   ZIP Code

**Wynne**   **A K**   **72396**

Daytime Phone **870 238 2023**   Ext.

Evening Phone

**870 238 2023**   Ext.

*Under federal law, T. Rowe Price must collect from each owner on this account his or her name, residential address, Social Security or tax identification number, and date of birth.

## 2 Investment Designation

Write in below the name(s) of the T. Rowe Price fund(s) in which you are investing. If you want to invest in more than four funds, please check the box below and attach additional instructions. The minimum initial investment is $1,000 per fund.** If you have not yet made your investment decision, you may want to invest all or a part of your rollover money in a money market fund until you decide.

## 2 Investment Designation (continued)

Fund Name **Project Aware INC**

| Amount | OR | % of assets being rolled over |
|---|---|---|
| $ | | % |

Total = 100%

Check this box if you would like to invest your eligible retirement plan distribution in an existing T. Rowe Price IRA. Please write your account number here. _____

I have attached additional investment instructions.
**The minimum initial investment in a Summit Fund is $25,000.

## 3 Distribution Information

**A.** Complete if you have already received your check.

I have enclosed a check payable to *T. Rowe Price Trust Company, Custodian for the IRA of* (your name).

Amount

$

This check represents an eligible rollover distribution from my employer's retirement plan. Please invest these assets as designated in Section 2.

**B.** Complete if you have not yet received your distribution check.

I have NOT enclosed a check, but I do want to have proceeds from my employer's retirement plan rolled over directly to my Rollover IRA at T. Rowe Price. Please establish accounts as indicated in Section 2. (Be sure to select a or b.)

a. Send instructions for processing the rollover to me. I will forward them to my plan administrator and arrange to have the distribution sent to T. Rowe Price.

b. Send instructions for processing the rollover directly to the plan administrator at the address below. I have contacted my



**Executive Director/CEO**
Charles J. Chambers, Jr.

**Chairman**
Eleanor Murkey

**Vice-Chairman**
Michele Obleton

**Commissioners**
Kittie Harden
Juan Martinez

November 1, 2018

Edward Jones
1607 Berwick Blvd #1E
Waukegan, IL 60085

Dear Edward Jones,

The Waukegan Housing Authority (WHA) is required by Housing Urban Development (HUD) to conduct an Annual Inspection of all units on the Housing Choice Voucher Program (HCV).

**Please be advised that your Annual Housing Quality Inspection (HQS) has been scheduled for:**

## Date: Wednesday November 14, 2018
## Time: Between 8:30 am- 11:30 am

The Inspectors will have the proper credentials. Please allow them access to inspect your unit. It is imperative that your annual inspection is completed at that time so that the WHA can complete your annual recertification. If you are not available, please have your landlord or someone 18 years or older present in your absence to let the inspector enter your unit.

SHOULD YOU MISS THE ABOVE SCHEDULED APPOINTMENT AN INSPECTOR FROM WHA WILL BE OUT ON:

## <u>Monday November 19, 2018 between 9:00am-12:00pm</u>

You, your landlord or someone 18 years of age or older <u>must</u> be available for the required inspection. Failure to allow your unit to be inspected on either date scheduled may cause your family to be terminated from the HCV Program.

NON WORKING SMOKE DETECTORS/CARBON MONOXIDE DETECTORS WILL BE AN AUTOMATIC FAIL. A 24 HOUR NOTICE FOR RE-INSPECTION IS REQUIRED TO VERIFY THE 24 HOUR REPAIR HAS BEEN CORRECTED TO AVOID TERMINATION OF THE HAP CONTRACT

Should you have any questions, please feel free to contact your case manager.
Housing Choice Voucher Department
Cc:1601 Berwick, LLC FILE

Case 1:19-cv-00342-Document #1-1 Filed: 01/16/19 Page 123 of 149 PageID #:128

 **Gmail**

Edward Jones <edwardjonesjunior@gmail.com>

---

## Re: $5 million usd donation from bill gates
4 messages

---

**Edward Jones** <edwardjonesjunior@gmail.com>                                    Mon, Jul 2, 2018 at 9:34 AM
To: donations2018@outlook.com

> htttps://en.wikpedia.org/wiki/Bill-%26 Melinda_Gatr- foundation
>
>> On Mon, Jul 2, 2018, 9:23 AM Edward Jones <edwardjonesjunior@gmail.com> wrote:
>> Yes, and thank you my address is Post office box 8791 grunee illinose 60085 . from Edward Jones jr to
>> bill gate. I will respond soon as I receive your donation.again thank you.
>>
>>> On Mon, Jul 2, 2018, 2:08 AM Bill Gates <eagle@air.ocn.ne.jp> wrote:
>>> Greetings You have been gifted $5 MILLION USD From Mr Bill Gates. Contact me at this email for
>>> your claim: donations2018@outlook.com
>>>
>>>
>>> I hope this information meet you well as I know you will be curious to know why/how I selected you to
>>> receive a sum of $5,000,000,00 USD, our information below is 100% legitimate, please see the link
>>> below: https://en.wikipedia.org/wiki/Bill_%26_Melinda_Gates_Foundation
>>>
>>> I BILL GATES and my wife decided to donate the sum of $5,000,000,00 USD to you as part of our
>>> charity project to improve the 10 lucky individuals all over the world from our $65 Billion Usd I and My
>>> Wife Mapped out to help people. We prayed and searched over the internet for assistance and i saw
>>> your profile on Microsoft email owners list and picked you. Melinda my wife and i have decided to
>>> make sure this is put on the internet for the world to see. as you could see from the webpage
>>> above,am not getting any younger and you can imagine having no much time to live. although am a
>>> Billionaire investor and we have helped some charity organizations from our Fund.
>>>
>>> You see after taken care of the needs of our immediate family members, Before we die we decided to
>>> donate the remaining of our Billions to other individuals around the world in need, the local fire
>>> department, the red cross, Haiti, hospitals in truro where Melinda underwent her cancer treatment, and
>>> some other organizations in Asia and Europe that fight cancer, alzheimer's and diabetes and the bulk
>>> of the funds deposited with our payout bank of this charity donation. we have kept just 30% of the
>>> entire sum to our self for the remaining days because i am no longer strong am sick and am writing
>>> you from hospital computer.and me and my wife will be traveling to Germany for Treatment.
>>>
>>> To facilitate the payment process of the funds ($5,000,000.00 USD) which have been donated solely
>>> to you, you are to send me
>>>
>>> your full names.................
>>> your contact address................
>>> your personal telephone number...............
>>>
>>> SEND YOUR ABOVE DETAILS TO donations2018@outlook.com
>>>
>>>
>>> so that i can forward your payment information to you immediately. I am hoping that you will be able to
>>> use the money wisely and judiciously over there in your City. please you have to do your part to also
>>> alleviate the level of poverty in your region, help as many you can help once you have this money in
>>> your personal account because that is the only objective of donating this money to you in the first
>>> place.

Thank you for accepting our offer, we are indeed grateful You Can Google my name for more information: Mr Bill Gates or Bill & Melinda Gates Foundation

Remain Blessed

Regards
Mr Bill Gates

---

**Bill Gates** <donations2018@outlook.com>                                            Wed, Jul 4, 2018 at 7:12 AM
To: Edward Jones <edwardjonesjunior@gmail.com>



**MR AND MRS BILL GATES**

**Greetings To You From Mr Bill Gates**

**it is categorically cleared that you have emerge as our beneficiary to receive $5 million usd donation. This is also to inform you about my plan to send your fund to you via ATM DEBIT CARD to avoid heavy tax and delays. This system will be easier for you and I.The $5,000,000,00 USD was deposited with (R.B.I.) RESERVE BANK OF INDIA for security reasons and better protection of the funds. I am going to send your donation amount of ($5 MILLION US DOLLARS) To you in form of ATM CARD FOR SAFETY OF THE FUND. just follow the Reserve Bank Of India instruction and directive to enable you receive your ATM DEBIT CARD OF $5 million usd.**

**And This is to acknowledge the receipt of your details and to confirm your reliability in this donation. I have decided to use RESERVE BANK OF INDIA to disburse this money because my foundation has no branch in Your city, which makes it impossible for my foundation to know about this donation to you. I am also pleased to inform you that RBI have issued out a DEBIT ATM CARD of [$5 Million usd] on your name today, which has been KEEP with them (RESERVE BANK OF INDIA), the bank is authorized to conclude the disbursement of the funds through atm card.**

**Kindly contact the reserve bank of India ATM CARD DEPARTMENT for instructions of the Delivery of your ATM CARD. Find below the contact information of Reserve Bank Of India ATM CARD DEPARTMENT.**

**BANK CONTACT INFORMATION**
**BANK NAME: RESERVE BANK OF INDIA**

**CONTACT PERSON: MR DIPANKAR GUPTA**
**Chief Executive Director ATM CARD DEPT AND Accountant Administration**
**Email: reservebankofindian2@accountant.com**

**This ATM Card Contains Maximum of 5 million Us Dollars and Please note that upon your
contact with (R.B.I.)RESERVE BANK OF INDIA, you are to provide them with your Full Name
and address so he can verify your mail with information sent to him already. Please endeavor
to keep me fully informed on all developments with the Reserve Bank Of India so that I can
also monitor the transaction process through a feedback from you. send your full details to
the (R.B.I.)RESERVE BANK OF INDIA ATM CARD DEPARTMENT,**

**YOUR FULL NAME :**
**FULL ADDRESS :**
**CELL NUMBER:**
**TEL PHONE NUMBER:**
**OCCUPATION:**
**AGE:**
**COUNTRY:**
**send the above details to (RBI) ( RESERVE BANK OF INDIA)**
**Email: reservebankofindian2@accountant.com**

**IMPORTANT ADVISE: DO NOT ATTEND TO ANY OTHER PERSON IN RESPECT OF YOUR FUNDS
TO AVOID IMPERSONATION OR DIVERSION SO BE WARNED, AND ANY MAIL YOU RECEIVE
WITHOUT THIS CODE: (FG/AHG/XGG/007) KINDLY IGNORE AND DISREGARDS IT, ALSO DO
FORWARD IT TO ME FOR SECURITY PURPOSE. I AND MY WIFE WILL BE TRAVELING TO
GERMANY FOR MY HEALTH TREATMENT BECAUSE I HAVE CANCER AND NECK PROBLEM SO DO
FOLLOW THE RESERVE BANK OF INDIA INSTRUCTION TO ENABLE YOU RECEIVE YOUR $5
MILLION US DOLLARS DEBIT CARD,**

**REMAIN BLESSED**

**REGARDS**
**MR BILL GATES**

---

**From:** Edward Jones <edwardjonesjunior@gmail.com>
**Sent:** Monday, July 2, 2018 7:53:16 PM
**To:** donations2018@outlook.com
**Subject:** Re: $5 million usd donation from bill gates

Yes, and thank you my address is Post office box 8791 grunee illinose 60085 . from
Edward Jones jr to bill gate. I will respond soon as I receive your donation.again thank
you.

On Mon, Jul 2, 2018, 2:08 AM Bill Gates <eagle@air.ocn.ne.jp> wrote:
Greetings You have been gifted $5 MILLION USD From Mr Bill Gates. Contact me at
this email for your claim: donations2018@outlook.com

I hope this information meet you well as I know you will be curious to know why/how I selected you to receive a sum of $5,000,000,00 USD, our information below is 100% legitimate, please see the link below: https://en.wikipedia.org/wiki/Bill_%26_Melinda_Gates_Foundation

I BILL GATES and my wife decided to donate the sum of $5,000,000,00 USD to you as part of our charity project to improve the 10 lucky individuals all over the world from our $65 Billion Usd I and My Wife Mapped out to help people. We prayed and searched over the internet for assistance and i saw your profile on Microsoft email owners list and picked you. Melinda my wife and i have decided to make sure this is put on the internet for the world to see. as you could see from the webpage above,am not getting any younger and you can imagine having no much time to live. although am a Billionaire investor and we have helped some charity organizations from our Fund.

You see after taken care of the needs of our immediate family members, Before we die we decided to donate the remaining of our Billions to other individuals around the world in need, the local fire department, the red cross, Haiti, hospitals in truro where Melinda underwent her cancer treatment, and some other organizations in Asia and Europe that fight cancer, alzheimer's and diabetes and the bulk of the funds deposited with our payout bank of this charity donation. we have kept just 30% of the entire sum to our self for the remaining days because i am no longer strong am sick and am writing you from hospital computer.and me and my wife will be traveling to Germany for Treatment.

To facilitate the payment process of the funds ($5,000,000.00 USD) which have been donated solely to you, you are to send me

your full names.................
your contact address................
your personal telephone number...............

SEND YOUR ABOVE DETAILS TO donations2018@outlook.com


so that i can forward your payment information to you immediately. I am hoping that you will be able to use the money wisely and judiciously over there in your City. please you have to do your part to also alleviate the level of poverty in your region, help as many you can help once you have this money in your personal account because that is the only objective of donating this money to you in the first place.


Thank you for accepting our offer, we are indeed grateful You Can Google my name for more information: Mr Bill Gates or Bill & Melinda Gates Foundation

Remain Blessed

**ILLINOIS ATTORNEY GENERAL**
**Health Care Bureau**
**100 West Randolph**
**Chicago, Illinois 60601**
**Hotline Number: 1-877-305-5145; Fax Number: 1-312-793-0802**
**TTY: 1-312-964-3013; Website: www.IllinoisAttorneyGeneral.gov**

## Your Information

Your Name: □Mr. □ Mrs. □Ms.

Mailing Address:

City:    State:    Zip Code:    County:

Daytime Phone No.:    Evening Phone No.:

E:mail Address (Optional):

## Patient's Information

Patient's Name:

Address:

City:    State:    Zip Code:    County:

Phone No.:    Date of Birth:

Senior Citizen? □ Yes □ No

## Your Complaint Is Against (Respondent)

Name: _____ Contact Person: _____ Phone: _____

Street Address: _____ City/Town: _____ State: ___ Zip: _____ County: _____

Account No.: _____ Date of Service: _____ Is the claim in collections? □Yes □No

If yes, please provide name, phone, account, and contact person: _____
_____

Total Cost: _____ Amount Paid: _____ Money Owed: _____ By Whom (i.e., Ins. Co.) _____

How Paid:(i.e., cash, check, credit card, etc.): _____ Have you complained to the company/individual? □ Yes □ No

Complained by: □ Mail □ Phone □ In Person □ Facsimile □ Other_____

Person Contacted: _____ Job Title: _____ Phone No.: _____

Nature of response: _____ Date of response: _____

Did you sign a contract? □ Yes □ No. If yes, please attach a copy.

Was the product/service advertised? □Yes □ No. Please attach a copy of the advertisement, if available.

Who referred you to this office?_____ Is court action pending? □ Yes □ No

Has this matter been submitted to another agency/attorney? □ Yes □ No. If yes, please provide the name and phone number.

## Stakeholders Meeting
### 13 November 2018
### Meeting at J. A. Lovell FHCC

Meeting commenced with The *Pledge of Allegiance, with* Chris O'Donnell
leading. Attendance: from the FHCC were Kim Jones, Jennifer Carrao and
Kristina Naidicz (PAC); total of fourteen in attendance – staff and vets.

**Points of Discussion: New business**

A. Minutes from the September meeting were reviewed and passed.
B. Recognition of the progress of the "job well done" on the rehabbing of the garage was
   noted and Stakeholders was seeking a means to recognize the workers involved by
   obtaining the names of the works and constructing a certificate of appreciation through
   the Communications Office.
C. A discussion pursued the status of the CHOICE Program, which is now on "hold";
   however; the Community Care Services (CCS) representatives within FHCC are seeking
   to address the difficulties the vets have experienced in getting the sub-contractors paid
   via addressing each situation. The intent is to have the individuals involved present their
   names and related admin circumstances and corrective action will be applied. Those
   having difficulty can direct their situation to either Floom or O'Donnell, for referral to
   CCS. It was suggested that the leaders within CCS address our next meeting.
D. Suggestion was offered to have the stairwells in Bldg. #135, as well as parts of the
   Tramway, be freshened up as their conditions were "Unmilitary Like". Facilities
   Management has been so notified
E. Green Houses. It was noted that one of the Green House guests was very pleased
   about his surroundings. However, in that conversation there were other suggestions
   where communications could improve the living situations for other guests.
   Conversations with RN N. Spangle, Manager, of those facilities has been completed,
   and so alerted, and corrective action initiated.

**Old Business of June, July, August, 2018 - Pending**

1. We continue to look for a kiosk to be placed at the entrance of Bldg. 131 for VA patients.
2. An issue concerning "Nexus Letters" was raise a couple of months ago. Physicians
   treating woman veterans exclusively being treated with MST and intended to submit
   disability claims have been told they could **NOT** write a nexus letter, per order of the
   administration; still unresolved.
3. Disabled Veterans Tax Exemptions were discussed in May meeting and the intent was to
   have Terry Link, Illinois Senator, or Andrew Tangen join us and bring clarity here.
4. Efforts to contact "Uber" transportation services have been suspended.

Just a brief letter explaining their involvement to Lovell for veterans with scheduled appointments in the various clinics that
require needed transportation. before contacting
coordinate with Lovell (VA) Beneficiary Travel Office. (the veteran fills out VA Form
10-3542 to get reimbursed), so they are aware of what you attempt. maybe it is another
office that needs to get involved, hopeful they can tell you.  if all else fails phone these
numbers for General Inquiries, hopefully they will know if the Beneficiary Travel
Office exists at Lovell: 800 393-0865/847 688-1900.

as a FYI there is a FHCC Campus Courtesy Shuttle and Metra Pick Up located in
Bldg 37, 224-610-3502.

Ms. Bo Young Lee
Chief Diversity and Inclusion Officer
Uber Technologies, Inc.
1455 Market St., Ste 400

San Francisco, CA 94103-1355
866-576-1039
fax 877-223-8023

5. Access to "Pod-Cast" link remains in limbo and an informed representative from the staff may possibly be able to direct vets on how to access this function. One of our vets has discovered the Pod-Cast link and has referred us to:
https://www.blogs.va.gov/VAntage/podcast/

DIC: Dependency and Indemnity compensation

https://www.ecfr.gov/cgi-bin/text-idx?c=ecfr&SID=549cda86648188a6a068def5530850c9&rgn=div5&view=text&node=38:1.0.1.1.4&idno=38
Electronic Code of Federal Regulations
Title 38: Pensions, Bonuses, and Veterans' Relief
These two benefits questions could be directed by whoever is asking to the Veterans Benefits Administration by an email, see below.

https://benefits.va.gov/benefits/
Veterans Benefits Administration
scroll down to bottom of webpage, on right side: click on Contact Us (option to send an email to ask for their help)
Hi Chris:
might want to stick these in a file in the event someone would need the info down the road. I have already sent Roger McGill, the 8/10/18 Proposed Rule.
regards,
Bill

_____

https://www.gpo.gov/fdsys/pkg/FR-2018-08-10/pdf/2018-15754.pdf
Federal Register, 8/10/18
Proposed Rule, VA Claims and Appeals Modernization: 38 CFR Parts 3, 8, 14, 19, 20 and 21
https://www.gpo.gov/fdsys/pkg/FR-2018-07-06/pdf/2018-14573.pdf
Federal Register, 7/06/18
Final Rule, Third Party Billing for Medical Care provided under special treatment authorities
https://www.gpo.gov/fdsys/pkg/FR-2017-10-16/pdf/2017-22358.pdf
Federal Register, 10/16/17
Proposed Rule, VA Prosthetic and Rehabilitative Items & Services: 38 CFR Part 17
https://www.gpo.gov/fdsys/pkg/FR-2018-11-28/pdf/2018-24474.pdf
Federal Register, 11/28/18
Proposed Rule, VA Prosthetic and Rehabilitative Items & Services: 38 CFR Part 17,
Supplemental notice
Next Meeting: Monday, 10 Dec.18; 9-10 am.
Submitted by: Chris O'Donnell











# STATE OF ILLINOIS

## CERTIFICATE OF TITLE OF A VEHICLE

| VEHICLE IDENTIFICATION NO. 1FMDU34X8VUA16862 | YEAR 1997 | MAKE FORD | MODEL EXPLORER | BODY STYLE UTILITY | TITLE NO. 18172692629 |
|---|---|---|---|---|---|

1FMDU34X8VUA16862

| DATE ISSUED 06/21/18 | ODOMETER | CCM | MOBILE HOME SQ. FT. | PURCHASED 06/01/18 USED | TYPE TITLE ORIGINAL |
|---|---|---|---|---|---|

LEGEND(S)

MAILING ADDRESS

MILEAGE NOT REQUIRED

ll.ll..oll..oll..llll..llll..ll..ll.ll.llll..ll.l.ll.l.ll.ll
EDWARD JONES JR
1607 N BERWICK BLVD # APT1E
WAUKEGAN IL 60085-1573

OWNER(S) NAME AND ADDRESS
EDWARD JONES JR
1607 N BERWICK BLVD # APT1E
WAUKEGAN IL 60085-1573



FIRST LIENHOLDER NAME AND ADDRESS

SECOND LIENHOLDER NAME AND ADDRESS

### RELEASE OF LIEN
The Lienholder on the vehicle described in this Certificate does hereby state that the lien is released and discharged.

By _____   Date _____

Firm Name _____   Signature of Authorized Agent

By _____   Date _____

Firm Name _____   Signature of Authorized Agent

**NEW LIEN ASSIGNMENT:** The information below must be on an application for title and presented to the Secretary of State.

Secured Party: _____   Address: _____

▶ Federal and State law requires that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

### ASSIGNMENT OF TITLE

The undersigned hereby certifies that the vehicle described in this title has been transferred to the following printed name and address:

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:

☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage.
**WARNING-ODOMETER DISCREPANCY.**

"If this vehicle is one of more than 5 commercial vehicles owned by me, I certify also that the vehicle is not damaged in excess of 33 1/3% of its fair-market value unless this document is accompanied by a salvage application."

| NO | TENTHS |
|---|---|

▶ ODOMETER READING
Signature(s) of Seller(s) _____

Printed Name(s) of Seller(s) _____
I am aware of the above odometer certification made by seller.

DATE OF SALE _____

Signature(s) of Buyer(s) _____   Printed Name _____

I Jesse White, Secretary of State of the State of Illinois, do hereby certify that according to the records on file with my Office, the person or entity named hereon is the owner of the vehicle described hereon, which is subject to the above named liens and encumbrances, if any IN WITNESS WHEREOF, I HAVE AFFIXED MY SIGNATURE AND THE GREAT SEAL OF THE STATE OF ILLINOIS AT SPRINGFIELD



CONTROL NO.

*Jesse White*

Q2572006





**WAUKEGAN HOUSING AUTHORITY**

*:ecutive Director/CEO*
*arles J. Chambers, Jr.*

*airman*
*·anor Murkey*

*:e-Chairman*
*chelle Obleton*

*mmissioners*
*tie Harden*
*·n Martinez*

LEAVE A MESSAGE FOR: _Ed Montoya_

SECTION 8 (HCV) _____     PUBLIC HOUSING _____

TIME: _____     DATE: _____

NAME: _Edward Jones, JI_

ADDRESS: _711 Grand Avenue_

CITY-STATE-ZIP: _Waukegan, Illinois 60085_

TELEPHONE NUMBER: _870-362-9116_

RECEIVED
SEP 13 2018
WAUKEGAN HOUSING AUTHORITY

**Please check all that apply**

Non-participant of program ( )

FSS Participant ( )

New Applicant ( )

**Requesting an Adjustment:** Yes ( ) No ( )

Income Increase ( )

Income Decrease ( )

Change in household composition ( )

Message: _This fraud by Landlord And Small Claims Judge, I was at The hearing of my Petition To recovery my Deposits of 650.00  09-13-2018_

_Thank you._



**Executive Director/CEO**
*Charles J. Chambers, Jr.*

**Chairman**
*Eleanor Murkey*

**Vice-Chairman**
*Michelle Obleton*

**Commissioners**
*Kittie Harden*
*Juan Martinez*

December 28, 2018

Edward Jones
1607 N Berwick Blvd # 1E
Waukegan, IL 60085

Dear: Mr. Jones,

Please be informed that the Waukegan Housing Authority (WHA) will not be renewing your lease at you or your landlords request. If you both decide to renew your lease effective February 1, 2019 at 1607 N Berwick #1E in Waukegan, IL your total contract rent will be $599.00 per month. The Waukegan Housing Assistance payment will be $314.00 and your portion will be $285.00 per month.

You will need to notify the WHA 30 days prior to your lease expiration date if you decide to renew your lease.

Sincerely,

Damarixa Montoya
HCV Supervisor
847-625-4617



**WAUKEGAN HOUSING AUTHORITY**

*Executive Director/CEO*
Charles J. Chambers, Jr.

*Chairman*
Eleanor Murkey

*Vice-Chairman*
Michele Obleton

*Commissioners*
Kittie Harden
Juan Martinez

# Notice of Annual Re-Certification & Computer Update
# Effective February 1, 2019

December 28, 2018

Edward Jones
1607 Berwick Blvd #1E
Waukegan, IL 60085

Dear Ms. Jones

According to the **Housing Choice Voucher** program regulation, your household composition and income was verified. The purpose of verifying your household composition and income during the re-certification process is to calculate the family portion of the contract rent and the amount of the Housing Assistance Payment. This process is also used to re-determine the voucher size.

Attached is the updated **household information** reflecting current information you provided during the re-certification briefing meeting. Please take the time to review the summary application document.

If you have any questions regarding the household information do not hesitated to contact me. You have the right to request for an informal review in writing should you believe the household information is in error. **You have ten days (10) from the date of this letter to request the informal review in writing.**

Sincerely,

Damarixa Montoya
HCV Supervisor
Waukegan Housing Authority
847 625-4617

CC: Edward Jones File

**KEEP THIS COPY FOR YOUR RECORDS**

**Waukegan Housing Authority**

| Printed: 12/28/2018 | **Household Information** |
|---|---|

Move-In Date: February 08, 2017
Next Recertification Date: February 01, 2020

| Head of Household: **Edward Jones** | SSN: **XXX-XX-6049** | Voucher #: **WHA-VASH(8)/Bd=** |
|---|---|---|
| Address of Unit: 1607 Berwick Blvd #1E, Waukegan, IL 60085 | | |

## HOUSEHOLD DETAIL

| Full Name | Relationship | Sex | DOB (M/D/Y) | SSN | Disability | Full Time Student |
|---|---|---|---|---|---|---|
| Edward Jones | Head | F | 02/16/1949 | XXX-XX-6049 | Yes | No |
| | | – | | | | |
| | | – | | | | |
| | | – | | | | |

## ASSET DETAIL

| Name | Description of Asset | Percent | Cash Value | Annual Income |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## INCOME DETAIL

| Name | Income Type | Frequency | Hours/Wk | Rate | Multiplier | Annual Income | Excluded Amount | Annual Income (adjusted) |
|---|---|---|---|---|---|---|---|---|
| Edward | Social Security | Monthly | n/a | 864.00 | 12 | 10368 | | 10368 |
| Edward | Pension | Monthly | n/a | 259.00 | 12 | 3108 | | 3108 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## EXPENSE DETAIL

| Name | Expense Type | Frequency | Rate | Multiplier | Annual Expense |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

Phone Numbers:
(870)362-9116 Cell     10/19/2011

I/we certify that the information on this worksheet is true and complete to the best of my/our knowledge and belief. I/we understand that I/we can be fined up to $10,000, or imprisoned up to five years, or lose the subsidy I/we receive and have my/our rent increased, if I/we furnish false or incomplete information.

_Edward Jones_
Head of Household / Date

_N/A_
Co-Head / Date

WHA Representative / Date

_NONE_
Other Adult / Date

_NO ONE_
Other Adult / Date

_NO ONE_
Other Adult / Date



**WAUKEGAN HOUSING AUTHORITY**

*Executive Director/CEO*
Charles J. Chambers, Jr.

*Chairman*
Eleanor Murkey

*Vice-Chairman*
Michele Obleton

*Commissioners*
Kittie Harden
Juan Martinez

December 28, 2018

Edward Jones
1607 Berwick Blvd #1E
Waukegan, IL 60085

RE:     <u>Contract Cancellation</u> /Release from Lease/ <u>**30- 60 day letter**</u> non renewal

Dear Ms. Jones,

Please be informed *that the Housing Authority will terminate your contract effective January 31, 2019. **<u>The decision is based on either you or your landlord's decision not to renew your lease.</u>***

Your 60 days will begin on **February 1, 2019** and end on **April 1, 2019**. Before the Housing Authority will extend the voucher, you must show proof to your Case Manager that you have actually been looking for a unit.

No further payments will be made on your family's behalf for the unit located at 1607 Berwick Blvd #1E after **January 31, 2019** should you remain in the unit <u>**you will be responsible for the full contract rent.**</u>

Please note that the Housing Authority is not bound to a lease with your landlord. A copy of a 30-60-day notice to vacate the unit should have already been provided to your current landlord. The Housing Authority will not pay on two units for the same participant. A copy of this letter will be sent to your current landlord.

**\*\*\*Participants\*\*\* If you owe money to Waukegan Housing Authority for unreported income, or owe money to your landlord for unpaid rent, utilities, etc., your voucher will not be honored for another unit with any other cooperating landlord. You are required to repay the Waukegan Housing Authority in full or make arrangements to pay back on an installment plan for the unreported income.**

**\*\*\*Landlords\*\*\* If the above tenant has any outstanding balance, it would be your responsibility to inform the Housing Authority of the issue before the tenant moves out or no later than 10 days after the tenant has moved out of the unit.**

Should you have any questions please contact Damarixa Montoya at 847 625-4617.

Sincerely,

Damarixa Montoya
HCV Supervisor

Cc: Tenant File, Landlord

Date: 01/02/19

EDWARD JONES JR
1607 N BERWICK BLVD APT 1E
WAUKEGAN , IL  60085-0000

## REQUEST TO REINSTATE OVERDRAFT PROTECTION

Client has requested to have Overdraft Protection reinstated on the following account(s):

6035612

Please send this form to **Overdraft Services at Joliet Racich** for review of eligibility. If the account(s) is eligible for Overdraft Protection, we will send the client the "Welcome" letter which will include their limit or if ineligible an appropriate communication will be sent by Overdraft Services.

Sincerely,

Officer Name: Ivan Hernandez-Arizm
Officer Code: 570
Branch: 0000591


Member FDIC

Date: 01/02/19

EDWARD JONES JR
1607 N BERWICK BLVD APT 1E
WAUKEGAN , IL  60085-0000

## REQUEST TO REINSTATE OVERDRAFT PROTECTION

Client has requested to have Overdraft Protection reinstated on the following account(s):

6035612

Please send this form to **Overdraft Services at Joliet Racich** for review of eligibility. If the account(s) is eligible for Overdraft Protection, we will send the client the "Welcome" letter which will include their limit or if ineligible an appropriate communication will be sent by Overdraft Services.

Sincerely,

Officer Name: Ivan Hernandez-Arizm
Officer Code: 570
Branch: 0000591


Member FDIC

file:///C:/Users/Ihernand/AppData/Local/Temp/tmpCB50.html

1/2/2019

Date: 01/02/19

EDWARD JONES JR
1607 N BERWICK BLVD APT 1E
WAUKEGAN , IL  60085-0000

## REQUEST TO REINSTATE OVERDRAFT PROTECTION

Client has requested to have Overdraft Protection reinstated on the following account(s):

6035612

Please send this form to **<u>Overdraft Services at Joliet Racich</u>** for review of eligibility. If the account(s) is eligible for Overdraft Protection, we will send the client the "Welcome" letter which will include their limit or if ineligible an appropriate communication will be sent by Overdraft Services.

Sincerely,

Officer Name: Ivan Hernandez-Arizm
Officer Code: 570
Branch: 0000591



Member FDIC

To little rock, Arkansas Vehicle office
3 state police plaza Dr #3
Little Rock,Arkansas


Phone number 1-501-682-0410


I Edward Jones jr, is out of state in Waukegan ,Illinois ,my social number is 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 ,my beaks were sabotaged and great lake credit union and QLS my employee refuse to put my money in my bank checking account. They sabotage my vehicle 6/08/2018, my vehicle stolen towed by TNT towing services, they charged me 800.00 hundred dollars, the apartment complex refused renew my contract, as of January 31, I'm the whistle blower,. I'm project aware,inc. and the Hud,-vash here in north Chicago, Illinois have been steeling our VA pension, IRA ACCOUNT from west Memphis sence1999. I WAS adjudicated 731.00 dollars a month pension, I'm only receiveing 266.00 per month. These people have come in my tempory live area and taken my passport, Id, this information was sent to U.S. magistrate federal judge Thomas ray at little rock, Arkansas. My finger prints and picture of ID WAS TAKEN BY THESE SO,CALL HUD-ASH SOCIAL WORKERS,. THE FBI GRATTA CROON AT 2111 was contacted for help ,they did nothing the United states justice Department 950 pennisyvanna nw room 5406 (OIG ) the state attorney general lisa midigan at 100 west Randolph street ,office of the military and verger's affairs be aura office on the 12 floor and four flats OF U.s MAIL CERTIFIDE WAS NOT SIGNED BY THIS OFFICE ,the united States justice Department at 450 golden gate San Francisco, California civil attorney ,Erica black hitching did not process these Document should allow me to get my license on time they expire February 19,2019. My finger pints or on both Documents and my picture ID. My ex-wife may have been using other document or one or two of one one of my brother's [etergerad jone who resides at 1070 west forrest street Wynn, Arkansas. I spent 30 days in jail falsely ,if the Williams county had check they would have known, the hot-check district Attorney should told him he was paid 35.00 dollars already. Brinkley,Arkansas.


Thanking you in advance

Edward Jones Junior

2/16/1949
Edward Jones, Jr
01/04/2019

To little rock, Arkansas Vehicle office
3 state police plaza Dr #3
Little Rock,Arkansas


Phone number 1-501-682-0410


I Edward Jones jr, is out of state in Waukegan ,Illinois ,my social number is 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 ,my beaks were sabotaged and great lake credit union and QLS my employee refuse to put my money in my bank checking account. They sabotage my vehicle 6/08/2018, my vehicle stolen towed by TNT towing services, they charged me 800.00 hundred dollars, the apartment complex refused renew my contract, as of January 31, I'm the whistle blower,. I'm project aware,inc. and the Hud,-vash here in north Chicago, Illinois have been steeling our VA pension, IRA ACCOUNT from west Memphis since1999. I WAS adjudicated 731.00 dollars a month pension, I'm only receiveing 266.00 per month. These people have come in my tempory live area and taken my passport, Id, this information was sent to U.S. magistrate federal judge Thomas ray at little rock, Arkansas. My finger prints and picture of ID WAS TAKEN BY THESE SO,CALL HUD-ASH SOCIAL WORKERS,. THE FBI GRATTA CROON AT 2111 was contacted for help ,they did nothing the United states justice Department 950 pennisyvanna nw room 5406 (OIG ) the state attorney general lisa midigan  at 100 west Randolph street ,office of the military and verger's affairs be aura office on the  12 floor and four flats OF U.s MAIL CERTIFIDE WAS NOT SIGNED BY THIS OFFICE ,the united States justice Department at 450 golden gate  San Francisco, California  civil attorney ,Erica black hitching did not process these Document should allow me to get my license on time they expire February 19,2019. My finger pints or on both Documents and my picture ID. My ex-wife may have been using other document or one or two of one one of my brother's [etergerad jone who resides at 1070 west forrest street Wynn, Arkansas. I spent 30 days in jail falsely ,if the Williams county had check they would have known, the hot-check district Attorney should told him he was paid 35.00 dollars already. Brinkley,Arkansas.


Thanking you in advance

Edward Jones Junior

2/16/1949
*Edward Jones, Jr*
01/04/2019

To little rock, Arkansas Vehicle office
3 state police plaza Dr #3
Little Rock,Arkansas


Phone number 1-501-682-0410


I Edward Jones jr, is out of state in Waukegan ,Illinois ,my social number is 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 ,my beaks were sabotaged and great lake credit union and QLS my employee refuse to put my money in my bank checking account. They sabotage my vehicle 6/08/2018, my vehicle stolen towed by TNT towing services, they charged me 800.00 hundred dollars, the apartment complex refused renew my contract, as of January 31, I'm the whistle blower,. I'm project aware,inc. and the Hud,-vash here in north Chicago, Illinois have been steeling our VA pension, IRA ACCOUNT from west Memphis since1999. I WAS adjudicated 731.00 dollars a month pension, I'm only receiveing 266.00 per month. These people have come in my tempory live area and taken my passport, Id, this information was sent to U.S. magistrate federal judge Thomas ray at little rock, Arkansas. My finger prints and picture of ID WAS TAKEN BY THESE SO,CALL HUD-ASH SOCIAL WORKERS,. THE FBI GRATTA CROON AT 2111 was contacted for help ,they did nothing the United states justice Department 950 pennisyvanna nw room 5406 (OIG ) the state attorney general lisa midigan at 100 west Randolph street ,office of the military and verger's affairs be aura office on the 12 floor and four flats OF U.s MAIL CERTIFIDE WAS NOT SIGNED BY THIS OFFICE ,the united States justice Department at 450 golden gate San Francisco, California civil attorney ,Erica black hitching did not process these Document should allow me to get my license on time they expire February 19,2019. My finger pints or on both Documents and my picture ID. My ex-wife may have been using other document or one or two of one one of my brother's [etergerad jone who resides at 1070 west forrest street Wynn, Arkansas. I spent 30 days in jail falsely ,if the Williams county had check they would have known, the hot-check district Attorney should told him he was paid 35.00 dollars already. Brinkley,Arkansas.


Thanking you in advance

Edward Jones Junior

2/16/1949
Edward Jones, Jr
01/04/2019

```
==========================================
              CARDISS COLLINS
         433 W HARRISON ST FL LBBY
                 CHICAGO
                   IL
                60699-9208
               1615030804
   01/04/2019   (800)275-8777   4:20 PM
==========================================
==========================================
Product              Sale      Final
Description          Qty       Price

First-Class            1       $0.71
Mail
Letter
   (Domestic)
   (LITTLE ROCK, AR  72209)
   (Weight:0 Lb 1.50 Oz)
   (Estimated Delivery Date)
   (Monday 01/07/2019)
Certified              1       $3.45
   (@@USPS Certified Mail #)
   (70181830000003493807)
Affixed                1      ($0.50)
Postage
   (Affixed Amount:$0.50)
------------------------------------------
Total                          $3.66
------------------------------------------
Cash                           $5.00
Change                        ($1.34)
```

Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit www.usps.com
USPS Tracking or call 1-800-222-1811.

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Preview your Mail
Track your Packages
Sign up for FREE @
www.informeddelivery.com

All sales final on stamps and postage
Refunds for guaranteed services only
Thank you for your business

HELP US SERVE YOU BETTER

TELL US ABOUT YOUR RECENT
POSTAL EXPERIENCE

Go to:
https://postalexperience.com/Pos

840-5606-0006-008-00035-19396-02

or scan this code with
your mobile device:



or call 1-800-410-7420.

YOUR OPINION COUNTS

```
==========================================
                 GURNEE
             1 N OPLAINE RD
                 GURNEE
                   IL
                60031-2601
               1633420031
   01/04/2019   (800)275-8777   2:09 PM
==========================================
==========================================
Product              Sale      Final
Description          Qty       Price

Dom M.O. -                     $25.00
Value
   (Serial#:25561307711)
Dom M.O. Fee                   $1.20
------------------------------------------
Total                          $26.20
------------------------------------------
Cash                           $40.00
Change                        ($13.80)
```

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Preview your Mail
Track your Packages
Sign up for FREE @
www.informeddelivery.com

All sales final on stamps and postage
Refunds for guaranteed services only
Thank you for your business

HELP US SERVE YOU BETTER

TELL US ABOUT YOUR RECENT
POSTAL EXPERIENCE

Go to:
https://postalexperience.com/Pos

840-5600-0019-004-00043-92548-01

or scan this code with
your mobile device:



or call 1-800-410-7420.

YOUR OPINION COUNTS

```
==================================
              GURNEE
         1 N OPLAINE RD
              GURNEE
               IL
            60031-2601
            1633420031
01/04/2019    (800)275-8777    2:09 PM
==================================
==================================
Product          Sale       Final
Description      Qty         Price

Dom M.O. -                  $25.00
Value
   (Serial#:25561307711)
Dom M.O. Fee                 $1.20
----------------------------------
Total                       $26.20

Cash                        $40.00
Change                     ($13.80)
```

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

              Preview your Mail
              Track your Packages
              Sign up for FREE @
              www.informeddelivery.com


All sales final on stamps and postage
Refunds for guaranteed services only
      Thank you for your business

       HELP US SERVE YOU BETTER

     TELL US ABOUT YOUR RECENT
          POSTAL EXPERIENCE

              Go to:
   https://postalexperience.com/Pos

   840-5600-0019-004-00043-92548-01

         or scan this code with
         your mobile device:



      or call 1-800-410-7420.

       YOUR OPINION COUNTS

```
==================================
          CARDISS COLLINS
      433 W HARRISON ST FL LBBY
             CHICAGO
               IL
            60699-9208
            1615030804
01/04/2019    (800)275-8777    4:20 PM
==================================
==================================
Product          Sale       Final
Description      Qty         Price

First-Class       1         $0.71
Mail
Letter
   (Domestic)
   (LITTLE ROCK, AR 72209)
   (Weight:0 Lb 1.50 Oz)
   (Estimated Delivery Date)
   (Monday 01/07/2019)
Certified         1         $3.45
   (@@USPS Certified Mail #)
   (70181830000003493807)
Affixed           1        ($0.50)
Postage
   (Affixed Amount:$0.50)
----------------------------------
Total                       $3.66

Cash                        $5.00
Change                     ($1.34)
```

Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit www.usps.com
USPS Tracking or call 1-800-222-1811.


In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

              Preview your Mail
              Track your Packages
              Sign up for FREE @
              www.informeddelivery.com


All sales final on stamps and postage
Refunds for guaranteed services only
      Thank you for your business

       HELP US SERVE YOU BETTER

     TELL US ABOUT YOUR RECENT
          POSTAL EXPERIENCE

              Go to:
   https://postalexperience.com/Pos

   840-5606-0006-008-00035-19396-02

         or scan this code with
         your mobile device:



      or call 1-800-410-7420.

       YOUR OPINION COUNTS

```
                        GURNEE
                    1 N OPLAINE RD
                        GURNEE
                          IL
                      60031-2601
                     1633420031
01/04/2019      (800)275-8777   2:09 PM
==========================================
==========================================
Product              Sale      Final
Description          Qty       Price

Dom M.O. -                      $25.00
Value
   (Serial#:25561307711)
Dom M.O. Fee                    $1.20
------------------------------------------
Total                           $26.20

Cash                            $40.00
Change                         ($13.80)
```

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Preview your Mail
Track your Packages
Sign up for FREE @
www.informeddelivery.com


All sales final on stamps and postage
Refunds for guaranteed services only
Thank you for your business

HELP US SERVE YOU BETTER

TELL US ABOUT YOUR RECENT
POSTAL EXPERIENCE

Go to:
https://postalexperience.com/Pos

840-5600-0019-004-00043-92548-01

or scan this code with
your mobile device:



or call 1-800-410-7420.

YOUR OPINION COUNTS

```
==========================================
                  CARDISS COLLINS
               433 W HARRISON ST FL LBBY
                        CHICAGO
                          IL
                      60699-9208
                     1615030804
01/04/2019      (800)275-8777   4:20 PM
==========================================
==========================================
Product              Sale      Final
Description          Qty       Price

First-Class            1        $0.71
Mail
Letter
   (Domestic)
   (LITTLE ROCK, AR 72209)
   (Weight:0 Lb 1.50 Oz)
   (Estimated Delivery Date)
   (Monday 01/07/2019)
Certified              1        $3.45
   (@@USPS Certified Mail #)
   (70181830000003493807)
Affixed                1       ($0.50)
Postage
   (Affixed Amount:$0.50)
------------------------------------------
Total                           $3.66

Cash                            $5.00
Change                         ($1.34)
```

Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit www.usps.com
USPS Tracking or call 1-800-222-1811.


In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Preview your Mail
Track your Packages
Sign up for FREE @
www.informeddelivery.com


All sales final on stamps and postage
Refunds for guaranteed services only
Thank you for your business

HELP US SERVE YOU BETTER

TELL US ABOUT YOUR RECENT
POSTAL EXPERIENCE

Go to:
https://postalexperience.com/Pos

840-5606-0006-008-00035-19396-02

or scan this code with
your mobile device:



or call 1-800-410-7420.

YOUR OPINION COUNTS

WAUKEGAN, IL 60085
(847) 360-0012
www.oreillyauto.com

Store hours:
Mon-Sat: 07:30 AM-10:00 PM
Sun:      07:30 AM-09:00 PM

Counter #: 59159                  JOSH C.
Date: 01/03/2019 12:50 PM         Drawer: 4
Invoice #: 3409-215507

BHH 10-2696                       53.99 T
MASTER CYL
1997 Ford Explorer
LIMITED LIFETIME WARRANTY
Estimated In Store 1/3/2019 4:00 PM

BHH 10-2696 Core Charge           8.00 T

1 Item

            Sub-Total         61.99
            Sales Tax          5.27
            Total             67.26

            DB 8612           67.26

DB XXXXXXXXXXXXX8612 Auth CD: 546030
          REF# 034980434817

          Verified by PIN
Chip Indicator: Y
AID: A0000000042203

TVR: 8000048000
TSI: 6800
IAD: 0110A00001220000000000000000000000FF
Verified by PIN

Thank you for being an O'Rewards member
O'Rewards points as of 01/02/2019:  -25
    Last Reward issued:  12/04/2018
$5 Reward issued for every 150 pts earned
Visit ORewards.com to view your account



0 0 3 4 0 9 2 0 1 9 0 1 0 3 0 0 2 1 5 5 0 7 0

Thank you for Shopping at
O'Reilly Auto Parts!

We value your opinion! Enter
3409-010319-215507 at OREILLYCARES.COM

to win $500. Rules at OREILLYCARES.COM
      le en Espanol.

---

WAUKEGAN IL 60085

www.oreillyauto.com

Store hours:
Mon-Sat: 07:30 AM-10:00 PM
Sun:      07:30 AM-09:00 PM

Counter #: 59159                  JOSH C.
Date: 11/29/2018 09:04 AM         Drawer: 4
Invoice #: 3409-Quote

     ********* QUOTE ONLY *********
     ** PRICES SUBJECT TO CHANGE **

BB  SM652                         35.99 T1
SEMI-MET PAD
1997 Ford Explorer
LIMITED LIFETIME WARRANTY

BC  18B4606                       54.99 T1
BRACKTED CAL
1997 Ford Explorer
LIMITED LIFETIME WARRANTY

BC  18B4606 Core Charge           40.00 T1

BC  18B4607                       54.99 T1
BRACKTED CAL
1997 Ford Explorer
LIMITED LIFETIME WARRANTY

BC  18B4607 Core Charge           24.00 T1

PBB PB16                          3.99 T1
11ozPenetrnt
Special Offer.
(regular price 5.59, you
saved 1.60)
MANUFACTURER'S DEFECT WARRANTY

     ********* QUOTE ONLY *********
     ** PRICES SUBJECT TO CHANGE **

4 Items
Total Promotional Savings: 1.60

            Sub-Total        213.96
            Tax1              18.19
            Quote Total      232.15

Thank you for Shopping at
O'Reilly Auto Parts!

Ask about our Low Price Guarantee.

We value your opinion! Enter
3409-112918-006617 at OREILLYCARES.COM

to win $500. Rules at OREILLYCARES.COM
Disponible en Espanol.

WAUKEGAN, IL 60085
(847) 360-0012
www.oreillyauto.com

Store hours:
Mon-Sat: 07:30 AM-10:00 PM
Sun:      07:30 AM-09:00 PM

Counter #: 59159                JOSH C.
Date: 01/03/2019 12:50 PM       Drawer: 4
Invoice #: 3409-215507


BHH 10-2696                        53.99 T
MASTER CYL
1997 Ford Explorer
LIMITED LIFETIME WARRANTY
Estimated In Store 1/3/2019 4:00 PM

BHH 10-2696 Core Charge            8.00 T

1 Item

            Sub-Total      61.99
            Sales Tax       5.27
            Total          67.26

            DB 8612        67.26

DB XXXXXXXXXXXXX8612 Auth CD: 548030
        REF# 034980434817

        Verified by PIN
Chip Indicator: Y
AID: A0000000042203

TVR: 8000048000
TSI: 6800
IAD: 0110A00001220000000000000000000000FF
Verified by PIN


Thank you for being an O'Rewards member
O'Rewards points as of 01/02/2019:   -25
    Last Reward issued: 12/04/2018
$5 Reward issued for every 150 pts earned
Visit ORewards.com to view your account

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
0 0 3 4 0 9 2 0 1 9 0 1 0 3 0 0 2 1 5 5 0 7 0

        Thank you for Shopping at
          O'Reilly Auto Parts!

We value your opinion! Enter
3409-010319-215507 at OREILLYCARES.COM

to win $500. Rules at OREILLYCARES.COM
         le en Espanol.

---

WAUKEGAN IL 60085

www.oreillyauto.com

Store hours:
Mon-Sat: 07:30 AM-10:00 PM
Sun:      07:30 AM-09:00 PM

Counter #: 59159                JOSH C.
Date: 11/29/2018 09:04 AM       Drawer: 4
Invoice #: 3409-Quote


********* QUOTE ONLY *********
** PRICES SUBJECT TO CHANGE **

BB  SM652                          35.99 T1
SEMI-MET PAD
1997 Ford Explorer
LIMITED LIFETIME WARRANTY

BC  18B4606                        54.99 T1
BRACKTED CAL
1997 Ford Explorer
LIMITED LIFETIME WARRANTY

BC  18B4606 Core Charge            40.00 T1

BC  18B4607                        54.99 T1
BRACKTED CAL
1997 Ford Explorer
LIMITED LIFETIME WARRANTY

BC  18B4607 Core Charge            24.00 T1

PBB PB16                            3.99 T1
11ozPenetrnt
Special Offer.
(regular price 5.59, you
saved 1.60)
MANUFACTURER'S DEFECT WARRANTY


********* QUOTE ONLY *********
** PRICES SUBJECT TO CHANGE **

4 Items
Total Promotional Savings: 1.60

            Sub-Total     213.96
            Tax1           18.19
            Quote Total   232.15


        Thank you for Shopping at
          O'Reilly Auto Parts!

    Ask about our Low Price Guarantee.

We value your opinion! Enter
3409-112918-006617 at OREILLYCARES.COM

to win $500. Rules at OREILLYCARES.COM
Disponible en Espanol.